**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| RANITA DAILEY, JOHN DALEY II, **ERIC HALL and DOMINIC POGGI,** on behalf of themselves and all other persons similarly situated, | ) ) ) ) | |
| | ) | Case No. 11 C 5685 |
| Plaintiffs, | ) ) | Judge Chang |
| v. | ) ) | Magistrate Judge Mason |
| GROUPON, INC., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
RENEWED MOTION FOR CLASS CERTIFICATION**

Douglas M. Werman –dwerman@flsalaw.com
Maureen A. Salas- msalas@flsalaw.com
David E. Stevens- dstevens@flsalaw.com
Sarah J. Arendt- sarendt@flsalaw.com
Werman Law Office, P.C.
77 W. Washington, Suite 1402
Chicago, IL 60602
(312) 419-1008

Jamie G. Sypulski – jsypulski@sbcglobal.net
Law Office Jamie Golden Sypulski
150 North Michigan Avenue
Suite 1000
Chicago, Illinois 60601
(312) 360-0960

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................... 1

II.    STATEMENT OF FACTS ................................................................................. 2

    A.  Class Representative's Employment With Defendant…................................ 2

    B.  Groupon's Common Compensation Policies For All Account Representatives ........... 4

        1.  Groupon's March 2011 Decision To Pay All Account Representatives Overtime Pay ................................................................................. 4

        2.  Groupon's August, 2011 Decision to Stop Paying All Account Representatives Overtime Pay ................................................................................. 6

    C.  Groupon's Common Classification Of All Account Representatives As Either Non- Exempt Or Exempt ................................................................................. 7

    D.  All Account Representatives Perform The Same Primary Job Duty:  Sales ............... 9

        1.  All Account Representatives Receive the Same Sales Training..................... 10

        2.  Groupon Has One Job Description For the 'Account Representative' Position ................................................................................. 12

        3.  The Job Performance Of All Account Representatives Is Based On The Same Sales Metrics ................................................................................. 12

        4.  The Primary Job Duty Of Sales Reps Is Sales ................................................ 13

            (i)  The Perfect Pipeline ......................................................................... 14

            (ii)  The Cold Call ................................................................................... 15

            (iii)  The Boiler Room................................................................................ 16

            (iv)  The Duties That Sales Reps Do Not Perform ................................... 18

            (v)  The Sale ........................................................................................... 20

        5.  Groupon's Sales Process Survey ....................................................... 22

III.    PROPOSED CLASS DEFINITIONS .............................................................. 24

IV.  ARGUMENT .................................................................................................................. 24

A. Class Certification Standard……........................................................................ 24

B. Plaintiffs' Meet the Rule 23 Requirements For Class Certification Of the IMWL
Claims……. ......................................................................................................... 25

1. Rule 23(a)(1):  The Class Is Sufficiently Numerous ...................................... 25

2. Rule 23(a)(2):  Issues of Liability Are Common of the Class ...................... 25

3. Rule 23(a)(3):  Plaintiffs' Claims Are Typical of the Class ........................... 29

4. Rule 23(a)(4):  Plaintiffs and Their Counsel Will Adequately Represent
the Class ...................................................................................................... 29

5. This Action Satisfies the Requirements of Rule 23(b)(3) .............................. 30

a. Common Questions On Liability Predominate .................................... 31

b. Superiority of Class Action Method .................................................... 33

V.  CONCLUSION ............................................................................................................. 35

## <u>TABLE OF AUTHORITIES</u>

## <u>CASES</u>

*Amchem Products, Inc. v. Windsor,*
    521 U.S. 591 (1997) ................................................................................. 31, 33

*Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds,*
    ___ U.S. ___, 133 S. Ct. 1184 (2013) .............................................. 24, 25, 30

*Butler v. Sears, Roebuck and Co.,*
    Nos. 11-8029, 12-8030, 2013 U.S. App. LEXIS 17748 (7th Cir. Aug. 22, 2013) .... *passim*

*Carnegie v. Household Int'l, Inc.,*
    376 F.3d 656 (7th Cir. 2004) ......................................................................... 33

*Comcast Corp. v. Behrend,*
    ___ U.S. ___, 133 S. Ct. 1426 (2013) ............................................... 31, 32, 33

*Curry v. Kraft Foods Global, Inc.,*
    No. 10 CV 1288, 2011 U.S. Dist. LEXIS 102510 (N.D. Ill. Sept. 12, 2011) ................... 34

*De La Fuente v. Stokely-Van Camp, Inc.,*
    713 F.2d 225 (7th Cir. 1983) ......................................................................... 29

*Demos v. City of Indianapolis,*
    302 F.3d 698 (7th Cir. 2002) ......................................................................... 26

*Driver, et al. v. AppleIllinois, LLC, et al.,*
    265 F.R.D. 293 (N.D. Ill. 2010) .................................................................... 25

*Gaspar v. Linvatec Corp.,*
    167 F.R.D. 51 (N.D. Ill. 1996) ...................................................................... 29

*General Tele. Co. Of Southwest v. Falcon,*
    457 U.S. 147 (1982) .................................................................................. 24, 25

*Haschak v. Fox & Hound Rest. Grp., et al.,*
    No. 10 C 8023, 2012 U.S. Dist. 162476 (N.D. Ill. Nov. 14, 2012) ................................. 29

*Healy v. International Brotherhood of Elec. Workers,*
    No. 11 C 8892, 2013 U.S. Dist. LEXIS 119102 (N.D. Ill. Aug. 22, 2013) ...................... 25

*Hill v. Tangherlini,*
    724 F.3d 965 (7th Cir. 2013) ......................................................................... 26

*In re Inter-Op Hip Prosthesis Liability Litigation*,
    204 F.R.D. 330 (N.D. Ohio 2001) .................................................................................. 31

*In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*,
    No. 10-4188, 2013 U.S. App. LEXIS 14519 (6th Cir. July 18, 2013) ............................ 32

*Jamie S. v. Milwaukee Pub. Schs.*,
    668 F.3d 481 (7th Cir. 2012) ........................................................................................... 25

*Johnson v. Pinstripes, Inc.*,
    12 C 1018, 2013 U.S. Dist. LEXIS 138253 (N.D. Ill. Sept. 26, 2013)............................ 26

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ............................................................................ 24, 28, 29

*Kennedy v. Commonwealth Edison Co.*,
    410 F.3d 365 (7th Cir. 2005) ........................................................................................... 27

*Kernats v. Comcast*,
    Nos. 09 C 3368 and 09 C 4305, 2010 U.S. Dist. LEXIS 112071
    (N.D. Ill. Oct. 20, 2010).................................................................................................. 24

*Krueger v. New York Tel. Co.*,
    163 F.R.D. 433 (S.D.N.Y. 1995) .................................................................................... 29

*Ladegaard v. Hard Rock Concrete Cutters, Inc.*,
    No. 00 C 5755, 2000 U.S. Dist. Lexis 17832 (N.D. Ill. Dec. 1, 2000)................ 30, 34, 35

*Leyva v. Medline Indust., Inc.*,
    716 F.3d 510 (9th Cir. 2013) ........................................................................................... 32

*Martens v. Smith Barney, Inc.*,
    181 F.R.D. 243 (S.D.N.Y. 1998) .................................................................................... 29

*Messner v. NorthShore Univ. Health Sys.*,
    699 F.3d 802 (7th Cir. 2012) ........................................................................................... 31

*Murray v. GMAC Mortgage Corp.*,
    434 F.3d 948 (7th Cir. 2006) ........................................................................................... 34

*Nielsen v. Greenwood*,
    No. 91 C 6537, 1996 U.S. Dist. LEXIS 14441 (N.D. Ill. Oct. 1, 1996) ......................... 30

*Piscione v. Ernst & Young*, L.L.P.,
    171 F.3d 527 (7th Cir. 1999) ........................................................................................... 26

*Reiseck v. Universal Commc'ns of Miami, Inc.,*
   591 F.3d 101 (2d Cir. 2010)..................................................................... 28

*Retired Chicago Police Ass'n v. City of Chicago,*
   7 F.3d 584 (7th Cir. 1993) ....................................................................... 24

*Roach v. T.L. Cannon Corp.,*
   No. 13-3070, ECF No. 1-1 (2d Cir. Aug. 15, 2013) ......................................... 32

*Roach v. T.L. Cannon Corp.,*
   No. 3:10 Civ. 0591 (TJM), 2013 U.S. Dist. LEXIS 45373 (N.D.N.Y. Mar. 29, 2013).... 32

*Robles v. Corporate Receivables, Inc.,*
   220 F.R.D. 306 (N.D.Ill. 2004)................................................................. 30

*Roe-Midgett v. CC Servs., Inc.,*
   04 CV 4051 DRH, 2006 WL 839443 (S.D. Ill. Mar. 29, 2006) ...................................... 26

*Rosario v. Livaditis,*
   963 F.2d 1013 (7th Cir. 1992) ........................................................... 26, 29

*Shaw v. Prentice Hall Computer Pub., Inc.,*
   151 F.3d 640 (7th Cir.1998) ..................................................................... 26

*Spano v. Boeing Co.,*
   633 F.3d 574 (7th Cir. 2011) ................................................................... 26

*Swanson v. Am. Consumer Indus.,*
   415 F.2d 1326 (7th Cir. 1966) ................................................................... 25

*Szabo v. Bridgeport Machines, Inc.,*
   249 F.3d 672 (7th Cir. 2001) ................................................................... 24

*Wal-Mart Stores, Inc., v. Dukes,*
   131 S. Ct. 2541 (2011).................................................................... 24, 25

*Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.,*
   12-3176, 2013 U.S. App. LEXIS 13842 (10th Cir. July 9, 2013) ................................... 32

## STATUTES AND RULES

Fair Labor Standards Act, 29 U.S.C. §216(b).................................................... 25

29 C.F.R. §778.117 ..................................................................................... 4

Illinois Minimum Wage Law, 810 ILCS 105/1 *et seq.* ......................................................... *passim*

Illinois Minimum Wage Law, 820 ILCS 105/4a(2)(E) ................................................................ 26

Fed. R. Civ. P. 23 ............................................................................................................. 25, 33

Fed. R. Civ. P. 23(a)(1) ........................................................................................................... 25

Fed. R. Civ. P. 23(a)(2) ........................................................................................................... 25

Fed. R. Civ. P. 23(a)(3) ........................................................................................................... 29

Fed. R. Civ. P. 23(a)(4) ........................................................................................................... 29

Fed. R. Civ. P. 23(b)(3) ........................................................................................... 30, 31, 32, 34

Fed. R. Civ. P. 23(f) ................................................................................................................. 32

Fed. R. Civ. P. 23(g) ................................................................................................................ 30

## MISCELLANEOUS AUTHORITIES

7AA C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 1778 ......................... 31

I.      **INTRODUCTION**

"Overtime is for bus boys."

— Andrew Mason, CEO, Groupon, Inc., E-mail dated August 19, 2011[1]


Overtime *is* for busboys: it is *also* for inside sales employees.  Plaintiffs, and all other Account Representatives, were inside sales people, non-exempt, and required to be paid overtime.

Accordingly, whether Defendant can establish – for it bears the burden of proof – that its inside sales employees were exempt under federal and state overtime laws is the central question for the merits.

The question that this motion raises is whether those exemption issues on the merits can be resolved on a class basis:  they can.  Indeed, the ultimate issue of this lawsuit, whether Sales Reps are exempt or non-exempt, is the very issue that Groupon itself answered "class wide" by changing the overtime status of *all* Sales Reps from exempt to non-exempt, and back again.  That common classification of Account Representatives for overtime is proof positive that Groupon treats all Account Representatives, Plaintiffs and the proposed Class, the same:

- prior to April 1, 2011, Groupon *did not pay any* Account Representatives overtime;

- beginning on April 1, 2011, Groupon *began paying all* Account Representatives overtime;

- beginning on August 23, 2011, Groupon *stopped paying all* Account Representatives overtime.

---

[1] Ex. 1, GRP57988. All cited documents are attached to the authenticating Declaration of Douglas M. Werman and are appended thereto as part of Plaintiffs' Evidentiary Appendix, filed contemporaneously with Plaintiffs' motion for class certification. All attachments or group exhibits to Plaintiffs' Evidentiary Appendix have been sequentially numbered in bates stamp order to allow for a reference to a specific page location.

So while Groupon's overtime policy took a few U-turns, whichever way it was headed it always applied to *all* Account Representatives, the class Named Plaintiffs seek to represent.

As our Court of Appeals recently held, "[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings," class certification is proper. *Butler v. Sears, Roebuck and Co.,* Nos. 11-8029, 12-8030, 2013 U.S. App. LEXIS 17748, at *13-14 (7th Cir. Aug. 22, 2013).

Because common issues are present here, because those common issues will determine liability, and because those issues are amenable to resolution on a class basis, this Court must grant class certification.

## II.    STATEMENT OF FACTS

"███████████████████████████████████████████
████████████████████."

– Groupon Characterization of Sales Reps to City Planners[2]


### A.    Class Representatives' Employment With Defendant

Defendant Groupon is a 'deal of the day' website offering its customers discounted coupons for goods and services within a given local market. Ex. 1, GRP00548-GRP00551 (2010 Training Manual). Merchants agree to feature their goods or services at a discount in exchange for advertising on the Groupon website. "GROUPON Works Grow Your Business Get new customers and grow your business by selling on Groupon. See why thousands of businesses have succeeded advertising on Groupon." Groupon Website, Chicago market, at http://www.groupon.com/browse/chicago (visited Sept. 29, 2013).

---

[2] Ex. 1, GRP196 (City Manager Handbook).

Named Plaintiffs Ranita Dailey, John Daley, and Dominic Poggi were employed by Groupon as inside sales persons known as "Account Representatives" or "Account Executives."[3] Answer Second Amd. Compl., ¶¶19, 23 (ECF No. 99) (Because Groupon most often used the term "Sales Rep" in its training materials and policy documents when referring to its inside sales force, Plaintiffs use that term or "Account Representative.")  Sales Reps were responsible for "cold calling" merchants within a geographic market, selling those merchants on the benefits of offering discounted coupons to Groupon customers, and securing commitments from those merchants on Groupon deals. Ex. 1, GRP00548-GRP00551 (2010 Training Manual) ("The job is an inside sales job and the phone is your best friend."; "What this means is that you need to "pound the phones.") *see also infra,* § II.D.4(ii). While Groupon and a merchant would enter into a "contract" for a particular deal, the decision to actually run that deal was made by City Planners and other management level employees at some time in the future, as part of the Groupon "Perfect Pipeline." *See infra,* § II.D.4(v), text at n.34 & 35.  At the time the merchant entered into the agreement with Groupon, the merchant had no understanding when its Groupon deal would run, or if it would run at all.  *Id.*  Indeed, Sales Reps are trained that they cannot make a firm commitment with a merchant that any Groupon deal will actually run. *Id.*

In performing their sales activities for Groupon, Account Representatives worked more than 40 hours in one or more individual workweeks.[4] Ex. 1, GRP10320-GRP10321 (e-mail from

---

[3] The Account Executive performs the same duties as the Account Representative, but has more experience and has attained a level of sales performance that merits an increased base salary. Ex. 1, GRP 160-161; GRP 173-174.

[4] *See also* Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶4; Carney Decl., ¶40; Hall Decl., ¶4; Hassey Decl., ¶4; Keohane Decl., ¶4; Kukuy Decl., ¶4; Letellier Decl., ¶4; Lonze Decl., ¶4; McNeer Decl., ¶4; Moscardelli Decl., ¶4; Noone Decl., ¶4; Pass Decl., ¶4; Pearson Decl., ¶4; Perry Decl., ¶4; Poggi Decl., ¶4; Ropers Decl., ¶4; Schlader Decl., ¶4; Sprague Decl., ¶4; Suh Decl., ¶4; Wills Decl., ¶4; *see also,* Ex. 4, Noone Dep., 70:20-22;

Bob Lopez, Divisional Sales Manager, stating that employment as a Sales Rep "is definitively not a 9-5 job …").

**B.    Groupon's Common Compensation Policies For All Account Representatives**

Prior to March 20, 2011, Groupon uniformly paid all Account Representatives on a salary plus commission basis for all time worked: Groupon did not pay Account Representatives overtime.  Answer Second Amd. Compl., ¶3 (ECF No. 99).

Between March 20, 2011, and August 23, 2011, Groupon paid Account Representatives overtime pay.  Answer Second Amd. Compl., ¶¶4-5 (ECF No. 99).  During this time period, Groupon uniformly calculated Plaintiffs' and other Account Representatives' overtime pay as follows:

$$\text{Salary}/2080 \text{ hours} = \text{Regular Rate}$$
$$\text{Regular Rate} * 1.5 = \text{Overtime Rate}$$

Answer Second Amd. Compl., ¶5 (ECF No. 99).  Thus, between March 20, 2011, and August 23, 2011, Groupon did not include the earned commissions of Sales Reps in calculating their regular rate of pay for overtime purposes.  *Id.*, at ¶¶ 4-8.[5]

After August 23, 2011, Defendant uniformly stopped paying Sales Reps time and one-half for time worked over 40 hours in a workweek, and again began paying them a base salary plus commission for all time worked.  Answer Second Amd. Compl., ¶8 (ECF No. 99); Ex. 1, GRP54394, GRP54449.

**1.    Groupon's March 2011 Decision To Pay All Account Representatives Overtime Pay**

---

Ex. 5, Suh Dep.,151:3-11; Ex. 6, Carney Dep.,45:8-24, 46:7-20, 46:24-47:3; Ex. 7, Hassey Dep., 89:17-90:8.

[5] "Commissions (whether based on a percentage of total sales or of sales in excess of a specified amount, or on some other formula) are payments for hours worked and must be included in the regular rate." 29 C.F.R. §778.117.

In March 2011, Groupon conducted meetings with Account Representatives to inform them that they were entitled to overtime pay "under applicable law," and that Groupon would begin to pay Account Representatives overtime pay. Ex. 1, GRP49820-GRP49833, GRP49848-GRP49851, GRP49853, GRP71516-GRP71517.  Prior to taking that decision, Defendant had obtained advice from outside counsel and consultants.  Ex. A.3, Defendant's Privilege Log (*e.g.,* p. 1-4, 9, 14, 20, 29, 31-32, identifying dozens of e-mails to and from counsel regarding the FLSA classification of sales representatives).

The meetings to explain Groupon's decision to pay sales representatives overtime pay were held at the behest of Daniel Barwick, Groupon's payroll manager, and were attended by him along with other Groupon managers.[6]  Ex.1, GRP49839, GRP49853.  During the March 2011 meetings, Mr. Barwick informed the Account Representatives that henceforth, Groupon would pay them overtime and that accordingly, they were required to record their daily hours worked on a new timekeeping system called "Ultipro."[7] *Id.*; *see also* Ex. 1, GRP49820.  Mr. Barwick also stated that Groupon had misclassified Sales Reps as overtime exempt, and had failed to properly pay them overtime pay for work over 40 hours per week. *Id.*  Mr. Barwick stated that in conjunction with the inception of the new timekeeping system, Groupon would

---

[6] See Ex. 2, P26897 - P27058 (attached in alphabetical order) Carney Decl., ¶18; Hall Decl., ¶18; Hassey Decl., ¶18; Keohane Decl., ¶18; Noone Decl., ¶18; Pearson Decl., ¶18; Poggi Decl., ¶18; Schlader Decl., ¶19; Sprague Decl., ¶18; Suh Decl., ¶19; *see also*, Ex. 8, Daley Dep., 161:8-13, 163:1-20; Ex. 9, Poggi Dep., 231:9-24, 232:1-2; Ex. 4, Noone Dep., 84:14-17; Ex. 5, Suh Dep., 143:14-22; Ex. 6, Carney Dep., at 44:7-13.

[7] See Ex. 2, P26897 - P27058 (attached in alphabetical order) Carney Decl., ¶19; Hall Decl., ¶19; Hassey Decl., ¶19; Keohane Decl., ¶19; Noone Decl., ¶19; Pearson Decl., ¶19; Poggi Decl., ¶¶19, 21; Schlader Decl., ¶20; Sprague Decl., ¶19; Suh Decl., ¶20; *see also*, Ex. __, Daley Dep.,163:13-20; Ex. 9, Poggi Dep., 233:4-18, 234:2-22; Ex. 4, Noone Dep., 84:14-24, 85:5-20; Ex. 5, Suh Dep., 144:10-21, 145:17-146:3; Ex. 10, Sprague Dep.,178:4-14, 179:4-9; Ex. 6, Carney Dep., 44:18-45:3.

calculate the amount of overtime pay owed to Sales Reps for workweeks prior to March 20, 2011, and would pay Account Representatives their earned back overtime pay. *Id.* Despite Mr. Barwick's statement that Account Representatives would be paid for the overtime worked prior to March 20, 2011, Groupon never made such payments. *Id.;* Ex. 1, GRP50835; Ex. 8, Daley Dep., 267:15-24;Ex., 9, D. Poggi Dep., 239:8-15.

### 2. Groupon's August 2011 Decision To Stop Paying All Account Representatives Overtime Pay

In August 2011, Groupon decided to change the status of the Account Representative once again: from non-exempt to exempt for overtime purposes. Ex. 1, GRP10872. And again, this decision was made with the assistance of outside counsel and/or consultants. Ex. A.3, Defendant's Privilege Log (*e.g.,* at 8, 24).

On August 18, 2011, Groupon COO Margo Georgiadis sent an e-mail to all Groupon District Sales Managers (DSMs), informing them that an e-mail would be sent out the following day to "all Sales Reps and Execs" that would inform the Sales Reps that they would no longer receive overtime wages. Ex. 1, GRP10872-3. The Georgiadis e-mail includes a copy of the notification e-mail, which is also from Georgiadis. *Id.* at GRP10873. That e-mail states that the March decision to pay overtime was made "███████████████████████████." *Id.* at GRP10872. However, the decision to reclassify the Account Representative job position to non-exempt, according to the e-mail, was wrong. *Id.* "███████████████████████████ ███████████████████████████████████████." *Id.* (emphasis added). The e-mail states that Groupon determined that ███████████████ ███████████████████████████████████. *Id.* at GRP10872-3. And that Sales Reps need ███████████████████████████████████ ██████. *Id.* at GRP10873; Ex. 1, GRP50835-GRP50836, GRP10872-GRP10873, GRP10883-

GRP10884; *see also* Plaintiff Declarations and deposition testimony.[8]

Finally, Groupon informed Account Representatives in the e-mail that it would not seek

to "████████████████████████████████████████████████████████████

████████." *Id.* at GRP10873; Ex. 1, GRP52898, GRP50835-GRP50836, GRP10872-GRP10873,

GRP10883-GRP10884.

### C. Groupon's Common Classification Of All Account Representatives As Either Non-Exempt Or Exempt

Groupon's internal personnel documents identify all Sales Reps as having the same

overtime status – exempt or non-exempt – during the same time periods.

The job offer letters sent to newly-hired Sales Reps are uniform regarding FLSA status.

During the time period between March 20, 2011, and August 26, 2011, offer letters identified the

Account Representative job position as "non-exempt" and entitled to overtime pay. Ex. 1, GRP7

(offer letter to Ranita Dailey, "Your position with Groupon is considered non-exempt");

GRP10320-GRP10321 (e-mail from Bob Lopez, Divisional Sales Manager, stating "████

██████████████████████████████████████████████████████████."); GRP50862 (e-

mail from payroll manager Daniel Barwick of June 15, 2011, stating that, "█████████████

████████████████████████████████████████████████████████████████

███████████████████").[9]

---

[8] See Ex. 2, P26897 - P27058 (attached in alphabetical order) Carney Decl., ¶22; Hall Decl., ¶23; Hassey Decl., ¶23; Keohane Decl., ¶23; Letellier Decl., ¶18; Moscardelli Decl., ¶18; Noone Decl., ¶23; Perry Decl., ¶18; Schlader Decl., ¶23; Suh Decl., ¶23; Wills Decl., ¶18; *see also*., Exhibit 11, Dailey Dep.,137:3-5.; Ex. 5, Suh Dep., 146:7-13; Ex. 6, Carney Dep., 14:11-20.

[9] Ex. 1, GRP25435-GRP25441 (June 2011 e-mail from Lindsay Frykman to Alison Allgor attaching Groupon template offer letter with proposed changes and stating that the Account Representative job position offered "████████████████…."); *see also* GRP53015-GRP53016, at 16 (Konstantopoulos, start date 5/9/11, "position with Groupon is considered 'non-exempt.'"); GRP53762 (Perry, start date 4/25/11, same); GRP54059 (Evans, start date 5/9/11, same);

For the time period prior to March 20, 2011, Groupon's offer letters were uniformly silent on Account Representatives' exempt status. Ex. 1, GRP82 (February 2011 offer letter to John Daley); GRP 31 (October 2010 offer letter to Daniel White); GRP 5894-GRP5895 (August 2009 offer letter to Rachael Gargiulo); *see also* GRP54411-GRP54415, GRP54408-GRP54409, GRP49858-GRP49859, GRP52544-GRP52545, GRP49860-GRP49861. Rather, the Account Representative offer letters identified an annualized based salary and eligibility for commissions, but failed to address the issue of overtime pay.  *Id.*

After August 23, 2011, when Groupon declared the Account Representative position exempt, offer letters to Account Representatives were modified to remove any language regarding exempt status. Ex. 1, GRP10851-GRP10852 (August 22, 2011, e-mail discussing uniform change in offer letters to remove "███████" language); GRP56516 (e-mail from Daniel Barwick, "████████████████████"); GRP9486-GRP9490, GRP9493-GRP9496, GRP55761- GRP55763.

Earning statements given to Account Representatives are similarly uniform in identifying Sales Reps as either exempt or non-exempt, depending on when the earning statement was issued.  For the time period prior to March 20, 2011, Groupon's earning statements given to Account Representatives are uniformly silent with regard to the issue of exempt status. Ex. 1, GRP3546 (Dominic Poggi earning statement for pay period ending February 8, 2011); GRP55-GRP67 (Daniel White Earning Statement for pay period ending November 8, 2010); GRP117-GRP119 (John Daley Earning Statements for pay periods ending between February 23, 2011, and March 23, 2011).

---

GRP54164 (Benson, start date 5/6/11, same); GRP11814 (Majeske, start date 7/31/11, same); GRP11819 (Dunham, start date 7/25/11, same); GRP11829 (Hammdorff, start date, same).

For the time period between March 20, 2011, and August 23, 2011, Account Representatives' earning statements identified the "Pay Group" as "SemiMonthly Non Exempt." Ex. 1, GRP17 (Dailey Earning Statement for pay period ending May 8, 2011); GRP3551 (Poggi earning statement for pay period ending March 30, 2011); GRP68-GRP81 (Daniel White Earning Statements for pay periods between April 8 and August 8, 2011); GRP120 -GRP135 (Daley Earning Statements for pay periods between April 8, 2011, and September 8, 2011).

For the time period after September 8, 2011, Account Representatives' earning statements were all changed to identify the "Pay Group" as "Semi Monthly Exempt." Ex. 1, GRP3611 (Mackenzie Rose earning statement for pay period ending September 23, 2011); GRP54394 (Brian Hanna earning statement for pay period ending September 15, 2011), GRP54449 (Luke A. Holec earning statement for pay period ending November 23, 2011).

### D. All Account Representatives Perform The Same Primary Job Duty: Sales

The Account Representatives were, first and foremost, sales people. The "



." Ex. 1, GRP 79880.  Sales Reps are the former. "

." *Id*.

Groupon's human resource department distinguishes between "sales workers" and "administrative support workers" and describes "sales workers" as persons who perform "

." *Id*. at GRP 60397.   Sales Reps seek to obtain "deal" contracts between Groupon and the merchant:  the merchant agrees to offer a particular good or service at a discount, and assuming that that "deal" eventually runs on the Groupon website and customers purchase the coupon, the revenue generated by those

coupons are divided between the merchant and Groupon.  Ex. 1, GRP00548-GRP00551 (2010

Training Manual); *see also* Merchant Terms And Conditions, eff. Aug. 12, 2013, at

https://www.grouponworks.com/merchant-terms-and-conditions (visited Sept. 29, 2013).  Sales

Reps obtain these "deal" contracts by 'cold calling' merchants in as many as ██ to ██ phone

calls per day.  Ex. 1, GRP 555.

### 1.    All Account Representatives Receive The Same Sales Training

All Account Representatives receive training in group sessions after their initial hire.[10]

The training was the same for all Sales Reps, using the same training manuals during the same

time periods, regardless of the geographic area to which they were ultimately assigned.[11] *See,*

*e.g.*, Ex. 1, GRP575-GRP593 (Groupon's March 3, 2009 Sales Manual); GRP 547-574 (May,

2010 Sales Training Manual); GRP 399-462); GRP491-506 (Deal Quality and Criteria); GRP

463-490 (Improving Deal Structure); GRP195-350 (City Management Handbook); Ex. A.2,

P0022-P0023 (New Hire Training Agenda); P0161 (New Sales Rep Training: Useful Links We

Give To Our Reps To Teach Them About CP); P0221-P0236 (Selling Groupon).

---

[10] Ex. 2, P26897 - P27058 (attached in alphabetical order)  Aslakson Decl., ¶5; Carney Decl., ¶5; Hall Decl., ¶5; Hassey Decl., ¶5; Keohane Decl., ¶5; Kukuy Decl., ¶5; Letellier Decl., ¶5; Lonzie Decl., ¶5; McNeer Decl., ¶5; Moscardelli Decl., ¶5; Noone Decl., ¶5; Pass Decl., ¶5; Pearson Decl., ¶5; Perry Decl., ¶5; Poggi Decl., ¶5; Steven Ropers Decl., ¶5; Schlader Decl., ¶5; Sprague Decl., ¶5; Suh Decl., ¶5; Wills Decl., ¶5; *see also*, Ex. 8, Daley Dep., 60:3 - 61:8; Ex. 11, Dailey Dep., 51:15 - 52:1; Ex. 9, Poggi Dep., 27:9-20; Ex. 12,  Lonze Dep.,32:3-6;  Ex. 7, Hassey Dep.,137:1-6; Ex. 6, Carney Dep., 85:5-8.

[11] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶5; Carney Decl., ¶5; Hall Decl., ¶5; Hassey Decl., ¶5; Keohane Decl., ¶5; Kukuy Decl., ¶5; Letellier Decl., ¶5; Lonzie Decl., ¶5; McNeer Decl., ¶5; Moscardelli Decl., ¶5; Noone Decl., ¶5; Pass Decl., ¶5; Pearson Decl., ¶5; Perry Decl., ¶5; Poggi Decl., ¶5; Steven Ropers Decl., ¶5; Schlader Decl., ¶5; Sprague Decl., ¶5; Suh Decl., ¶5; Wills Decl., ¶5; *see also*, Ex. 8, Daley Dep., 61:11 - 62:4; Ex. 11, Dailey Dep., 111:19-112:3; Ex. 7, Hassey Dep.,  68:16-20, 134:10-22 137:1-18;  Ex. 10, Sprague Dep., 186:12-19.

The training Account Representatives received included: (i) generating merchant sales leads, including what Internet resources were available to create such sales leads, like ███████ ████,[12] *id.*, GRP583-84, 555 ("████████████████████████████ …");[13] (ii) providing Sales Reps ███████████████" to use when cold calling prospective merchants, *id.,* GRP408-424, GRP433-435, GRP585-586, GRP560-569); (iii) providing ██████ and ███████ guidelines, *id.*, GR424, GRP431, P491-509, GRP591-92, GRP557;[14] (iv) using Groupon's sales software, salesforce.com, as part of the sales process, *id.,* GRP577-579; (v) overcoming ████████████ to working with Groupon, *id.* at GRP 420, 444-451, 567 (including providing Sales Reps with detailed ████████████ (*id.*, GRP452-461, 567)); and (vi) distinguishing Groupon from ██████████████████████████ ███████████. *Id.* at GRP420.

---

[12] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶6; Carney Decl., ¶6; Hall Decl., ¶6; Hassey Decl., ¶6; Keohane Decl., ¶6; Kukuy Decl., ¶6; Letellier Decl., ¶6; Lonzie Decl., ¶6; McNeer Decl., ¶6; Moscardelli Decl., ¶6; Noone Decl., ¶6; Pass Decl., ¶6; Pearson Decl., ¶6; Perry Decl., ¶6; Poggi Decl., ¶6; Steven Ropers Decl., ¶6; Schlader Decl., ¶6; Sprague Decl., ¶6; Suh Decl., ¶6; Wills Decl., ¶6; *see also*, Ex. 8, Daley Dep., 62:1 - 64:20; Ex. 11, Dailey Dep., 112:23 - 114:19, 115:2 - 117:4; Ex. 7, Hassey Dep., 11:19-22, 13:8-12, 20:20-21:16; Ex. 9, Poggi Dep., 27:21- 29:7, 30:7-22, 34:6-17; Ex. 4, Noone Dep., 12:9-16; Ex. 12, Lonze Dep., 15:12-5; Ex. 10, Sprague Dep., 110:6-19, 111:8-18; Ex. 6, Carney Dep., 79:3-16, 86:19-87:2, 88:17-89:8, 91:9-16.

[13] Ex. A, GRP555 ("█████████████████████████████████████████████████████████████████████████████████████████.").

[14] Ex. A, GRP502-506 ("█████████████████████████████████████████████████████████████████████████████)(emphasis in original); GRP431 ("███████████████████████████████████████████████████████████████████████")



After training was completed, all Sales Reps were assigned to make sales to merchants in a particular geographical area.[15]  Regardless of the geographical area that a new employee might be assigned, Sales Reps worked from a central Groupon office in Chicago, Illinois, and performed the same job duties.  *See infra,* Section II.D.4, n.17.

### 2. Groupon Has One Job Description For The 'Account Representative' Position

Groupon literature on the Account Representative position emphasizes that the principal duty of the Account Representative is ███. Ex. 1, GRP138-GRP141, GRP150-GRP155. For example, "[w]e hire engaging individuals with clear reasons why they are driven to sell for Groupon." Ex. 1, GRP138, (5/18/10, 12/29/10 and 4/12/11 job description), "[w]ell matched individuals to this role are comfortable selling over the phone and cold calling various types of local businesses. . .." (Ex. 1, GRP139 (5/18/10, 12/29/10 and 4/12/11 job descriptions)). Groupon's job postings for the Account Representative position further state "well matched individuals are skilled in selling over the phone and cold calling various types of local businesses." Ex. 1, GRP149.

### 3. The Job Performance Of All Account Representatives Is Based On The Same Sales Metrics

All Sales Reps must meet the same set of performance criteria.  Account Representatives are told that their "████████████████████████████████████████████" Ex. 1, GRP559.  The metrics include "████████," "████████████," "████████,"

---

[15] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶7; Carney Decl., ¶7; Hall Decl., ¶7; Hassey Decl., ¶7; Keohane Decl., ¶7; Kukuy Decl., ¶7; Letellier Decl., ¶7; Lonzie Decl., ¶7; McNeer Decl., ¶7; Moscardelli Decl., ¶7; Noone Decl., ¶7; Pass Decl., ¶7; Pearson Decl., ¶7; Perry Decl., ¶7; Poggi Decl., ¶7; Steven Ropers Decl., ¶7; Schlader Decl., ¶7; Sprague Decl., ¶7;Suh Decl., ¶7; Wills Decl., ¶7; *see also,* Ex. 8, Daley Dep., 71:19-23; Ex. 11, Dailey Dep., 83:21-13; Ex. 4, Noone Dep., 50:9-14, 56:2-7; Ex. 9, Poggi Dep., 155:12-19, 156:2-10, 217:13-21; Ex. 12, Lonze Dep., 168:4-9;  Ex. 10, Sprague Dep., at 181:4-13, 185:15-186:6;  Ex. 6, Carney Dep., 73:5-74:5, 79:3-16, 81:16-23.

"███████," "███," and "███████." According to Groupon, this "████████

███." *Id*.; *see also* Ex. 1, GRP218-GRP224.[16] Account Representatives receive performance

warnings based on those same sales metrics. Ex. 1, GRP 183-GRP184, GRP192-GRP193

(template warning letters).

### 4. The Primary Job Duty Of Sales Reps Is Sales

The Account Representative job is an inside sales position.[17] Ex. 1, GRP 79880.

Groupon's organizational charts identify Account Representatives as being employed at the

bottom of each City Model *sales* team. Ex. 1, GRP156-GRP158, GRP669, GRP79881 ("Those

who sell"). At the top of each City's sales team is the City Planner, also known as the City

---

[16] These include, for each geographical market sales team, the number of ████████
(Ex. 1, GRP6165 - GRP6214, GRP45586), "█████," "████," "█████," "██████
██," "███," "███████," "█████," and "█████
███." *Id*., at GRP5947. Account Representatives performance is also judged on the basis
of "████," "█████████
████," "████████." *Id*., at GRP6261 (explaining
meaning of terms), GRP5712 –GRP5715, GRP5870 (exemplars of different "sales teams");
GRP6820 – GRP6841; *see also* Ex. 7, Hassey Dep., 124:11-16, 125:6-8; Ex. 9, Poggi Dep.,
164:6-9; Ex. 12, Lonze Dep., 11:10-17; Ex. 4, Noone Dep., 62:2-11, 117:2-9; Ex. 6,Carney
Dep., 53:10-54:1.

[17] Ex. 1, GRP5948-GRP6032 (January 9, 2012, e-mail from Groupon Human Resources
identifying hundreds of Account Representatives as being employed in "sales"); GRP 49650
(individual Contributor Job Level Chart identifying Account Representative job as being a sales
position and identifying job duties); GRP79910 (December 13, 2010, e-mail from SVP of Sales
identifying the Merchant Partner (MP) as a "█████" and identifying specific Account
Representatives who were successful in selling ███); GRP50730 (characterizing regular
Account Executives as inside sales reps); Ex. 2, P26897 - P27058 (attached in alphabetical order)
Aslakson Decl., ¶¶3, 8, 10, 13; Carney Decl., ¶¶3, 8, 10, 13; Hall Decl., ¶¶3, 8, 11, 14; Hassey
Decl., ¶¶3, 8, 11, 14; Keohane Decl., ¶¶3, 8, 11, 14; Kukuy Decl., ¶¶3, 8, 11, 14; Letellier Decl.,
¶¶3, 8, 11, 14; Lonzie Decl., ¶¶3, 8, 10, 13; McNeer Decl., ¶¶3, 8, 11, 14; Moscardelli Decl., ¶¶3,
8, 10, 13; Noone Decl., ¶¶3, 8, 11, 14; Pass Decl., ¶¶3, 8, 11, 14; Pearson Decl., ¶¶3, 8, 11, 14;
Perry Decl., ¶¶3, 8, 11, 14; Poggi Decl., ¶¶3, 8, 11, 14; Steven Ropers Decl., ¶¶3, 8, 10, 13;
Schlader Decl., ¶¶3, 8, 10, 13; Sprague Decl., ¶¶3, 8, 10, 13; Suh Decl., ¶¶3, 8, 10, 13; Wills
Decl., ¶¶3, 8, 10, 13; Ex. 8, Daley Dep., 39:10-19, 114:11-18; Ex. 11, Dailey Dep., 80:23; Ex. 7,
Hassey Dep., 37:22-38:6; Ex. 9, Poggi Dep., 144:23-145:12; Ex. 4, Noone Dep., 10:10-17; Ex.
5, J. Suh Dep., 197:21-198:1; Ex. 12, Lonze Dep., 56:19-57:1; Ex. 10, Sprague Dep., 53:8-10;
Ex. 6, Carney Dep., 44:3-23, 123:24-124:4, 198:20-199:18

Manager. *Id.* Account Representatives work at the direction of the City Manager and their

District Sales Manager. *Id.* The City Manager is responsible to:



Ex. 1, GRP196 (capitalized emphasis in original) (City Manager Handbook, GRP195-197).

According to Groupon, the difference between "highly successful" City Managers and the rest is

that "██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████." *Id.*

at GRP197. City Managers are told to "████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████" *Id.* at GRP196[18]

(i)      **The Perfect Pipeline**

City Managers are instructed that that:



Ex. 1, GRP205 (emphasis added). Groupon also maintains an "Individual Contributor Job Level

Chart" that describes, in part, the Account Representative and Account Executive "Job

Complexity" as follows:

---

[18] *See also*, Ex. 6, Carney Dep., 21:21-23 ("Q. Did you feel that your time at Groupon was drone-ish and like a robot? A. Yes.").



Plt's. Evid. App, Ex. 1, GRP49650.

Groupon trains City Managers on how "█████████████████ ████████," which includes an explanation that Sales Representatives will earn greater gross profit by "██████████████████." Ex. 1, GRP206-GRP207. "████████ ████████████████████████████████████████████" Ex 13, Rule 30(b)(6) Dep., 95:3-5. City Planning, and not Account Representatives, "███████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████" Ex 13, Rule 30(b)(6) Dep., 95:8-17.

Groupon directs City Managers that "[████████████████████████ █████████████████████████████████████████████████ █████████████████████████████████████████████████ ████████." Ex. 1, GRP252.

(ii)    **The Cold Call**

Of the sales duties that Groupon requires of its Sales Reps, one of the most important is cold calling.  The "cold call" is a telephone call a Sales Rep makes to a merchant who has not

indicated any interest in Groupon.  The cold call is intended to encourage merchants to sell their goods or services through Groupon, to generate sales leads, and to obtain sales or repeat sales from vendor merchants.[19]  A Groupon manager told Plaintiff Roy Carney during his employment interview for the Account Representative position : "This is a sales position … not relationship sales.  It was 100 percent cold calling." Ex. 6, Carney Dep., 42:16-19.

### (iii)    The Boiler Room

The Account Representatives worked next to each other, making sales calls at long rows of shared tables. Ex. 1, GRP79484; Ex. 7, Hassey. Dep., 199:23-24, 200:1-4.  "It was an intense atmosphere, kind of like a call center atmosphere … me and my peers had a joke that we considered it the boiler room.  Because we would just dial, dial, dial." Ex. 7, Hassey Dep., 200:5-11.  Groupon tells Sales Reps to " ███████████████ " (Ex. 1, GRP550) and that "[t]he people that are most successful at this job are the people who make ██████ calls per day when they start." Ex. 1, GRP555.

Groupon requires newly hired Account Representatives to sign a "New Hire Employee 90 Day Terms and Conditions." See, e.g., Ex. 1, GRP3645, GRP54375. The document is intended to "ensure we have set clear expectations from day one, so that you are aware of what performance levels have helped our new hires ramp up successfully, and you know how you are

---

[19] Ex. 2, P26897 - P27058 (attached in alphabetical order)  Aslakson Decl., ¶8; Carney Decl., ¶8; Hall Decl., ¶8; Hassey Decl., ¶8; Keohane Decl., ¶8; Kukuy Decl., ¶8; Letellier Decl., ¶8; Lonzie Decl., ¶8; McNeer Decl., ¶8; Moscardelli Decl., ¶8; Noone Decl., ¶8; Pass Decl., ¶8; Pearson Decl., ¶8; Perry Decl., ¶8; Poggi Decl., ¶8; Steven Ropers Decl., ¶8; Schlader Decl., ¶8; Sprague Decl., ¶8; Suh Decl., ¶8; Wills Decl., ¶8; Ex. 8, Daley Dep., 39:10-15, 74:24 - 75:6, 65:13-20; Ex. 11, Dailey Dep., 269:1-9, 72:17-22, 163:13-22;  Ex. 7, Hassey Dep., 74:16-21, 88:2-10, 117:23-118:19;  Ex. 4, Noone Dep., 52:11-17;  Ex. 10, Sprague Dep., 10:5-21; Ex. 6, Carney Dep., 42:3-23

measured." Ex. 1, GRP3645. Defendant claims that its measurement "criteria is based on a year's worth of data and sales rep performances in all our markets." *Id.* The criteria are:

> **Outbound Calls.** New Hire is expected to have made a minimum requirement of 50 outbound sales calls a day and 10 "solid" calls per day. Solid Call is defined as a call lasting longer than 2 minutes.
>
> **Contracts Sent.** New Hire is expected to send 2 contracts per day or 30 (month, 1), 40 (month 2), & 40 (month 3) to prospective Groupon merchants. There is a minimum requirement of 16 (month 1), 26 (month 2), & 28 (month 3) contracts sent.
>
> **Contracts Back.** New Hire is expected to close 1 contract per day or 15 (month 1), 20 (month 2), & 20 (month 3) with prospective Groupon merchants. There is a minimum requirement of 8 (month 1), 13 (month 2), and 14 (month 3) contracts back.
>
> **Gross Profit.** New Hire is expected to achieve 100% of their monthly gross profit sales goal. There is a minimum requirement of 65% of their monthly gross profit sales goal.

*Id.* These measurement criteria are confirmed by the Sales Reps themselves.[20] The majority of Account Representatives' work time is spent in sales activities, including cold calls, prospecting and work incidental to such sales activity.[21] All, or virtually all, of the work the Sales Reps

---

[20] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶8; Carney Decl., ¶8; Hall Decl., ¶9; Hassey Decl., ¶9; Keohane Decl., ¶9; Kukuy Decl., ¶9; Letellier Decl., ¶9; McNeer Decl., ¶9; Moscardelli Decl., ¶8; Noone Decl., ¶9; Pass Decl., ¶9; Pearson Decl., ¶9; Perry Decl., ¶9; Poggi Decl., ¶9; Schlader Decl., ¶9; Sprague Decl., ¶9; Suh Decl., ¶9; Wills Decl., ¶¶8, 9; Ex. 8, Daley Dep., 121:16-23, 244:17 - 245:5, 257:5-15; Ex. 7, Hassey Dep., 124:11-16, 125:6-8; Ex. 12, Lonze Dep., 11:10-17

[21] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶8; Carney Decl., ¶8; Hall Decl., ¶¶8, 9; Hassey Decl., ¶¶8, 9; Keohane Decl., ¶¶8, 9; Kukuy Decl., ¶¶8, 9; Letellier Decl., ¶8, 9; Lonzie Decl., ¶8; McNeer Decl., ¶¶8, 9; Moscardelli Decl., ¶8; Noone Decl., ¶¶8, 9; Pass Decl., ¶¶8, 9; Pearson Decl., ¶¶8, 9; Perry Decl., ¶¶8, 9; Poggi Decl., ¶¶8, 9; Steven Ropers Decl., ¶8; Schlader Decl., ¶¶8, 11; Sprague Decl., ¶8; Suh Decl., ¶¶8, 11; Wills Decl., ¶8; Ex. 8, Daley Dep., 40:10-15, 63:21 - 64:1, 108:12-15; Ex. 11, Dailey Dep., 80:23, 268:24 - 269:9; Ex. 7, Hassey Dep., 19:16-23; Ex. 4, Noone Dep., 89:10-20; Ex. 12, Lonze Dep., 32:17-23, Ex. 6, Carney Dep., 42:3-23, 123:24-124:4

performed was related to sales, including communicating with merchants to encourage them to use Groupon a second time. [22]

### (iv)    The Duties That Sales Reps Do Not Perform

Account Representatives have no responsibility for increasing, developing, facilitating, and/or maintaining the merchant vendor's customer sales.[23] For example, Account Representatives do not determine the products or services the merchant sold or offered to the public generally, the pricing of those products or services, or how the merchant advertised or marketed its goods or services to the public.[24] Account Representatives do not perform marketing or editorial job duties.[25]  Thus, in performing their sales jobs, Account Representatives

---

[22] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶8; Carney Decl., ¶8; Hall Decl., ¶¶8, 9; Hassey Decl., ¶¶8, 9; Keohane Decl., ¶¶8, 9; Kukuy Decl., ¶¶8, 9; Letellier Decl., ¶8; Lonzie Decl., ¶8; McNeer Decl., ¶8; Moscardelli Decl., ¶8; Noone Decl., ¶¶8, 9; Pass Decl., ¶¶8, 9; Pearson Decl., ¶8; Perry Decl., ¶8,; Poggi Decl., ¶8; Steven Ropers Decl., ¶8; Schlader Decl., ¶8; Sprague Decl., ¶8; Suh Decl., ¶8; Wills Decl., ¶8; Ex. 8, Daley Dep., 65:13-20; Ex. 11, Dailey Dep., 163:13-22;  Ex. 7, Hassey Dep., 38:9-16;  Ex. 12, Lonze Dep., 133:23-24, 134:1-13.

[23] Ex. 2, P26897 - P27058 (attached in alphabetical order)  Aslakson Decl., ¶11; Carney Decl., ¶11; Hall Decl., ¶12; Hassey Decl., ¶12; Keohane Decl., ¶12; Kukuy Decl., ¶12; Letellier Decl., ¶12; Lonzie Decl., ¶11; McNeer Decl., ¶12; Moscardelli Decl., ¶11; Noone Decl., ¶12; Pass Decl., ¶12; Pearson Decl., ¶12; Perry Decl., ¶12; Poggi Decl., ¶12; Steven Ropers Decl., ¶11; Schlader Decl., ¶11; Sprague Decl., ¶11; Suh Decl., ¶11; Wills Decl., ¶11; Ex. 8, Daley Dep., 119:5-14. 120:2-12;  Ex. 12, Lonze Dep., 56:19-57:1;  Ex. 10, Sprague Dep., 53:8-16; Ex. 6, Carney Dep., 177:17-178:12.

[24] Ex. 2, P26897 - P27058 (attached in alphabetical order)  Aslakson Decl., ¶11; Carney Decl., ¶11; Hall Decl., ¶12; Hassey Decl., ¶12; Keohane Decl., ¶12; Kukuy Decl., ¶12; Letellier Decl., ¶12; Lonzie Decl., ¶11; McNeer Decl., ¶12; Moscardelli Decl., ¶11; Noone Decl., ¶12; Pass Decl., ¶12; Pearson Decl., ¶12; Perry Decl., ¶12; Poggi Decl., ¶12; Steven Ropers Decl., ¶11; Schlader Decl., ¶11; Sprague Decl., ¶11; Suh Decl., ¶11; Wills Decl., ¶11; Ex. 4, Noone Dep., 95:10-96:13, 103:1-12; Ex. 12, Lonze Dep., 48:8-11; Ex. 6, Carney Dep., 178:13-22.

[25] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶10; Carney Decl., ¶10; Hall Decl., ¶11; Hassey Decl., ¶11; Keohane Decl., ¶11; Kukuy Decl., ¶11; Letellier Decl., ¶_11 Lonzie Decl., ¶10; McNeer Decl., ¶11; Moscardelli Decl., ¶10; Noone Decl., ¶11; Pass Decl., ¶11; Pearson Decl., ¶11; Perry Decl., ¶11; Poggi Decl., ¶11; Steven Ropers Decl., ¶10; Schlader Decl., ¶10; Sprague Decl., ¶10; Suh Decl., ¶10; Wills Decl., ¶10; Ex. 8, Daley Dep.,

focus on closing individual sales with individual merchants. They have no responsibility for marketing the merchant vendor's goods, products or services on Groupon, or creating the editorial copy or language of the daily deal that was featured on the Groupon website.[26]

The Groupon marketing department is responsible for enticing individuals to subscribe to Groupon and to buy the daily "Groupons" offered on the website.[27] The Groupon editorial department writes the copy for the specific merchant ads.[28]

Account Representatives have no responsibility for planning long or short term sales goals for the geographic areas to which they were assigned.[29] Ex. 1, GRP195-197; GRP205.

---

56:13, 93:19 - 94:9, ; Ex. 11, Dailey Dep., 178:11, 181:2-19, 270:17-24; Ex. 4, Noone Dep., 95:10-96:13, 103:1-12; Ex. 12, Lonze Dep., 48:8-11, 124:17-21; Ex. 6, Carney Dep., 172:11-174:3; 178:13-22; Ex. 7, Hassey Dep., 38:17-39:1; Ex. 9, D. Poggi Dep., 59:11-60:4.

[26] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶10; Carney Decl., ¶10; Hall Decl., ¶11; Hassey Decl., ¶11; Keohane Decl., ¶11; Kukuy Decl., ¶11; Letellier Decl., ¶11; Lonzie Decl., ¶10; McNeer Decl., ¶11; Moscardelli Decl., ¶11; Noone Decl., ¶11; Pass Decl., ¶11; Pearson Decl., ¶11; Perry Decl., ¶11; Poggi Decl., ¶11; Steven Ropers Decl., ¶10; Schlader Decl., ¶10; Sprague Decl., ¶10; Suh Decl., ¶10; Wills Decl., ¶10; Ex. 8, Daley Dep., 56:13, 93:19 - 94:9, ; Ex. 11, Dailey Dep., 178:11, 181:2-19, 270:17-24; Ex. 4, Noone Dep., 95:10-96:13, 103:1-12; Ex. 12, Lonze Dep., 48:8-11, 124:17-21; Ex. 6, Carney Dep., 172:11-174:3; 178:13-22; Ex. 7, D. Hassey Dep., 38:17-39:1; Ex. 9, Poggi Dep., 59:11-60:4.
[27] Ex. 2, P26897 - P27058 (attached in alphabetical order)., ¶11; Kukuy Decl., ¶11; Letellier Decl., ¶11; Lonzie Decl., ¶10; McNeer Decl., ¶11; Moscardelli Decl., ¶10; Noone Decl., ¶11; Pass Decl., ¶11; Pearson Decl., ¶11; Perry Decl., ¶11; Poggi Decl., ¶11; Steven Ropers Decl., ¶10; Schlader Decl., ¶10; Sprague Decl., ¶10; Suh Decl., ¶10; Wills Decl., ¶10.

[28] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶10; Carney Decl., ¶10; Hall Decl., ¶11; Hassey Decl., ¶11; Keohane Decl., ¶11; Kukuy Decl., ¶11; Letellier Decl., ¶11; Lonzie Decl., ¶10; McNeer Decl., ¶11; Moscardelli Decl., ¶10; Noone Decl., ¶11; Pass Decl., ¶11; Pearson Decl., ¶11; Perry Decl., ¶11; Poggi Decl., ¶11; Steven Ropers Decl., ¶10; Schlader Decl., ¶10; Sprague Decl., ¶10; Suh Decl., ¶10; Wills Decl., ¶10; Ex. 8, Daley Dep., 56:13, 93:19 - 94:9, ; Ex. 11, Dailey Dep., 178:11, 181:10-14, 270:17-24.

[29] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶16; Carney Decl., ¶16; Hall Decl., ¶17; Hassey Decl., ¶17; Keohane Decl., ¶17; Kukuy Decl., ¶17; Letellier Decl., ¶17; Lonzie Decl., ¶16; McNeer Decl., ¶17; Moscardelli Decl., ¶16; Noone Decl., ¶17; Pass Decl., ¶17; Pearson Decl., ¶17; Perry Decl., ¶17; Poggi Decl., ¶17; Steven Ropers Decl., ¶16; Schlader Decl., ¶16; Sprague Decl., ¶16; Suh Decl., ¶16; Wills Decl., ¶16; Ex. 11, Dailey Dep., 82:6-15, 130:1-15, 77:2-3, 129:21-24, 175:3-9, 229:9-14; Ex. 8, Daley Dep., 296:13-15; Ex. 4,

(v)     **The Sale**

Account Representatives have no authority to determine the terms of merchant contract free from immediate direction or supervision.[30]  That means that the terms of each contract between a merchant vendor and Groupon is created one of two ways:  (1) dictated by the merchant itself, and then approved by one of the supervisors (such as the DSM or the City Planner); or (2) outlined by the DSM or City Planner and approved by the merchant.[31] Ex. 1, GRP205 (" █████████████████████████████████████████████ █████████████████████████████████████ "); *see also* GRP195-197 ("MICRO-CITYMANAGMENT"); GRP 507 (" ███████████████████████ ██████████████████████████████████████████████████ ████████████████████████████ ") (emphasis in original).  Account

---

Noone Dep., 35:4-21;  Ex. 10, Sprague Dep., 67:11-16, 69:23-70:5; Ex. 6, Carney Dep., 156:9-17, 163:7-10; Ex. 13, Rule 30(b)(6) Dep., p. 95:8-17 .

[30] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶¶14, 15; Carney Decl., ¶¶14, 15; Hall Decl., ¶¶15, 16; Hassey Decl., ¶¶15, 16; Keohane Decl., ¶¶15, 16; Kukuy Decl., ¶¶15, 16; Letellier Decl., ¶¶15, 16;  Lonzie Decl., ¶¶14, 15; McNeer Decl., ¶¶15, 16; Moscardelli Decl., ¶¶14, 15; Noone Decl., ¶¶15, 16; Pass Decl., ¶¶15, 16; Pearson Decl., ¶¶15, 16; Perry Decl., ¶¶15, 16; Poggi Decl., ¶¶15, 16; Steven Ropers Decl., ¶¶14, 15; Schlader Decl., ¶¶14, 15; Sprague Decl., ¶¶14, 15; Suh Decl., ¶¶14, 15; Wills Decl., ¶¶14, 15; Ex. 8, Daley Dep., 133:24 - 134:9, 306:15 - 307:2, 334:24 - 336:7; Ex. 11, Dailey Dep., 176:1-14, 220:1-7, 174:19 - 175:9; 196:5-10; Ex. 6, Carney Dep., 186:8-17 ("Q. But did you find that she was, for example, hovering over you while you were on the phone than other managers? A. No, they – it felt like they were always all hovering around too when we were on the phone … And it wasn't just me, but the entire team, they'd be walking through to make sure you were on the phone, all that stuff.").

[31] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶14; Carney Decl., ¶14; Hall Decl., ¶15; Hassey Decl., ¶15; Keohane Decl., ¶15; Kukuy Decl., ¶15; Letellier Decl., ¶15;  Lonzie Decl., ¶14; McNeer Decl., ¶15; Moscardelli Decl., ¶14; Noone Decl., ¶15; Pass Decl., ¶15; Pearson Decl., ¶15; Perry Decl., ¶15 ; Poggi Decl., ¶15; Steven Ropers Decl., ¶14 ; Schlader Decl., ¶14 ; Sprague Decl., ¶14; Suh Decl., ¶14; Wills Decl., ¶14; Ex. 8, Daley Dep., 62:10-13, 218:23-219:5; Ex. 11, Dailey Dep., 176:1-19, 196:5-10, 242:7-24; Ex. 4, Noone Dep., 138:17-24, 157:2-11, 202:2-5; Ex. 6, Carney Dep., 144:2-22.

Representatives are not permitted, without prior approval, to deviate from established guidelines, *i.e.* the terms of similar daily deals Groupon had made with similar merchant vendors. [32] *Id;* Ex. 1, GRP76166; GRP61738 (July 6, 2011 e-mail, "████████████████████ ████████████████████████████████████████████").  Account Representatives did not have the authority to determine the final terms of any deal contract, and every sale made with a merchant vendor was subject to final approval by the District Sales Manager or City Planner.[33] *Id*; Ex. 1, GRP502 - GRP506 (detailing criteria for merchant deals); GRP503 ("████████████████████████████████████████████████ ████████████████████████████████████████████") (emphasis in original).  Thus, Account Representatives might make a sale to a merchant vendor that would be rejected by the District Sales Manager or City Planner.[34]  Similarly, Account Representatives

---

[32] Ex. 2, P26897 - P27058 (attached in alphabetical order)  Aslakson Decl., ¶14; Carney Decl., ¶14; Hall Decl., ¶15; Hassey Decl., ¶15; Keohane Decl., ¶15; Kukuy Decl., ¶15; Letellier Decl., ¶15;  Lonzie Decl., ¶14; McNeer Decl., ¶15; Moscardelli Decl., ¶14; Noone Decl., ¶15; Pass Decl., ¶15; Pearson Decl., ¶15; Perry Decl., ¶15; Poggi Decl., ¶15; Steven Ropers Decl., ¶14; Schlader Decl., ¶14; Sprague Decl., ¶14; Suh Decl., ¶14; Ex. 8, Daley Dep., 62:10-13, 138:6-13; 193:24-194:9, 208:18 - 209:3, 209:18 - 210:1, 246:3-15; Ex. 11, Dailey Dep., 122:22 - 123:4, 128:12-19; Ex. 7, Hassey Dep., 27:3-13, 27:22-28:3, 57:20-58:4;  Ex. 12, Lonze Dep., 85:22-87:1;  Ex. 10, Sprague Dep., 79:4-8, 107:24-108:4; Ex. 6, Carney Dep., 90:11-24, 134:18-23, 154:5-23.

[33] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶¶14, 15; Carney Decl., ¶¶14, 15; Hall Decl., ¶¶15, 16; Hassey Decl., ¶¶15, 16; Keohane Decl., ¶¶15, 16; Kukuy Decl., ¶¶15, 16; Letellier Decl., ¶¶15, 16;  Lonzie Decl., ¶¶14, 15; McNeer Decl., ¶¶15, 16; Moscardelli Decl., ¶¶14, 15; Noone Decl., ¶¶15, 16; Pass Decl., ¶¶15, 16; Pearson Decl., ¶¶15, 16; Perry Decl., ¶¶15, 16; Poggi Decl., ¶¶15, 16; Steven Ropers Decl., ¶¶14, 15; Schlader Decl., ¶¶14, 15; Sprague Decl., ¶¶14, 15; Suh Decl., ¶¶14, 15; Wills Decl., ¶¶14, 15; Ex. 8, Daley Dep., 133:24 - 134:9, 306:15 - 307:2, 334:24 - 336:7; Ex. 11, Dailey Dep., 176:1-14, 220:1-7, 174:19 - 175:9; 196:5-10; Ex. 7, Hassey Dep., 61:6-10;  Ex. 9, Poggi Dep., 199:5-11; Ex. 6, Carney Dep., 155:8-13.

[34] Ex. 2, P26897 - P27058 (attached in alphabetical order)  Aslakson Decl., ¶15; Carney Decl., ¶15; Hall Decl., ¶16; Hassey Decl., ¶16; Keohane Decl., ¶16; Kukuy Decl., ¶16; Letellier Decl., ¶16;  Lonzie Decl., ¶15; McNeer Decl., ¶16; Moscardelli Decl., ¶15; Noone Decl., ¶16; Pass Decl., ¶16; Pearson Decl., ¶16; Perry Decl., ¶16 ; Poggi Decl., ¶16; Steven Ropers Decl., ¶15 ;

might make a sale to a merchant vendor that the City Planner might decide not to "run." *See supra,* n.33; *see also* Ex. 1, GRP551 ("███████████████████████████

████████████████████████")); Ex. 6, R. Carney Dep., 156:9-17 ("A. Because getting the contract back never guaranteed that your deal would run. Q. Do you know why that was? A. It was above my, above my pay scale.").  If a sale did not "run," the merchant was not obligated under the contract.[35] Ex. 1, GRP78020 ("████████████████████████

████████████████████████████████████████").

### 5. Groupon's Sales Process Survey

In late June 2011, Groupon sent all Account Representatives employed in its G1 and NOW! sales divisions the same "Sales Process Survey" to complete.  Ex. 13, Rule 30(b)(6) Dep., Ex 2 (GRP60700-GRP60714); Rule 30(b)(6) Dep., 20, 4:24; 27: 18:18; 28:16-22. The primary purpose of the survey was for Groupon ████████████████████████████

████████████████████████. Ex. 13, 30(b)(6) Dep., 57:6-20; 23, 6:10; 56:2-17.  As part of the survey design process, between ██████████████████

███████████████████████████████████████████

██████████████████████. Ex. 13, 30(b)(6) Dep., 69:13-16; 75:4-10, 72:3:9; 75:8-10.  ████████████████████████████████

---

Schlader Decl., ¶15; Sprague Decl., ¶15; Suh Decl., ¶15; Ex. 8, Daley Dep., 138:6-13, 219:13-22, 239:2-11, 244:2-6; Ex. 11, Dailey Dep., 116:5-14, 235:8-19, 237:1-14; Ex. 9, Poggi Dep., 109:22-110:5, 115:2-16;  Ex. 4, Noone Dep., 109:9-11, 148:12-15; Ex. 6, Carney Dep., 155:14-156:17, 158:12-23; Ex. 7, Hassey Dep., 127:21-24; Ex. 5, Suh Dep., 93:6-9; Ex. 12, Lonze Dep., 182:7-10; Ex. 10, D. Sprague Dep., 103:16-23

[35] Ex. 2, P26897 - P27058 (attached in alphabetical order) Aslakson Decl., ¶15; Carney Decl., ¶15; Hall Decl., ¶16; Hassey Decl., ¶16; Keohane Decl., ¶16; Kukuy Decl., ¶16; Letellier Decl., ¶16;  Lonzie Decl., ¶15; McNeer Decl., ¶16; Noone Decl., ¶16; Pass Decl., ¶16; Pearson Decl., ¶16; Perry Decl., ¶16 ; Poggi Decl., ¶16; Steven Ropers Decl., ¶15 ; Schlader Decl., ¶15; Sprague Decl., ¶15; Suh Decl., ¶15; Wills Decl., ¶15.

██████████████████████████████████████████ Ex. 13, 30(b)(6)

Dep., 71:17-24; 72:1-2.

All G1 and NOW! Sales Reps were given the survey to complete. Ex. 13, 30(b)(6) Dep.,

106:11-17. Approximately ████ Account Representatives responded to the survey, amounting to

more than ████ of the Sales Reps then employed, a response rate that ██████████

████████████. Ex. 13, 30(b)(6) Dep., 106:7-10; 113:19-114:14, 117:3-7.

The survey asked both G1 and NOW! Sales Reps to rank the amount of time they spent

performing the same five "████████████████████████████████████████

████████████████████████████████." Ex. 13, 30(b)(6)

Dep., 75:11-18, 78:11-20, 89:2-90:14.[36]

The survey revealed the following:



[36] The survey uses the term "████████." Ex. 13, 30(b)(6) Dep., 54:19-24. Defendant was
not attempting to assign any legal meaning to the term "administrative" and was not intending to
use that term as it is defined in the FLSA. 30(b)(6) Dep., 55:4-10.

23

Of particular note, the NOW! Sales Reps reported spending 

███████████████; the G1 Sales Reps reported spending ███████████

████████. Ex. 1,GRP 60636.[37]

## III.   PROPOSED CLASS DEFINITIONS

The proposed IMWL classes are defined as:

Class #1 – All inside Account Representatives and Account Executives employed by Defendant from August 19, 2008, through March 19, 2011, and after August 22, 2011, to the present.

Class #2 – All inside Account Representatives and Account Executives employed by Defendant from March 20, 2011 through August 22, 2011.

## IV   ARGUMENT

### A.   Class Certification Standard

The plaintiff bears the burden of showing that class certification is appropriate. *General Tele. Co. Of Southwest v. Falcon,* 457 U.S. 147, 161 (1982); *Retired Chicago Police Ass'n v. Chicago,* 7 F.3d 584, 596 (7th Cir. 1993). The district court possesses broad discretion in determining whether that burden is met. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir. 1998).

In evaluating a certification motion, the court's analysis must be "rigorous," and that rigor may "entail some overlap with the merits." *Amgen, Inc. v. Connecticut Ret. Plans & Trust Funds.* ___ U.S. ___, 133 S. Ct. 1184, 1194 (2013) *quoting Wal-Mart Store, Inc., v. Dukes,* 564 U.S. __, 131 S. Ct. 2541, 2551 (2011); *Szabo v. Bridgeport Machines, Inc.,* 249 F.3d 672, 676 (7th Cir. 2001); *Kernats, et al. v. Comcast Corp.,* Nos. 09 C 3364, 09 C 4305, 2010 U.S. Dist. LEXIS 112071, at *10 (N.D. Ill. Oct. 20, 2010). "Merits questions may be considered to the

---

[37] ██████████████████████████████████████" data are: ████████████████████

*Id.*, 175:11-176:2.

extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen*, 133 S. Ct. at 1195. That is because class certification turns on whether the requirements of Rule 23 are met, not on the ultimate resolution of the merits. *Falcon*, 457 U.S. at 161; *Driver, et al. v. AppleIllinois, LLC, et al.,* 265 F.R.D. 293, 300 (N.D. Ill. 2010).

## B. Plaintiffs' Meet The Rule 23 Requirements For Class Certification Of The IMWL Claims

### 1. Rule 23(a)(1): The Class Is Sufficiently Numerous

Plaintiffs' IMWL claim here meets the Rule 23(a)(1) numerosity requirement. Defendant admits that it employed more than a hundred Account Representatives during the applicable limitations period. Answer Second Am. Compl., ¶ 49, ECF No. 99. After the Court granted Plaintiffs' motion for Section 216(b) notice, Defendant produced a class list of 1,070 Account Representatives who were mailed notice of the FLSA collective action claims. Ex. A, Werman Decl., ¶ 13. This easily satisfies the numerosity element. *Swanson v. Am. Consumer Indus*., 415 F.2d 1326, 1333 (7th Cir. 1969) (noting that 40 class members would be sufficient).

### 2. Rule 23(a)(2): Issues of Liability Are Common to the Class

The commonality requirement depends on a common contention that is capable of class-wide resolution, thus allowing the truth of an issue central to the claim to be determined "in one stroke." *Wal-Mart Store, Inc., v. Dukes,* 564 U.S. __, 131 S. Ct. 2541, 2551 (2011); *and see Jamie S. v. Milwaukee Pub. Schs.,* 668 F.3d 481, 497 (7th Cir. 2012) (citing *Wal-Mart*) (plaintiff must demonstrate that putative class members all "suffered the same injury"). A single common question will suffice. *Jamie S.*, 668 F.3d at 497, *quoting Wal-Mart,* 131 S. Ct. at 2556. And where the defendant engages in standardized conduct against the putative class members, the legality of which is an "outcome determinative issue," commonality is met. *Healy v.*

25

*International Brotherhood of Elec. Workers,* No. 11 C 8892, 2013 U.S. Dist. LEXIS 119102, * at 12-13 (N.D. Ill. Aug. 22, 2013).

Commonality does not demand that each class member have an identical claim. *Spano v. Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011). Thus, some factual variation between class members will not defeat class certification. *Rosario v. Livaditis,* 963 F.2d 1013, 1017-18 (7th Cir. 1992).

Commonality is satisfied here. Sales Reps are entitled to overtime *unless* Defendant can prove that an exemption applies, and its principal exemption argument is that Sales Reps are performing 'administrative' duties. Under the IMWL, Defendant must establish, *inter alia,* that the "primary duty" of the Sales Rep is administrative, *and* that the primary duties require the exercise of both discretion and independent judgment.[38] *Piscione v. Ernst & Young*, L.L.P., 171 F.3d 527, 533-34 (7th Cir. 1999) *overruled on other grounds by Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013). But "sales work" does *not* fall within the ambit of the administrative exemption. *Piscione,* 171 F.3d at 540; *Shaw v. Prentice Hall Computer Pub., Inc.,* 151 F.3d 640, 644 (7th Cir.1998); *Roe-Midgett v. CC Servs., Inc.,* 04 CV 4051 DRH, 2006 WL 839443 (S.D. Ill. Mar. 29, 2006) *aff'd*, 512 F.3d 865 (7th Cir. 2008). Therefore, since all Sales Reps perform the same duties, as Groupon's documents and the Sales Process Survey make clear, whether those duties constitute "sales work" can be determined on a class basis "in one stroke." *See Johnson v. Pinstripes, Inc.,* 12 C 1018, 2013 U.S. Dist. LEXIS 138253, at *8-9 (N.D. Ill. Sept. 26, 2013) (commonality found where company-wide policy required sidework

---

[38] That is, the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." *Demos v. City of Indianapolis*, 302 F.3d 698, 704 (7th Cir. 2002). The IMWL utilizes the "white collar" test in effect under the FLSA prior to March 31, 2004. 820 ILCS 105/4a(2)(E).

duties, and whether those duties were of a tipped or non-tipped occupation can be determined class-wide).

When the tide waters of overtime compliance finally washed over Groupon, *all* Sales Reps got wet; when that tide receded into noncompliance, *all* Sales Reps were beached. The two policy decisions that Groupon took central to this lawsuit – to begin paying overtime and to stop paying overtime – were made as to Sales Reps as a whole. Thus, Groupon's e-mail that informed the Sales Reps, *all* Sales Reps, that they would no long receive overtime, stated: "████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████." Ex. 1, GRP50835 (Aug. 19, 2011, E-mail to all Sales Reps) (emphasis added). Groupon could make this decision as to all Sales Reps, "█████████████████████████████████," because all Account Representatives were performing the same duties.

Of course, Plaintiffs assert that those job responsibilities were "sales work," and further, that that work did *not* require independent judgment or discretion. *See Kennedy v. Commonwealth Edison Co.,* 410 F.3d 365, 374 (7th Cir. 2005) (exemption is not available for employees who simply apply well-established techniques or procedures described in manuals or other sources within prescribed limits). Indeed, Groupon very deliberately created and enforced a process designed to *preclude* the use of judgment and discretion on the part of Sales Reps. *See, e.g.*, Ex. 1, GRP197 (directing managers "██████████████████████████████ ████████"); *id.*, at GRP96 (directing City Planners ██████████████████████████ ████████████████████████████████████████████ ██████████████████."); *id.*, at GRP205 (directing City Managers "████████████

████████████████████████████████████████████████" and to "████████████████████
████████████████████████████████████████████.").  But before the question of

judgment and discretion even arises, Defendant must first establish on the merits that the

"primary duty" of the Sales Reps is 'administrative' and not sales: if Groupon fails in that effort,

the "inquiry ends."  *Reiseck v. Universal Commc'ns of Miami, Inc.,* 591 F.3d 101, 108 (2d Cir.

2010).

The question for this motion, however, is whether Defendant's affirmative defenses can

be resolved class-wide: they can, because the duties of the Sales Reps were the same, and as the

August 2011 e-mail demonstrates, Groupon treated those employees the same.

In addition to the administrative exemption issues, other common questions exist:

- whether Groupon is a 'retail or service establishment' for purpose Groupon's commission sales person affirmative defense, and, if so whether Defendant meets the other conditions for the commission sales person exemption; and

- whether Groupon became obligated to make full overtime payments that included earned commissions as required by the IMWL during the "Overtime Period," and if so, what the proper method of calculating such payments was."

Here, the claims of individual class members are based on the common application of the

IMWL, and they were aggrieved by the same conduct.  *See Keele,* 149 F.3d at 592; *and see*

*Butler v. Sears, Roebuck and Co.,* Nos. 11-8029, 12-8030, 2013 U.S. App. LEXIS 17748, at *11-

12 (issue central to validity of the plaintiff's claim that can be resolved "in one stroke" justifies

class certification).   Indeed, if Defendant does not meet its burden of proof on the exemptions

that it raises, liability will be established as to every Account Representative.

Commonality is met here because the applicability, *vel non*, of Defendant's affirmative

defenses can be made on a class-wide basis.

28

### 3.    Rule 23(a)(3): Plaintiffs' Claims Are Typical of the Class

Claims of the class representative and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory. *Keele*, 149 F.3d at 595; *De La Fuente v. Stokely-Van Camp, Inc*., 713 F.2d 225, 232 (7th Cir. 1983). Typicality and commonality are closely akin. *Rosario*, 963 F.2d at 1018. "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp*., 167 F.R.D. 51, 57 (N.D. Ill. 1996).

Plaintiffs' IMWL claims arise from the same alleged unlawful conduct as the claims of the class of Account Representatives: Defendant's failure to pay them overtime pay, or failure to pay them overtime pay at the correct regular rate. These common practices are and will be *the principal issue* of the litigation for both classes of employees. This makes the claims for both classes "typical" under Rule 23(a)(3).

### 4.    Rule 23(a)(4): Plaintiffs and Their Counsel Will Adequately Represent the Class

The adequacy requirement is meant to ensure that the representative party will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). Courts determine adequacy in two parts: (1) the plaintiff's ability to ensure vigorous advocacy on behalf of the class without interests antagonistic to the class; and (2) the adequacy of the named plaintiff's counsel to fairly and adequately represent the interests of the class. *Haschak v. Fox & Hound Rest. Grp., et al.,* No. 10 C 8023, 2012 U.S. Dist. 162476, at * 8 (N.D. Ill. Nov. 14, 2012). The conflict of interest inquiry "merely requires that plaintiffs not have 'antagonistic' interests, so 'only a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status.'" *Martens v. Smith Barney, Inc.,* 181 F.R.D. 243, 259 (S.D.N.Y. 1998) *quoting Krueger v. New York Tel. Co*., 163 F.R.D. 433 (S.D.N.Y. 1995). "The burden of demonstrating adequacy

under this standard …is not a heavy one." *Nielsen v. Greenwood*, No. 91 C 6537, 1996 U.S. Dist. LEXIS 14441, at *16 (N.D. Ill. Oct. 1, 1996).

Named Plaintiffs all worked as Groupon Account Representatives, and their overtime claims are identical to those of the rest of the class. Plaintiffs have shown their commitment to vigorous litigation by answering written discovery and giving depositions.  This qualifies them as "conscientious representative plaintiffs" and satisfies the adequacy of representation requirement.  *Robles v. Corporate Receivables, Inc*., 220 F.R.D. 306, 314 (N.D. Ill. 2004); *Ladegaard v. Hard Rock Concrete Cutters, Inc.,* No. 00 C 5755, 2000 U.S. Lexis 17832, *17-18 (N.D. Ill. Dec. 1, 2000).

Nor do Plaintiffs have any interests antagonistic to the class. Rather, Plaintiffs have the same interests and have suffered the same damages as the proposed class members.

Plaintiffs' counsel is also qualified and able to conduct the proposed litigation on behalf of the class.  Under Rule 23(g), courts must consider four factors when appointing class counsel: (1) the work counsel has performed in identifying the potential class claims; (2) class counsel's experience in handling complex litigation and class actions; (3) counsel's knowledge of the applicable law; and (4) the resources that class counsel will commit to representing the class. Fed.R.Civ.P. 23(g).  Those requirements are met here.  Ex.  A, Werman Decl.; ¶¶ 6-18, Ex. B. Sypulski Decl ¶¶ 2-8.

### 5.      This Action Satisfies the Requirements of Rule 23(b)(3)

Class certification is appropriate under Rule 23(b)(3) where "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and . . . a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3); *Amgen,* 133 S. Ct. at 1191.

30

Plaintiffs' action here meets that standard.

### a. Common Questions On Liability Predominate

Common questions predominate for purposes of Rule 23(b)(3) if undergirding the claims of the named plaintiffs and those of the class is a "common nucleus of operative facts and issues." *Messner v. NorthShore Univ. Health Sys.,* 699 F.3d 802, 815 (7th Cir. 2012); *and see Butler,* 2013 U.S. App. LEXIS 17748, at *11-12 (reaffirming *Messner* post-*Comcast*). The "predominance requirement is satisfied when 'common questions represent a significant aspect of [a] case and . . . can be resolved for all members of [a] class in a single adjudication.'" *Id.*, *quoting* 7AA C. Wright, A. Miller & M. Kane, Federal Practice and Procedure, § 1778.

This does not mean that individual questions must be absent. "The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Messner,* 699 F.3d at 815.

Neither is the predominance analysis "bean counting" or "counting noses." *Butler,* 2013 U.S. App. LEXIS 17748, at *11-12. "[T]he predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.*, *quoting Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 623 (1997). "[C]ommon issues need only predominate, not outnumber individual issues." *Id.*, *quoting In re Inter-Op Hip Prosthesis Liability Litigation*, 204 F.R.D. 330, 345 (N.D. Ohio 2001). Furthermore, predominance does *not* require "common results for members of the class," nor does it require "common proof of damages for class members." *Id.*, *quoting Messner,* 699 F.3d at 819. "Rule 23(b)(3) does not impose such a heavy burden." *Id.*

In March, the Supreme Court reversed the Third Circuit affirmance of class certification of an anti-trust claim against Comcast. *Comcast Corp. v. Behrend*. ___ U.S. ___, 133 S. Ct. 1426 (2013). Since *Comcast*, numerous employers, and some judges, *see, e.g., Roach v. T.L. Cannon Corp.*, No. 3:10 Civ. 0591 (TJM), 2013 U.S. Dist. LEXIS 45373, 2013 WL 1316452 (N.D.N.Y. Mar. 29, 2013),[39] have adopted an extreme interpretation of that decision that would preclude class certification where individualized damages issues exist. Recently, our Court of Appeals resoundingly rejected that misinterpretation of *Comcast*, and affirmed what has long been black-letter law in this Circuit and in every circuit: the fact that individualized inquiries may be necessary to determine damages does *not* defeat class certification. *Butler*, 2013 U.S. App. LEXIS 17748, at *13-14.

> If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined *in individual hearings*, in settlement negotiations, or by creation of subclasses, *the fact that damages are not identical across all class members should not preclude class certification.*

*Id.* (emphasis added).

Indeed, there were "legions" of such appellate court rulings across the circuits before *Comcast*, 133 S. Ct. at 1437 (Ginsburg and Breyer, JJ., dissenting) ("[r]ecognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal") (citing cases), and the appellate decisions since *Comcast*, including *Butler,* have affirmed this black-letter rule. *Leyva v. Medline Indust., Inc.*, 716 F.3d 510, 513-14 (9th Cir. 2013); *In re Whirlpool Corp. Front-Loading Washer Products Liability Litigation*, No. 10-4188, 2013 U.S. App. LEXIS 14519, at *49-52 (6th Cir. July 18, 2013); *and see Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 12-3176, 2013 U.S. App. LEXIS 13842, 2013 WL

---

[39]     The Second Circuit has accepted the plaintiff's Rule 23(f) petition in *Roach*. *Roach v. T.L. Cannon Corp.,* No. 13-3070, ECF No. 1-1, at 1 (2d Cir. Aug. 15, 2013).

3389469, at *17 (10th Cir. July 9, 2013) (remanding to district court for predominance consideration, but stating that individualized damages, standing alone, do not thwart class certification, and class may be certified for purposes of liability determination only).

The *Comcast* decision thus merely stands for the unremarkable proposition that "a damages suit cannot be certified to proceed as a class action unless the damages sought are the result of the class-wide *injury* that the suit alleges." *Butler*, 2013 U.S. App. LEXIS 17748, at *7 (emphasis in original).

More broadly, *Butler* reaffirms the central touchstone of class action litigation: efficiency. *Butler*, 2013 U.S. App. LEXIS 17748, at *4, 6, 9. "[T]he more claimants there are, the more likely a class action is to yield substantive economies in litigation. It would hardly be an improvement to have in lieu of this single class action 17 million suits each seeking damages of $15 to $30." *Id.* at 14, *quoting Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004). Thus, the central question on predominance is whether the class action would "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prods., Inc.,* 521 U.S. at 615, *quoting* Fed. R. Civ. P. 23, Advisory Comm. Notes.

Here, issues of Defendant's affirmative defenses, and thus liability, predominate over any individual questions.

### b.     Superiority of Class Action Method

In determining whether a class action is superior to other methods for resolving a controversy, pertinent considerations are: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in a particular

forum; and (4) the difficulties likely to be encountered in the management of a class action. *Ladegaard,* 2000 U.S. Dist. LEXIS 17832, at * 25-28. These considerations in this case demonstrate superiority.

Further, wage and hour cases are particularly conducive to class treatment, because the damages of any given class member will likely be small relative to the cost of individual litigation, and injured employees are unlikely to bring their claims. *Curry v. Kraft Foods Global, Inc.,* No. 10 CV 1288, 2011 U.S. Dist. LEXIS 102510, at *20-21 (N.D. Ill. Sept. 12, 2011); *see also Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir. 2006) ("Rule 23(b)(3) was designed for situations . . . in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate").

Here, the class mechanism is superior. Under the first and second factors, there is no known interest from putative class members to control this litigation as against class treatment. "Thus, there does not appear to be an interest of individual members in controlling the prosecution of the state claims." *Ladegaard,* 2000 U.S. Dist. LEXIS 17832, at * 26. Under the third factor, it is extremely desirable to have all this litigation concentrated in one action before this Court. The factual issues regarding the failure to pay overtime are the same between the two classes. The legal issues regarding Defendant's conduct in violating the IMWL is the same throughout the two classes. This single forum will create consistency among the class members' near identical claims.

Under the fourth factor, there will not be any difficulties in the management of the two class claims. The two classes are ascertainable. The size of the classes, or the geographical location of their members, creates no difficulty. "Further, any issues specific to individual

34

members, such as damages or defenses, can be determined through a separate motion or hearing." *Ladegaard,* 2000 U.S. Dist. LEXIS 17832, at * 28.

## V.   CONCLUSION

Defendant had agreed to class certification, committed to it in open court, and prepared a 30-page memorandum supporting it. Joint Mot. Certification [Def.'s Draft], at 1-2, ECF No. 114-1.  Defendant may be whistling a different tune now, but it cannot change the original melody. Class certification is warranted in this case because the resolution of the overtime claims of Named Plaintiffs will resolve the overtime claims of all Account Representatives.

For the foregoing reasons, Plaintiffs respectfully request the Court to: (1) certify Plaintiffs' IMWL claims as a class action under Rule 23; (2) order that notice be sent to all class members; (3) order Defendant to produce to Plaintiffs' Counsel the contact information for each class member; (4) appoint Named Plaintiffs as Class Representatives; (5) appoint Plaintiffs' counsel as class counsel; and (6) grant such other relief as the Court deems proper.

Respectfully submitted,

Dated:  October 2, 2013

s/ Douglas M. Werman