**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

RANITA DAILEY, JOHN DALEY II,
ERIC HALL AND DOMINIC POGGI,
on behalf of themselves and all others
similarly situated,

                    Plaintiffs,

      v.

GROUPON, INC.,

                  Defendant.

No.  11-CV-5685

Judge Edmond E. Chang

Magistrate Judge Michael T. Mason

## <u>DEFENDANT GROUPON, INC.'S OPPOSITION TO PLAINTIFFS' RENEWED</u> <u>MOTION FOR CLASS CERTIFICATION</u>

**PUBLIC VERSION**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    STATEMENT OF FACTS ..................................................................................4

     A.     Competing Concerns Managed By AEs ..................................................6

     B.     Market Research Regarding Potential Merchants.....................................7

     C.     Merchant Selection by AEs .....................................................................9

     D.     Negotiation of the Deal Structure .........................................................10

     E.     Negotiation of Contract Terms ..............................................................13

     F.     Developing Groupon's Presence in a Market .........................................17

     G.     AEs' Varying Approach to the Merchant Relationship.........................19

     H.     AEs' Participation in the Editorial Process Differs ...............................21

     I.     AEs' Varied Responsibility Regarding Scheduling of Deals ...............21

     J.     AEs' Involvement in Post-Deal Customer Service Issue Varies ...........21

     K.     Training of AEs Has Varied ..................................................................23

     L.     AEs Work Variable Hours .....................................................................24

     M.     AE Performance Metrics Have Varied ..................................................24

     N.     AE Survey Data .....................................................................................25

     O.     Compensation ........................................................................................26

III.    LEGAL STANDARD ......................................................................................27

IV.    ARGUMENT ...................................................................................................28

     A.     Plaintiffs Fail to Meet the Commonality and Predominance
                Requirements of Rule 23 .......................................................................28

1.      Individualized Fact Inquiries Are Required To Determine If Each Account Executive's Primary Duty Were Work Directly Related To Groupon's General Business Operations ....................................................30

          a.      Plaintiffs Ignore Controlling Authority Establishing that "Sales Representatives" May Perform Duties Directly Related to an Employer's General Business Operations ...................................30

          b.      Substantial Variances in AEs Actual Job Functions Preclude Class Treatment, and Instead Require Individualized Inquiries to Ascertain Each AE's Primary Duties ...........................................34

          c.      "Sales Work" Does Not Automatically Fall Outside of the Administrative Exemption ...................................36

          d.      Plaintiffs' Reliance on Common Job Titles, Descriptions, and Classifications is Entirely Unavailing ...................................................................................37

2.      Individualized Assessments Are Needed Regarding AEs' Exercise of Independent Judgment or Discretion on Matters of Significance. ......................................................38

B.      Damages Cannot Be Determined on a Class-Wide Basis.....................................40

1.      *Comcast* and *Espenscheid* Require That Damages Can Be Determined On a Class-Wide Basis...............................................41

2.      Plaintiffs Have Failed to Demonstrate that Damages Can Be Determined on a Class-Wide Basis ...............................................42

V.      CONCLUSION.............................................................................................................45

## TABLE OF AUTHORITIES

**Cases:**                                                                   **Page(s):**

*Amchem Prods., Inc. v. Windsor*
        521 U.S. 591 (1997).............................................................................................27, 28

*Am. Honda Motor Co. v. Allen*
        600 F.3d 813 (7th Cir. 2010) ......................................................................................28

*Bunyan v. Spectrum Brands, Inc.*
        07-CV-0089-MJR, 2008 WL 2959932 (S.D. Ill. Jul. 31, 2008)........................................38

*Butler v. Sears, Roebuck & Co.*
        727 F.3d 796 (7th Cir. 2013) .......................................................................................45

*Christopher, et al. v. SmithKline Beecham Corp.*
        132 S.Ct. 2156 (2012).........................................................................32 (FN174)

*Comcast Corp. v. Behrend*
        133 S. Ct. 1426 (2012)...........................................................4 (FN11), 40, 41, 42, 45

*Cruz v. Lawson Software, Inc.*
        764 F. Supp. 2d 1050 (D. Minn. 2011).........................................................35 (FN176), 38

*Demos v. City of Indianapolis*
        302 F.3d 698 (7th Cir. 2002) .............................................................................29 (FN171)

*DeWalt v. Greencroft Goshen, Inc.*
        902 F.Supp.2d 1127 (N.D. Ind. 2012) ......................................................... 35, FN177, 37

*Espenscheid v. DirectSat USA, LLC*
        705 F.3d 770 (7th Cir. 2013) ...................................................4 (FN11), 40, 41, 42, 44, 45

*Farmer v. DirectSat USA, LLC*
        No. 08 CV 3962, 2013 WL 2457956 (N.D. Ill. June 6, 2013)....................................42, 44

*Franks v. MKM Oil, Inc.*
        No. 10 CV 00013, 2012 WL 3903782 (N.D. Ill. Sept. 7, 2012)................................28, 43

*General Tel. Co. of the SW v. Falcon*
        457 U.S. 147 (1982)........................................................................................27

*Green v. Harbor Freight Tools USA, Inc.*
        888 F.Supp.2d 1088 (D. Kan. 2012)...............................................................3 (FN10), 38

*Hardin v. Harshbarger*
    814 F. Supp. 703 (N.D. Ill. 1993) ...................................................................27

*Haywood v. North Amer. Van Lines, Inc.*
    121 F.3d 1066 (7th Cir. 1997) ...................................................... 34 (FN175), 39 (FN182)

*Hill v. R+L Carriers*
    No. C 09-1907 CW, 2011 WL 830546 (N.D. Cal. Mar. 3, 2011) ....................................29

*Hundt v. Direct Sat USA, LLC*
    No. 08 C 7238, 2013 WL 3338586 (N.D. Ill. Jul. 1, 2013) .........................................29, 36

*Kennedy v. Commonwealth Edison Co.*
    410 F.3d 365 (7th Cir. 2005) ........................................................... 29 (FN171)

*Marting v. Crawford & Co.*
    No. 00 C 7132, 2006 WL 681060 (N.D. Ill. Mar. 14, 2006) ...........................................37

*Messner v. NorthShore Univ. HealthSystem*
    669 F.3d 802 (7th Cir. 2012) .......................................................................27, 28

*Oetinger v. First Residential Mortg. Network, Inc.*
    No. 3:06-CV-381-H, 2009 WL 2162963 (W.D. Ky. Jul. 16, 2009) ..................................38

*Oshana v. Coca-Cola Co.*
    472 F.3d 506 (7th Cir. 2006) .......................................................................27

*Palacio v. Progressive Ins. Co.*
    244 F. Supp. 2d 1040 (C.D. Cal. 2002) ............................................................39 (FN182)

*Pavone v. Aegis Lending Corp.*
    No. 05-c-1529, 2006 WL 2536632 (N.D. Ill. Aug. 31, 2006) ..........................................28

*Piscione v. Ernst & Young, L.L.P.*
    171 F.3d 527 (7th Cir. 1999) ..........................................................29 (FN171)

*Roe-Midgett v. CC Servs., Inc.*
    No. 04 CV 4051 DRH, 2006 WL 839443 (S.D. Ill. Mar. 29, 2006) .................29 (FN171)

*Roe-Midgett v. CC Services, Inc.*
    512 F.3d 865 (7th Cir. 2008) ...................... 29 (FN171), 30 (FN172), 31 (FN 173), 34, 37

*Schaefer-LaRose v. Eli Lily & Co.*
    679 F.3d 560 (7th Cir. 2012) ...................................... 1, 31, 32, FN174, 33, 40

*Shaw v. Prentice Hall Computer Pub., Inc*.
    151 F.3d 640 (7th Cir.1998) .......................................................................29 (FN171), 37

*Spainhower v. U.S. Bank Nat'l Ass'n*
    No. 2:08-CV-00137, 2010 WL 1408105 (C.D. Cal. Mar. 25, 2010)................................29

*Verkuilen v. MediaBank, LLC*
    646 F.3d 979 (7th Cir. 2011) .......................................................................31, 34 (FN175)

*Wal-Mart Stores Inc. v. Dukes*
    131 S. Ct. 2541 (2011)................................................................................................27, 28

*In re Wells Fargo Home Mortgage Overtime Pay Litig.*
    No. C 06-01770 MHP, 2010 U.S. Dist. LEXIS 3132
    (N.D. Cal. Jan. 12, 2010) ..........................................................................................34

## Statutes and Other Authorities: <span style="float:right">Page(s):</span>

Fed. R. Civ. P. 23 ............................................................................................... Passim

29 CFR § 541.2 ................................................................................................... Passim

29 CFR § 541.103 ............................................................................................. 35, FN177

29 CFR § 541.201 (2013) ................................................................................. 31 (FN173), 33

29 CFR § 541.205 ............................................................................................... Passim

29 CFR § 541.206 ..............................................................................................35

820 ILCS § 105/4a ............................................................................................ 1, 30, FN172

69 FR 22122-01 .................................................................................................36

U.S. Dep't of Labor, Field Operations Handbook § 22c01(c) (2010) ............................................1

## I.    INTRODUCTION

Named Plaintiffs, former Account Executives ("AEs")[1] of Defendant, Groupon, Inc. ("Groupon"), seek class certification under Rule 23 for their claim that they are entitled to overtime pay under the Illinois Minimum Wage Law, 820 ILCS § 105/4a ("IMWL" or the "Act"), for weeks where they claim to have worked in excess of forty hours.  Under the IMWL, employees are not entitled to overtime if they fall within one of the recognized exemptions, including what is referred to as the "administrative exemption."  That exemption applies where an employee's primary duty is:  (i) office or non-manual work that is directly related to the management or general business operations of the employer or its customers; and (ii) involves the exercise of discretion and independent judgment as to matters of significance.

Plaintiffs readily acknowledge that the question their renewed motion for class certification raises is whether the applicability of the administrative exemption in this case can be resolved on a class-wide basis.  (*See* Plaintiffs' Memorandum of Law in Support of their Renewed Motion for Class Certification ("Plts. Mem."), p. 1).  In their submission, Plaintiffs do not (and cannot) dispute that the determination of whether the administrative exemption applies may only be resolved by examining an employee's *actual* job characteristics and duties as they are *actually* performed.  *See Schaefer-LaRose v. Eli Lily & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (whether an employee falls under a particular exemption "requires a thorough, fact intensive analysis of the employee's employment duties and responsibilities"); U.S. Dep't of Labor, Field Operations Handbook § 22c01(c) 2010 ("[w]hether a particular employee primarily performs exempt work depends on the actual duties performed").

---

[1] Plaintiffs' Second Amended Complaint refers to the putative class as "Account Executives."  (*See* Dkt. No. 91-1).  Groupon similarly refers to the putative class as "Account Executives" or "AEs."

An examination of how AEs actually perform their duties and responsibilities reveals great variance among Groupon's AEs as to the manner in which they perform their jobs. The variance results from a number of factors, including, but not limited to: the time period when an AE worked at Groupon; the particular markets served by an AE; the Groupon products for which an AE had responsibility; the differences in the extent of supervision and direction provided by different managers; and perhaps most critically, an individual AE's approach to and performance of the job, which widely varied in light of the freedom given to AEs. As named Plaintiff Ranita Dailey readily admitted, "every day at Groupon was different. So an employee that might have started January 1st of 2011 had a totally different manager, system, or set of rules than one that might have started June 2011."[2] Or as another named Plaintiff, John Daley, put it: the "only thing that was consistent at Groupon was the change."[3]

Recognizing that under Rule 23 Plaintiffs must show that, as class representatives, their purported job experiences are representative of the *actual* job experiences of the universe of Groupon AEs, Plaintiffs have submitted twenty-four cookie-cutter declarations from (with one exception) former AEs. These declarations try to simplify the job experience of Groupon AEs as though AEs robotically spend their entire day cold-calling merchants based on a company-provided script without any ability to negotiate deal structure or contract terms. The declarations do not accurately reflect the reality of an AE's job at Groupon, but rather tell an incomplete, inaccurate and misleadingly static portrayal of the AE job experience. Not only does the deposition testimony of Plaintiffs' representatives, as well as the declarations of current and former AEs submitted by Groupon, tell a very different story regarding the AE job experience,

---

[2] App. Ex. 2, Dailey Dep. at 10:17-21; App. Ex. 32, Massery Decl. ¶ 7 ("my DSMs have had different approaches").

[3] App. Ex. 3, Daley Dep. at 74:13-19; App. Ex. 31, Locklund Decl. ¶ 5 ("my job…has evolved from month to month and continues to evolve today").

but the resumés of Plaintiffs' declarants further contradict their characterization of the AE job.

For instance, contrary to Plaintiffs' made-for-litigation position, the resumés describe their

experience as an AE at Groupon in the following manner:

- "facilitated marketing campaign from ideation to contract negotiation through completion;"[4]

- "identif[ied] client's marketing goals and develop[ed] unique structure;"[5]

- "met with top clients quarterly to create campaigns for growth & profitability;"[6]

- "launched and developed original product line in Chattanooga, TN;"[7]

- "presented each Account's marketing strategy from inception through post-sale follow-up;"[8] and

- "assist[ed] and provide[d] creative direction in launching the GrouponLive channel in Chicago and LA."[9]

None of the foregoing duties and accomplishments was described in Plaintiffs'

declarations for the straight-forward reason that doing so would destroy the homogeneity of

experience that Plaintiffs need to bring this case as a class action under Rule 23.[10]  As described

*infra* at pages 4-26, the AE job has changed over time and AEs have actually performed their job

duties in myriad ways, such that individualized factual inquiries are necessary here to determine

---

[4] App. Ex. 17, Dana Hassey Résumé.

[5] App. Ex. 25, Daniel Sprague Résumé.

[6] App. Ex. 26, Jinah Suh Résumé.

[7] App. Ex. 23, Dominic Poggi Résumé.

[8] App. Ex. 13, Roy Carney Résumé.

[9] App. Ex. 16, Eric Hall Résumé.

[10] Named Plaintiffs Daley and Hall, and opt-in Plaintiffs Suh, Hassey, and Carney disavowed certain descriptions in their resumés concerning how they performed their job duties.  Plaintiffs' contradictory characterizations of their job duties could evolve into distracting credibility determinations for a jury, rendering class treatment improper. *See Green v. Harbor Freight Tools USA, Inc.*, 888 F. Supp. 2d 1088, 1103 (D. Kan. 2012) (decertifying class where defendant would introduce evidence "calling into question the credibility of Plaintiffs' claims, including Plaintiffs' own résumés touting their management responsibilities as well as their contradictory testimony and sworn discovery responses").

the application of the administrative exemption. In short, there is no universality of experience

and Plaintiffs cannot meet their burden to satisfy the requirements of Rule 23.

Similar individualized inquiries are needed with respect to damages issues because

Plaintiffs do not (and cannot) provide a common methodology to determine any damages on a

class-wide basis. Both the United States Supreme Court and the Seventh Circuit have recently

held that the absence of a common methodology to determine damages on a class-wide basis

precludes class certification.[11] Determining Plaintiffs' alleged overtime hours would require

fact-intensive inquiries into the hours worked by each AE given that there was no policy

requiring AEs to work more than forty hours in a week.[12] Rather, the hours worked were subject

to the discretion of each AE and were largely dependent on the extent of each AE's desire to

close deals with merchants knowing that they stood to receive commissions.[13] This would

require investigating each AE's memory of the claimed hours worked, an undertaking that the

Supreme Court and Seventh Circuit have concluded will result in individualized issues of fact,

overwhelming questions common to the class.

## II. STATEMENT OF FACTS

Plaintiffs maintain, as they must, that "[a]ll Sales Reps perform the same duties."[14] But

the evidence demonstrates that AEs actually perform duties in widely divergent ways and with

varying degrees of discretion and initiative. For instance, some AEs spend considerable time

---

[11] *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1434-35 (2012); *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773-77 (7th Cir. 2013).

[12] App. Ex. 11, Suh Dep. at 138:2-140:8; App. Ex. 5, Hassey Dep. at 122:2-124:10.

[13] App. Ex. 31, Locklund Decl. ¶ 24; App. Ex. 32, Massery Decl. ¶44.

[14] Plts. Mem. at 26.

performing market research,[15] while others claim to spend little or no time on such activities.[16] Some AEs spend time developing creative and novel deal structures,[17] while others claim to simply replicate past Groupon deals.[18] And some AEs negotiate contract terms with merchants without advance approval of their managers,[19] while others steadfastly deny ever negotiating with merchants.[20] Opt-in Plaintiff (Dana Hassey) succinctly described it as: "*everyone* [at Groupon] *works differently* and it is about finding what works best for me"[21] (emphasis added).

While Plaintiffs go to great lengths to describe the AE job as one where AEs spend 80% or more of their time "cold-calling" merchants in a "boiler room" like atmosphere, that characterization is directly at odds with the facts. ███████████████████████████████ ████████████████████████████████████████[22] Furthermore, Plaintiffs' superficial description of the AE job simply ignores many of the tasks performed by AEs. The following sub-sections describe the AE job at Groupon and how it has evolved since inception.

---

[15] App. Ex. 3, Daley Dep. at 331:14-332:1; App. Ex. 7, Lonze Dep. at 32:8-23; App. Ex. 29, Intal Decl. ¶¶ 4, 15, 34; App. Ex. 31, Locklund Decl. ¶ 6; App. Ex. 2, Dailey Dep. at 55:9-56:2; App. Ex. 33, Mohideen Decl. ¶ 4; App. Ex. 32, Massery Decl. ¶¶ 11, 12.

[16] App. Ex. 9, Poggi Dep. at 209-4:18; App. Ex. 8, Noone Dep. at 160:7-19; App. Ex. 5, Hassey Dep. at 79:12-81:24.

[17] App. Ex. 2, Dailey Dep. at 82:16-84:10; App. Ex. 18, Liam Keohane Résumé ("implemented new and innovative deal structures to reflect changing deal types"); App. Ex. 33, Mohideen Decl. ¶ 6; App. Ex. 28, Banfield ¶ 7.

[18] App. Ex. 3, Daley Dep. at 132:16-133:1; App. Ex. 4, Hall Dep. at 183:12-20; App. Ex. 5, Hassey Dep. at 68:4-14.

[19] App. Ex. 7, Lonze Dep. at 52:19-54:22; App. Ex. 31, Locklund Decl. ¶¶ 8-9; App. Ex. 36, Schuberth Decl. ¶ 15; App. Ex. 33, Mohideen Decl. ¶ 6; App. Ex. 29, Intal Decl. ¶ 10; App. Ex. 34, Ronalds Decl. ¶ 14.

[20] App. Ex. 5, Hassey Dep. at 28:5-12.

[21] *Id.* at 82:2-15.

[22] App. Ex. 37, Wijekoon Decl. ¶ 7; App. Ex. 46, GRP00060636; App. Ex. 42, GRP00017009; App. Ex. 44, GRP00021115.

## A. Competing Concerns Managed By AEs.

Groupon is an e-commerce company that creates an internet market place. Groupon's customers purchase vouchers from Groupon that are redeemable for goods or services offered by merchants at significant discounts. Groupon and the merchants then share the payments received from Groupon's customers. In return for its portion of that payment, Groupon offers the merchant exposure to the public and various support services.

AEs are Groupon's primary contact with merchants. Negotiations with merchants involve understanding whether a proposed deal structure will work for each of three different constituents: the merchant, Groupon's customers, and Groupon.[23] In order to make sure that a deal will work for a particular merchant, it is important to understand the merchant's business, including the price point for the merchant's goods or services, and how a potential deal structure may perform for that particular merchant.[24] At the same time, it is necessary for the AE to understand whether a deal is structured in a way that will be attractive to Groupon's customers.[25] This involves considering such variables as the price point for the vouchers, what is being offered in the deal, the discount percentage (*i.e.,* the discount from the merchant's standard retail prices), the performance and timing of past deals, and what limitations, if any, will be placed on the Groupon voucher.[26]

---

[23] App. Ex. 7, Lonze Dep. at 63:13-18; App. Ex. 30, LaPlante Decl. at ¶ 21; App. Ex. 12, Sarah Berkley Résumé (describing that she "[b]uilt the merchant's feature around a strategic deal structure that will benefit the business [the merchant], consumer, and brand"); App. Ex. 32, Massery Decl. ¶18; App. Ex. 38,Wroblewski Decl. ¶ 8; App. Ex. 36, Schuberth Decl. ¶ 9; App. Ex. 31, Locklund Decl. ¶ 7.

[24] App. Ex. 7, Lonze Dep. at 46:8-12, 48:9-23; Mohideen Decl. ¶ 6; App. Ex. 31, Locklund Decl. ¶ 7; App. Ex. 36, Schuberth Decl. ¶ 9.

[25] App. Ex. 7, Lonze Dep. at 58:3-13.

[26] *Id.* at 61:8-62:16; App. Ex. 31, Locklund Decl. ¶ 7; App. Ex. 36, Schuberth Decl. ¶ 9.

In addition to balancing the concerns of the merchant and customers, AEs must also determine whether the deal will work financially for Groupon.[27] This includes making sure that Groupon has both a wide variety of deals at all times and deals at different price points.[28] At the end of the day, it is an AE's responsibility to balance the various concerns of all three constituents (the merchant, customer and Groupon) in structuring the features of each deal.[29]

### B. Market Research Regarding Potential Merchants.

One of the significant differences with respect to AEs' discharge of their job duties is in the area of research and lead generation. Certain members of the putative class extensively researched their respective markets and came to thoroughly understand them, including differences in subscriber preferences across geographic areas.[30] That research allowed them to find merchants for Groupon to partner with on deals, a process termed "lead generating" or "prospecting."[31] Although the role of lead generating has evolved over time for the putative class, from the start of Groupon through at least December 2012, AEs were the primary group responsible for researching and identifying merchants with whom to partner.[32] Indeed, Plaintiff Daley reported spending "hours and hours and hours" doing lead research.[33]

---

[27] App. Ex. 7, Lonze Dep. at 62:23-63:2; App. Ex. 31, Locklund Decl. ¶ 7; App. Ex. 36, Schuberth Decl. ¶ 9.

[28] App. Ex. 7, Lonze Dep. at 63:3-18; *see also* App. Ex. 29, Intal Decl. ¶ 6.

[29] App. Ex. 7, Lonze Dep. at 63:13-64:6.

[30] App. Ex. 33, Mohideen Decl. ¶ 4; App. Ex. 36, Schuberth Decl. ¶ 6; App. Ex. 29, Intal Decl. ¶¶ 4, 16, 17; App. Ex. 32, Massery Decl. ¶ 11.

[31] App. Ex. 52, GRP00069054; App. Ex. 31, Locklund Decl. ¶ 6; App. Ex. 38, Wroblewski Decl. ¶¶ 9-10.

[32] App. Ex. 46, GRP00060654. This built Groupon's merchant partner database and shaped each market; App. Ex. 31, Locklund Decl. ¶ 6; App. Ex. 29, Intal Decl. ¶ 4; App. Ex. 7, Lonze Dep. at 32:17-23; App. Ex. 8, Noone Dep. at 56:2-4; App. Ex. 4, Hall Dep. at 220:13-16; App. Ex. 5, Hassey Dep. at 12:7-11; App. Ex. 34, Ronalds Decl. ¶ 10; App. Ex. 53, GRP00079609, E-mail from AE ("It's our responsibility to lead gen quality business that meet our standard and we are trusted to do this").

[33] App. Ex. 3, Daley Dep. at 331:14-332:1.

The amount of time spent performing market research on leads, however, varied by AE and tended to evolve over time. For instance, opt-in Plaintiff Daniel Sprague claimed that he spent 20-60 minutes a day lead generating.[34] Opt-in Plaintiff Caleb Noone testified that he spent as much as 70% of his time performing lead generating work when he joined Groupon, but that after his first several weeks of employment, it dropped to 5-10% of his time.[35] Ms. Lonze testified that when she started, she spent half her time performing lead research, but that it later dropped to 30% (*i.e.*, anywhere from 3-6 times what Noone did following the start of his employment at Groupon).[36] Opt-in Plaintiff Dana Hassey testified that she nearly stopped performing lead research altogether.[37] Other AEs were either advised not to lead generate, or viewed it as a small part of their jobs.[38]

The varying amounts of time AEs spent lead generating was also contingent on their particular geographic market or product responsibility. For example, named Plaintiff Dominic Poggi spent time assigned to different markets and different product platforms. When he first joined the Chattanooga, Tennessee market, he spent 4-5 hours generating leads in order to build that market.[39] After that market was established, Mr. Poggi's lead generating time decreased by half.[40] Eventually, Mr. Poggi joined GrouponNow for the Detroit, Michigan market and stopped lead generating altogether because his leads were assigned to him.[41]

---

[34] App. Ex. 10, Sprague Dep. at 14:11-15:13.

[35] App. Ex. 8, Noone Dep. at 160:5-19.

[36] App. Ex. 7, Lonze Dep. at 27:5-20, 32:8-23.

[37] App. Ex. 5, Hassey Dep. at 80:4-14.

[38] App. Ex. 38, Wroblewski Decl. ¶ 9; App. Ex. 32, Massery Decl. ¶ 15.

[39] App. Ex. 9, Poggi Dep. at 93:5-94:11.

[40] *Id.* at 99:12-100:2.

[41] *Id*. at 98:17-22.

Beyond differences in the amount of time spent lead generating, AEs have reported differences in the qualitative approach to generating leads. For instance, Plaintiff Dailey testified that she was "super creative" in finding new leads.[42] By contrast, named Plaintiff Poggi testified that he did not deviate from "guidelines" on how to generate leads.[43]

### C. Merchant Selection by AEs.

Historically, members of the putative class decided what merchant types and what specific merchants to pursue with little or no restrictions.[44] Indeed, there were times when AEs could call on merchants outside of their own geographic territories.[45] Additionally, the putative class was not told uniformly who to call and when.[46] At times there were varying restrictions on the quality of merchants to call, and at times there were none at all.[47]

In or around the third quarter of 2011, Groupon implemented what was referred to as the Purchase Order System.[48] Under that system, AEs were given direction as to the type of merchant that Groupon wanted an AE to pursue.[49] It remained up to the AE to determine which

---

[42] App. Ex. 2, Dailey Dep. at 82:16-22; *see also* App. Ex. 56, P0297, New Hire Orientation Handbook ("creative deals are HIGHLY encouraged").

[43] App. Ex. 9, Poggi Dep. at 104:17-105:1.

[44] App. Ex. 30, LaPlante Decl. ¶ 4; App. Ex. 31, Locklund Decl. ¶ 6; App. Ex. 36, Schuberth Decl. ¶ 8; App. Ex. 29, Intal Decl. ¶ 9.

[45] App. Ex. 7, Lonze Dep. at 164:4-8; App. Ex. 36, Schuberth Decl. ¶ 8; App. Ex. 32, Massery Decl. ¶ 39.

[46] App. Ex. 34, Ronalds Decl. ¶ 24; App. Ex. 6, Keeler Dep. at 160:5-17; App. Ex. 30, LaPlante Decl. ¶ 4; App. Ex. 36, Schuberth Decl. ¶ 8; App. Ex. 33, Mohideen Decl. ¶ 5; App. Ex. 7, Lonze Dep. at 26:14-27:17; App. Ex. 28, Banfield Decl. ¶ 3.

[47] App. Ex. 30, LaPlante Decl. ¶ 8; App. Ex. 6, Keeler Dep. at 160:5-161:7; App. Ex. 36, Schuberth Decl. ¶ 14; App. Ex. 33, Mohideen Decl. ¶ 5.

[48] App. Ex. 30, LaPlante Decl. ¶ 22; App. Ex. 31, Locklund Decl. ¶ 19; App. Ex. 36, Schuberth Decl. ¶ 20.

[49] *Id.*; App. Ex. 33, Mohideen Decl. ¶ 26.

particular merchant to call upon within a particular merchant type or category.[50]  And AEs were still permitted to call upon merchants outside the designated merchant type.[51]  During the time that that system was in place,



[52]

      Groupon currently uses a tool called ████████████████████████ ███████████████████  Some AEs, however, continue to use their own judgment in targeting merchants.[53]  For instance, as one AE explained, ████████████████████████████ ██████████████████████████ but he knows they sell well and so he still tries to partner with them.[54]  He attributes his success to using his judgment about what to pursue instead of solely relying on ████████████.[55]  Another putative class member agreed that whether to follow

.[56]

### D.      Negotiation of the Deal Structure.

      "Deal structuring" within Groupon refers to determining:  (i) the goods or services offered (*i.e.*, what the Groupon voucher is redeemable for); (ii) the price point for the Groupon voucher; (iii) the discount percentage (*i.e.*, the difference between the cost of the Groupon

---

[50]App. Ex. 31,  Locklund Decl. ¶ 20; App. Ex. 36, Schuberth Decl. ¶ 20; App. Ex. 33, Mohideen Decl. ¶ 26.

[51] App. Ex. 31, Locklund Decl. ¶ 20; App. Ex. 33, Mohideen Decl. ¶ 26.

[52] App. Ex. 30, LaPlante Decl. ¶ 22; App. Ex. 36, Schuberth Decl. ¶ 20; App. Ex. 28, Banfield Decl. ¶ 4.

[53] App. Ex. 38, Wroblewski Decl. ¶ 12; App. Ex. 30, LaPlante Decl. ¶ 32; App. Ex. 31, Locklund Decl. ¶ 21; App. Ex. 36, Schuberth Decl. ¶ 21; App. Ex. 29, Intal Decl. ¶ 36.

[54] App. Ex. 38, Wroblewski Decl. ¶ 14.

[55] *Id.* ("my success has been tied to my judgment about what deals to pursue, not just what the system tells me to pursue").

[56] App. Ex. 34, Ronalds Decl. ¶¶ 23, 24; *see also* App. Ex. 29, Intal Decl. ¶ 36.

voucher and the retail price of the goods/services covered by the Groupon); (iv) the type of

Groupon (*i.e.*, whether it is a "general spend" offering versus an "experiential" deal);[57] and

(v) the deal fine print (*e.g.*, whether there are expiration dates, limits on dates and times for use

of the voucher, limits on the number of purchases per customer, and limits on the maximum

number of vouchers sold).

According to Plaintiffs, AEs play no role in negotiating any of the deal structure terms,

but instead simply replicate past deal structures or implement deal structures proposed by

merchants or their DSMs (or City Planners).[58]  This oversimplification is contradicted by the

record.  The depositions and resumés of the opt-in Plaintiffs, as well as the declarations of

putative class members submitted by Groupon, show that deal structuring was part and parcel of

AEs' responsibilities to negotiate with merchants.[59]  At a minimum, for class certification

purposes, the substantial differences in deal structuring activities by AEs highlight the need for

individualized inquiries into how AEs actually perform their job duties.

Plaintiffs' contention that they had no responsibility for negotiating deal structure terms

is belied, in the first instance, by their own resumés, which reveal the following characterizations

and admissions of their involvement in such activities:

- "develop[ed] unique Groupon features;"[60]

---

[57] "General spend" refers to a feature where Groupon offers a voucher for a merchant's goods or services at a price discounted from the merchant's standard retail pricing (*e.g.*, a $20 voucher for $40 worth of food at a restaurant).  "Experiential" deals refer to instances where Groupon offers a voucher for a defined set of goods and/or services at a price below the merchant's standard retail price (*e.g.*, a $50 voucher that can be redeemed for a *prix-fixe* dinner).

[58] *See* Plts. Mem. at 20-21.

[59] App. Ex. 7, Lonze Dep. at 106:7-107:24; App. Ex. 9, Poggi Dep. at 36:9-21; App. Ex. 10, Sprague Dep. at 42:5-24; App. Ex. 11, Suh Dep. at 67:20-68:23; App. Ex. 30, LaPlante Decl. ¶¶ 9, 10; App. Ex. 31, Locklund Decl. ¶ 7; App. Ex. 29, Intal Decl. ¶ 7; App. Ex. 38, Wroblewski Decl. ¶ 35; App. Ex. 36, Schuberth Decl. ¶ 9.

[60] *See* App. Ex. 15, Nicole Evans LinkedIn Profile.

- "handled entire sales process including: initial pitch, proper deal structure;"[61]

- "negotiated price point and feature content to maximize revenue;"[62]

- "served as an expert to merchants on deal structure and strategy that are proven models for successful achievement of desired merchant outcomes;"[63]

- "worked with a variety of hotels to determine the most advantageous combination of price, black-out dates, and expiration timeframe;"[64]

- "negotiated contracts and feature details with existing clients;"[65] and

- "structure[d] and execute[d] offers with merchants while managing key logistical details such as budgets, timelines and revenue goals."[66]

Those admissions are consistent with the deposition testimony of certain opt-in Plaintiffs. Ms. Lonze acknowledged that it was her responsibility to negotiate deal-feature terms, including the discount percentage and certain fine print issues, and that she negotiated these terms without advance approval of her DSM.[67] Ms. Hassey admitted that within certain parameters, she was able to determine the final deal structure terms without the advance approval of her DSM or City Planner.[68]

The declarations submitted by Groupon likewise show that a portion of the putative class negotiated and determined deal structure terms without the advance approval of their DSMs or City Planners, including specifically that they:

---

[61] *See* App. Ex. 18, Liam Keohane LinkedIn Profile.

[62] *See* App. Ex. 19, Alex Konstantopolos LinkedIn Profile.

[63] *See* App. Ex. 21, Sean McDonnell LinkedIn Profile.

[64] *See* App. Ex. 27, Lydia Wiley LinkedIn Profile.

[65] *See* App. Ex. 20, Lonze Résumé.

[66] *See* App. Ex. 22, Noone Résumé.

[67] App. Ex. 7, Lonze Dep. at 102:14-104:11.

[68] App. Ex. 5, Hassey Dep. at 140:4-141:10, 153:10-154:10.

- negotiated the feature price point and discount percentage with merchants;[69]

- negotiated the particular goods and services included in a feature;[70]

- negotiated fine print issues, including the type and extent of restrictions;[71] and

- negotiated whether to structure the feature as a general spend versus a experiential deal type.[72]

Furthermore, contrary to Plaintiffs' effort to suggest that an AE's job is simply to replicate past deal terms, the record demonstrates that, throughout the class period, at least some AEs were asked to develop (and in fact did develop) novel deal types and creative deal structures that would increase Groupon's revenues. Ms. Dailey conceded that "our trainers introduced the idea or concept that thinking outside of the box when it came to creative deals might garner a higher amount of money[]" and that "basically creativity as far as bringing the best of the best to our Groupon customers every day was what we were told would drive our sales numbers."[73] Mr. Hall and Ms. Suh conceded that they received email instructions prompting them to come up with creative deal types and structures.[74] At times, Groupon even provided extra financial incentives and rewards for particularly creative deal types and structures.[75]

### E. Negotiation of Contract Terms.

In an attempt to demonstrate a similarity of experience as required for class treatment, and to avoid the application of the administrative exemption, Plaintiffs stake out the extreme

---

[69] App. Ex. 30, LaPlante Decl. ¶ 12; App. Ex. 31, Locklund Decl. ¶ 7; App. Ex. 36, Schuberth Decl. ¶ 9.

[70] App. Ex. 31, Locklund Decl. ¶ 7; App. Ex. 30, LaPlante Decl. ¶ 13; App. Ex. 36, Schuberth Decl. ¶ 9.

[71] App. Ex. 31, Locklund Decl. ¶ 12; App. Ex. 30, LaPlante Decl. ¶ 13; App. Ex. 29,Intal Decl. ¶ 9.

[72] App. Ex. 31, Locklund Decl. ¶ 18; App. Ex. 30, LaPlante Decl. ¶ 19; App. Ex. 28, Banfield Decl. ¶ 5.

[73] App. Ex. 2, Dailey Dep. at 126:14-127:8.

[74] App. Ex. 4, Hall Dep. at 188:16-191:8; App. Ex. 11, Suh Dep. at 67:20-68:23; *see also* App. Ex. 40, GRP00489, 2011 Sales Training Manual advising AEs to "Think Outside the Box" for deal types.

[75] App. Ex. 56, P0297, New Hire Orientation Handbook ("creative deals are HIGHLY encouraged (and we'll pay you for the most creative each month)"); App. Ex. 1, Carney Dep. 146:8-147:18.

position that AEs "have no authority to determine the terms of merchant contracts free from immediate direction of supervision."[76] Not true. ████████████████████████

██████████████████████████████████████████████████████████████████████████████

███████ ████████████████████████████████████████████████

Some of the opt-in Plaintiffs claim that, without advance blessing of their manager, they

████████████████████████████████████████████ █████████████████████████████

█████████████████████████████████████████████,[81] or that they could not

propose alternative payment terms in their discussions with merchants.[82] Indeed, they went so far as to reject the notion that they ever engaged in "negotiations" of any kind in their discussions with merchants.[83] ████████████████████████████████████████████

████████████████████████████ ██████████████████████████████████



---

[76] Plts. Mem. at 20.

[77] "Margin split" refers to the split of revenues between Groupon and the merchant from the sale of the Groupon voucher.

[78] "Credit card fees" refer to the fees, █████████████ █████ ████████████████, that credit card companies charge in connection with the customers' purchase of vouchers.

[79] "Payment terms" refers to the timing sequence by which Groupon pays merchants.

[80] App. Ex. 3, Daley Dep. at 65:15-24; App. Ex. 8, Noone Dep. at 21:4-17, 122:15-123:3; App. Ex. 10, Sprague Dep. at 79:1-8.

[81] App. Ex. 8, Noone Dep. at 23:3-13, 143:19-144:16; App. Ex. 9, Poggi Dep. at 51:5-19.

[82] App. Ex. 5, Hassey Dep. at 163:3-12.

[83] Ms. Lonze repeatedly admitted during her deposition that she had engaged in "negotiations" with merchants over a wide variety of issues. *See, e.g.* App. Ex. 7, 88:16-21, 104:21-105:21, 106:7-107:24, 121:24-122:11. DOL regulations specifically identify "negotiating" as one of the actions that constitutes the "administrative operations of a business." 29 CFR § 541.205(b). Following the deposition of Ms. Lonze (who was the first of the declarants deposed for class certification discovery), Plaintiffs' counsel began objecting to the use of the word "negotiate" in virtually any question posed to declarant deponents and these deponents began to deny that they engaged in "negotiations" with merchants.

[84] App. Ex. 29, Intal Decl. ¶ 13; App. Ex. 34, Ronalds Decl. ¶ 14; App. Ex. 31, Locklund Decl. ¶ 9; App. Ex. 30, LaPlante Decl. ¶ 14; App. Ex. 36, Schuberth Decl. ¶ 10; App. Ex. 33, Mohideen Decl. ¶ 7; App. Ex. 32, Massery Decl. ¶¶ 23, 34, 35.



One of the opt-in Plaintiffs (Ms. Lonze), admitted that at times she could ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[88] She further acknowledged that AEs

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[89] She also testified that she was not

required to obtain approval from her manager ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[90]

And for certain "event type" deals, she acknowledged the ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[91] Additionally, Ms. Hassey (an opt-in

Plaintiff) testified that in certain markets ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[92]

The declarations of the putative class members submitted by Groupon reveal that at times

various AEs had the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[85] App. Ex. 31, Locklund Decl. ¶¶ 10, 11; App. Ex. 30, LaPlante Decl. ¶ 15; App. Ex. 36, Schuberth Decl. ¶ 10; App. Ex. 33, Mohideen Decl. ¶ 8; App. Ex. 32, Massery Decl. ¶ 33; App. Ex. 28, Banfield Decl. ¶ 6.

[86] App. Ex. 30, LaPlante Decl. ¶¶ 13, 17; App. Ex. 29, Intal Decl. ¶ 8.

[87] App. Ex. 38, Wroblewski Decl. ¶ 38; App. Ex. 28, Banfield Decl. ¶ 6.

[88] App. Ex. 7, Lonze Dep. at 71:13-73:5, 76:3-15, 77:21-78:7, 78:16-22.

[89] *Id.* at 75:9-13, 80:21-81:8.

[90] *Id*. at 84:5-11; *see also* App. Ex. 31, Locklund Decl. ¶¶ 10, 11; App. Ex. 30, LaPlante Decl. ¶ 15; App. Ex. 36, Schuberth Decl. ¶ 10; App. Ex. 33, Mohideen Decl. ¶ 8; App. Ex. 32, Massery Decl. ¶ 33.

[91] App. Ex. 7, Lonze Dep. 89:18-96:12.

[92] App. Ex. 5, Hassey Dep. at 158:2-13.



.[93]  These declarations further reveal that at other times and in other markets, ████████████████████████ .[94]  The record further shows that at least certain putative class members had ████████████████████████████████████████████████ .[95]

Some putative class members had periods of time during which their contract terms had to be approved by management before being sent to the merchant, while others never experienced such a process.[96]  These differences further highlight the need for individualized proof rather than uniform class-wide treatment.  Indeed, for a substantial period, there was no DSM or City Planner approval of deals.  Rather, AEs created deals working with merchants, inserted their negotiated deal terms into the contract, sent merchants the contract, received merchant agreement, and the deal usually ran on Groupon's website.[97]

---

[93] App. Ex. 33, Mohideen Decl. ¶ 7; App. Ex. 32, Massery Decl. ¶¶ 23, 34, 35; App. Ex. 36, Schuberth Decl. ¶ 10; App. Ex. 29, Intal Decl. ¶ 13; App. Ex. 34, Ronalds Decl. ¶ 14; App. Ex. 31, Locklund Decl. ¶ 9; App. Ex. 30, LaPlante Decl. ¶ 10.

[94] App. Ex. 38, Wroblewski Decl. ¶¶ 37-38.

[95] App. Ex. 32, Massery Decl. ¶ 33; App. Ex. 33, Mohideen Decl. ¶ 8; App. Ex. 30, LaPlante Decl. ¶ 14; App. Ex. 36, Schuberth Decl. ¶ 10; App. Ex. 31, Locklund Decl. ¶¶ 10, 13; App. Ex. 29, Intal Decl. ¶ 14.

[96] App. Ex. 38, Wroblewski Decl. ¶ 36; App. Ex. 32,  Massery Decl. ¶ 23; App. Ex. 34, Ronalds Decl. ¶ 8; App. Ex. 29, Intal Decl. ¶ 8; App. Ex. 30, LaPlante Decl. ¶17; App. Ex. 36, Schuberth Decl. ¶ 11; App. Ex. 33, Mohideen Decl. ¶ 10.

[97] App. Ex. 30, LaPlante Decl. ¶ 17; App. Ex. 31, Locklund Decl. ¶ 13; App. Ex. 36, Schuberth Decl. ¶ 11; App. Ex. 29, Intal Decl. ¶¶ 13-19.

### F.     Developing Groupon's Presence in a Market.

AEs also contributed to the development of Groupon's brand through their interactions with merchants.[98]  Specifically, in sourcing quality merchants and structuring deals, AEs were expected to protect Groupon's brand.[99]  For instance, in a July 2011 email, AEs were instructed:

> If you are just closing deals to close deals, know that it is one of the most destructive things that can happen here at Groupon.  To build a great long term relationship with our subscribers and our merchants and to remain the clear market leader, we need to maintain and increase deal quality every day, every week, every month.[100]

A number of putative class members were involved in "launching" new Groupon markets during the putative class period.[101]  Job descriptions from 2010 and 2011 specified that the "*gig is all about building a market by identifying and calling on the best local businesses that make each city unique*" (emphasis added).[102]  These AEs had to build databases of merchants from scratch, requiring extensive research – a task that would necessarily impact the long term development of those markets.[103]

The experience of one putative class member, Christina Intal, highlights the considerable variance within the putative class in terms of the AE position.  Intal began her job as an AE in

---

[98] App. Ex. 29, Intal Decl. ¶ 10; App. Ex. 62, P0708-05211 (March 2011 email from Darren Schwartz asking AEs for input: "please reply to me with any product enhancements you would like to see based on your observations or your merchant's. When I say product I mean the actual site and how it works for subscribers and for merchants."); App. Ex. 63, P0708-05469 (March 2011 AEs asked to nominate merchant partners); App. Ex. 55, GRP00079928 (October 2010 email from Groupon's "Editor in Chief" asking AEs for feedback they receive from merchants on the editorial process).

[99] App. Ex. 60, P0708-04908 (email asking AEs to help with brand issues).

[100] App. Ex. 64, P0708-00579 (July 2011 email from Groupon's senior VP of sales).

[101] App. Ex. 36, Schuberth Decl. ¶ 6; App. Ex. 61, P0708-05022 (identifying Santa Barbara as launching, and two sales people who launched it); App. Ex. 59, P0708-02474 (reflect that many large markets (LA, DC, SF, NYC, Boston) did not launch until mid-2011).

[102] App. Ex. 39, GRP00152-154, GRP00145-146.

[103] App. Ex. 5, Hassey Dep. at 10:13-13:12; App. Ex. 9, Poggi Dep. at 74:6-20; App. Ex. 36, Schuberth Decl. ¶ 6; App. Ex. 33, Mohideen Decl. ¶ 4.

late 2009 when Groupon was rapidly expanding to new markets. She had just three days of training.[104] She was then assigned to "launch" the Orange County, California market, along with one other new AE.[105] They had no City Planner, City Manager, Account Manager, or DSM.[106] Intal and the other AE were soley responsible, therefore, for finding merchants, creating a pipeline of deals – which they closed without any manager's approval – and then independently scheduling those deals.[107] Once they had closed 30 or 40 deals, which took three or four months, the market became active on Groupon's website. Intal and the other AE then continued to secure commitments from the merchants and run their deals without approval from a supervisor.[108] They had no account manager, so Intal and the other AE prepared merchants for their deals to run and handled all post-deal customer service issues. Intal was not assigned a DSM until six months into her tenure, but even then her DSM did not dictate the terms of her deals.[109] She did not get a City Planner until mid-2011, who at that point took over the scheduling of deals from Intal and the other AE.[110] An account manager was assigned to her market in mid-2011, before which Intal handled all the post-deal support and after which she still continued to handle issues on an as needed basis.[111]

Unlike the "boiler room" described by Plaintiffs, certain members of the putative class also developed Groupon's market presence by making visits to their respective markets during

---

[104] App. Ex. 29, Intal Decl. ¶¶ 1, 2.

[105] *Id*. at ¶ 4.

[106] *Id*. at ¶¶ 4, 19.

[107] *Id*. at ¶¶ 6, 7.

[108] *Id.* at ¶ 13.

[109] *Id.* at ¶ 28.

[110] *Id*. at ¶ 25.

[111] *Id*. at ¶ 20.

the class period.[112]  These city visits were not just for the purpose of calling on and closing

contracts with merchants, but were also designed to promote Groupon in the market, to attend

events, to "get a better understanding of the city," to visit businesses, to take note of new

businesses to call later, and to foster better relationships with merchants.[113]

### G.  AEs' Varying Approach to the Merchant Relationship.

While certain opt-in Plaintiffs claim that they were told that the AE position was "not

relationship sales,"[114] the evidence shows that relationship building was essential to other AEs'

job duties.  Plaintiff Dailey, for instance, listed in her resumé that, as an AE at Groupon, she built

"positive rapport" with key leaders in her market, which she explained meant that she drove sales

by seeking out and building a relationship with "someone that maybe owns the major theater or

someone who loves the arts in the city or someone with a lot of pull, the mayor's office."[115]

The concept of creatively "building" merchant relationships and/or consulting with

merchants is similarly reflected in a number of the opt-in Plaintiff resumés.  For example, certain

opt-in Plaintiffs have described their job as: "building relationships with business owners…to

coordinate and develop unique Groupon features;"[116] being "responsible for building and

maintaining relationships with promoters, venues and artists on a daily basis;"[117] "maintain[ing]

---

[112] *Compare* App. Ex. 29, Intal Decl. ¶ 38 (did); App. Ex. 34, Ronalds Decl. ¶ 17 (did); App. Ex. 33, Mohideen Decl. ¶ 12 (did); *with* App. Ex. 38, Wroblewski Decl. ¶ 48 (did not); App. Ex. 32, Massery Decl. ¶ 42 (did not); App. Ex. 8, Noone Dep. at 166:19-167:2 (did not); App. Ex. 5, Hassey Dep. at 156:10-157:13 (did not); App. Ex. 2, Dailey Dep. at 90:5-7 (did not).

[113] App. Ex. 9, Poggi Dep. at 54:5-15; App. Ex. 11, Suh Dep. at 46:2-48:19; App. Ex. 4, Hall Dep. at 58:6-11; App. Ex. 7, Lonze Dep. at 156:10-157:3; App. Ex. 8, Noone Dep. at 166:19-167:2; App. Ex. 5, Hassey Dep. at 176:20-23; App. Ex. 29, Intal Decl. ¶ 38.

[114] *See* Plts. Mem. at 16.

[115] App. Ex. 2, Dailey Dep. at 92:22-93:3.

[116] App. Ex. 15, Evans LinkedIn Profile.

[117] App. Ex. 18, Keohane LinkedIn Profile.

relationship as marketing consultant with vendor post-feature;"[118] "served as an expert to merchants on deal structure and strategy that are proven models for successful achievement of desired merchant outcomes;"[119] and "consulting business owners with their marketing objectives."[120]

Furthermore, some AEs have worked with the same merchants for years, even keeping them despite changing market assignment.[121] The ability of AEs to work across markets has changed over time. In the beginning, AEs were not restricted to deals within their respective markets. Although that changed for a period of time, it recently changed once more, allowing some AEs to again pursue cross-market relationships with merchants.[122]

And once AEs get to the point of actually engaging a merchant, the manner in which they approach merchants depends on the AE's personality or style and his/her assessment of the merchant's preferences.[123] While some putative class members claim they were directed to follow a script, others deny using a script; again, the experience varies by individual AE.[124]

---

[118] App. Ex. 14, Nikki Dorough LinkedIn Profile.

[119] App. Ex. 24, Zach Renn LinkedIn Profile.

[120] App. Ex. 21, McDonnell LinkedIn Profile.

[121] App. Ex. 32, Massery Decl. ¶ 39; App. Ex. 34, Ronalds Decl. ¶ 31; App. Ex. 29, Intal Decl. ¶ 23.

[122] App. Ex. 32, Massery Decl. ¶ 14; App. Ex. 36, Schuberth Decl. ¶ 8.

[123] App. Ex. 38, Wroblewski Decl. ¶ 28; App. Ex. 40, GRP00411 (2011 Sales Training Manual).

[124] Groupon's training manual ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████ App. Ex. 41, GRP00561;
App. Ex. 38, Wroblewski Decl. ¶ 28; App. Ex. 34, Ronalds Decl. ¶ 12; App. Ex. 29, Intal Decl. ¶ 9; App. Ex. 30, LaPlante Decl. ¶ 6; App. Ex. 31, Locklund Decl. ¶ 4; App. Ex. 33, Mohideen Decl. ¶ 24; App. Ex. 32, Massery Decl. ¶ 17 ("it would be difficult to stick to a script because the conversation could go in any direction").

## H.     AEs' Participation in the Editorial Process Differs.

Plaintiffs are mistaken in their contention that the putative class as a whole had no involvement in the editorial process.[125]  While some claim that they were not involved in this activity, others expressed varying levels of involvement in the editorial process.  Like almost every aspect of this case, this is an individualized issue.  For example, putative class members have provided input on how their merchants' deals appear on the Groupon website, such as what pictures, logos, and buzzwords would be used.[126]  The level of involvement in the editorial process varies from AE to AE, and even from merchant to merchant.[127]

## I.     AEs' Varied Responsibility Regarding Scheduling of Deals.

Plaintiffs argue in their brief that AEs play no role in the scheduling of when Groupon runs deals on its website.[128]  Contrary to that blanket assertion, the record shows that some AEs have been involved in the scheduling and timing of when deals run on Groupon.  One of the opt-in Plaintiffs (Ms. Lonze) was involved in the scheduling of deals and successfully influenced the deal pipeline.[129]  During her tenure at Groupon, Ms. Lonze recognized untapped potential for both Groupon and merchants by persuading her managers to begin running deals on Saturdays in

---

[125] *See* Plts. Mem. at 18.

[126] App. Ex. 55, GRP00079928 (reminding AEs to "continue to pitch editorial & go through write-up prep exactly as we do now."); App. Ex. 38, Wroblewski Decl. ¶ 42; App. Ex. 33, Mohideen Decl. ¶ 14; App. Ex. 32, Massery Decl. ¶ 32; App. Ex. 30, LaPlante Decl. ¶ 28; App. Ex. 7, Lonze Dep. 123:19-133:10; App. Ex. 10, Sprague Dep. 139:14-21.  Suh, for example, recommended to a merchant that he should include "digital retouch images."  App. Ex. 11, Suh Dep. at 246:13-20.  Suh talked to her city planner to move one of her merchants' deals on the webpage so that those deals would be more prominently displayed.  *Id.* at 231:11-233:21.

[127] App. Ex. 38, Wroblewski Decl. ¶ 42; App. Ex. 34, Ronalds Decl. ¶ 32; App. Ex. 32, Massery Decl. ¶¶ 31, 32.

[128] Plts. Mem. at 21-22.

[129] App. Ex. 7, Lonze Dep. at 169:5-174:23; 176:9-178:1.

her market.[130]  Similarly, other putative class members – Christina Intal and Katy Schuberth – at times had responsibility for determining when particular deals ran.[131]

### J.  AEs' Involvement in Post-Deal Customer Service Issue Varies.

For varying portions of the putative class period, AEs had no "account managers," and thus AEs handled all post-deal servicing tasks.[132]  These tasks included, among other things, preparing a merchant for a deal to run (*e.g.*, voucher redemption instructions),[133] responding to tax treatment questions,[134] resolving payment or redemption disputes,[135] and addressing "customer service" issues that arise for merchants or customers buying a voucher.[136]  AEs also responded to questions posted by customers about their merchants' deals on an online discussion board.[137]  As the sole point of contact for merchants running deals with Groupon, AEs could spend varying and considerable amounts of time on these tasks.[138]

---

[130] *Id.* at 178:15-180:12.

[131] App. Ex. 36, Schuberth Decl. ¶13; App. Ex. 29, Intal Decl. ¶ 26; *see also* App. Ex. 32, Massery Decl. ¶ 27 ("my city planner would schedule the deal, with my collaboration").

[132] App. Ex. 57, P0708-00175 (announcement regarding customer service taking responsibility from AEs in July 2011, but AEs still responsive for interfacing with merchants about it); App. Ex. 33, Mohideen Decl. ¶¶ 13, 14, 19; App. Ex. 38, Wroblewski Decl. ¶ 45; App. Ex. 32, Massery Decl. ¶ 38; App. Ex. 5, Hassey Dep. at 36:4-40:17; App. Ex. 36, Schuberth Decl. ¶ 12.

[133] App. Ex. 6, Keeler Dep. at 99:2-8.

[134] App. Ex. 48, GRP00061506-61507; App. Ex. 49, GRP 00061508-61509 (February 2012 emails providing instructions to AEs on how to handle tax questions they may receive from merchants).

[135] App. Ex. 38, Wroblewski Decl. ¶¶ 44-46; App. Ex. 29, Intal Decl. ¶¶ 21, 22; App. Ex. 31, Locklund Decl. ¶ 16; App. Ex. 28, Banfield Decl. ¶ 9.

[136] App. Ex. 29, Intal Decl. ¶ 19; App. Ex. 38,Wroblewski Decl. ¶ 25.

[137] App. Ex. 43, GRP00020312 (6/28/11 Email exchange between AE and Tom McInerney re managing deal discussion boards); App. Ex. 36, Schuberth Decl. ¶ 12; App. Ex. 1, Carney Dep. at 175:4-15.

[138] App. Ex. 32, Massery Decl. ¶ 38; App. Ex. 36, Schuberth Decl. ¶ 12.

Account managers were rolled out slowly over time, by market and by account.[139]  Thus, the amount of time putative class members had no account managers varies by market.[140]  Moreover, even now, the extent to which AEs handle post-deal issues continues to vary on an individual basis.[141]  Simply put, there is no uniform way that AEs handle such concerns.

### K.    Training of AEs Has Varied.

Contrary to Plaintiffs' assertions, not all members of the putative class received the same initial training.[142]  Those hired in the beginning of the putative class period (the early days of Groupon as a company) received little, if any, formal training.  In some instances, no training manual was provided to AEs.[143]  Even among the opt-in Plaintiffs, "new hire" trainings were of different lengths.[144]  Moreover, some AEs participated in formal mentoring programs for the benefit of more junior AEs[145], while others declined to participate in these programs.[146]  Significantly, while Plaintiffs focus on an alleged uniformity of training, they simply ignore what AEs are trained to do: operate independently and approach each deal on a case-by-case basis.

---

[139] As of the Summer of 2011, only the top 30 markets had account managers.  App. Ex. 46, GRP00060654; App. Ex. 6, Keeler Dep. at 96:14-20.

[140] App. Ex. 36, Wroblewski Decl. ¶ 45; App. Ex. 32, Massery Decl. ¶ 38, App. Ex. 29, Intal Decl. ¶ 20.

[141] App. Ex. 51, GRP00063091 (Dailey email to her DSM regarding issues she had taken care of independently since merchant management had not); App. Ex. 38, Wroblewski Decl. ¶ 44; App. Ex. 32, Massery Decl. ¶ 38; App. Ex. 34, Ronalds Decl. ¶ 30; App. Ex. 29, Intal Decl. ¶¶ 21, 22; App. Ex. 6, Keeler Dep. at 178:4-21.

[142] *See* Plts. Mem. at 10.

[143] App. Ex. 29, Intal Decl. ¶ 2; App. Ex. 36, Schuberth Decl. ¶¶ 3, 4.

[144] *Compare* App. Ex. 4, Hall Dep. at 21:17-24:1; App. Ex. 11, Suh Dep. at 247:11-19; App. Ex. 8, Noone Dep. at 10:19-11:14; App. Ex. 7, Lonze Dep. at 13:1-10 (week-long training); *with* App. Ex. 5, Hassey Dep. at 137:1-24; App. Ex. 10, Sprague Dep. at 108:22-109:15; App. Ex. 3, Daley Dep. at 60:9-61:19 (two-week long training).

[145] App. Ex. 7, Lonze Dep. at 140:5-141:9; App. Ex. 8, Noone Dep. at 57:9-59:15; App. Ex. 5, Hassey Dep. at 75:5-23, 175:20-176:4.

[146] App. Ex. 10, Sprague Dep. at 141:10-13; App. Ex. 38, Wroblewski Decl. ¶ 48.

### L. AEs Work Variable Hours.

Simply put, some AEs come and go as they please, working from home when they see fit. In this regard, some teams have established their own "flex time" practice, where AEs independently determine their work schedule and hours.[147]  Nor was there any set sick or vacation time policy.  As Plaintiff Daley put it, he could take off 50 or 100 days a year if he wanted to.[148]  AEs, whose compensation includes commissions, were free to decide how many hours (if any) they worked in excess of forty hours per week.[149]  Even an AE's personal experience with respect to hours worked might vary substantially during his/her tenure.  One of the opt-in Plaintiffs (Suh) was permitted to work from remote locations for months on end.[150]

### M. AE Performance Metrics Have Varied.

Contrary to Plaintiffs' claim that all AEs are judged by the same set of performance criteria,[151] the emphasis on performance metrics has differed according to time, the directions of a particular DSM or City Planner, and the market.[152]  For example, one DSM in charge of several Florida markets instituted



.[153]

.[154] Another

---

[147] App. Ex. 32, Massery Decl. ¶ 10.

[148] App. Ex. 3, Daley Dep. at 55:7-18.

[149] App. Ex. 10, Sprague Dep. at 178:22-179:3 ("I still continued to set my own schedule"); App. Ex. 11, Suh Dep. at 147:5-19; App. Ex. 8, Noone Dep. at 70:20-72:11; App. Ex. 4, Hall Dep. at 222:2-10; App. Ex. 31, Locklund Decl. ¶ 24; App. Ex. 32, Massery Decl ¶¶ 8, 9.

[150] App. Ex. 11, Suh Dep. at 31:22-32:7

[151] Plts. Mem. at 12-13.

[152] App. Ex. 38, Wroblewski Decl. ¶ 17; App. Ex. 32, Massery Decl. ¶ 40; App. Ex. 38, Schuberth Decl. ¶ 7; App. Ex. 29, Intal Decl. ¶ 11; App. Ex. 33, Mohideen Decl. ¶ 23.

[153] App. Ex. 38, Wroblewski Decl. ¶ 19.

[154] *Id.*

DSM allowed his AEs to make up their own performance goals, as there were none in place at the time.[155]

### N. AE Survey Data.

Plaintiffs' description of the June 2011 AE survey is superficial at best.[156] In order to design the survey, Groupon's newly recruited Director of Business Operations interviewed 20 to 25 AEs about their jobs, from which he concluded that no day was typical for an AE, but instead that there existed a "great deal of variety in the work they were performing."[157] As a result of the interviews, he also hypothesized that the "new guy" AE was spending time differently than a "seasoned veteran" AE, and that there were also differences based on assigned markets, *i.e.*, small versus large and old versus new markets.[158] The survey results confirmed his observations.[159] Furthermore, the data from the survey reveals a wide range in the amount of time AEs spent on various tasks:



---

[155] App. Ex. 29, Intal Decl. ¶ 30.

[156] Plts. Mem. at 22-23.

[157] App. Ex. 6, Keeler Dep. at 9:3-6, 145:1-146:11, 177:14-178:21.

[158] *Id.* at 137:4-24.

[159] *Id.* at 137:4-138:17, 144:10-146:11.

█ ███████████████████████████████████████████

████[160].

Though Plaintiffs maintain that one of the "most important" duties for the putative class

was cold-calling, ████████████████████████████████████████

███████████████████[161] The AE survey results greatly conflict with Plaintiffs'

declarants' representations of the time spent "cold-calling" and demonstrate that plaintiffs have

exaggerated the facts. For instance, Plaintiff Suh claimed in her declaration that she spent 60-

70% of her day "cold-calling."[162] Plaintiff Suh's contemporaneously completed survey,

however, shows that she ██████████████████████████████[163]

Similarly, Plaintiff Carney's survey results indicate that he only spent ███████████████

████ as compared to his current claim of spending 70% of his day cold-calling.[164]

### O. Compensation.

███████████████████████████████████,[165] and additionally receive

commissions on their deals.[166] ████████████████████████████

█████████████████████████[167] █████████████████████

██████████████████████████████████████[168]

---

[160] App. Ex. 37, Wijekoon Decl. ¶¶ 5-10.

[161] *Id.*

[162] App. Ex. 68, Suh Dep. Ex. 29.

[163] App. Ex. 11, Suh Dep. Ex. 27.

[164] App. Ex. 66, Carney Dep. Ex. 7; App. Ex. 66, Carney Dep. Ex. 1.

[165] *See, e.g.,* App. Ex. 11, Suh Dep. at 7:16-8:3.

[166] *See, e.g.,* App. Ex. 10, Sprague Dep. at 40:3-41:4; App. Ex. 2, Dailey Dep. at 60:2-61:8, 62:5-63:1, 66:19-67:20.

[167] App. Ex. 29, Intal Decl. ¶ 41; App. Ex. 34, Ronalds Decl. ¶ 35.

[168] App. Ex. 29, Intal Decl. ¶ 41; App. Ex. 34, Ronalds Decl. ¶ 44.

Commission policies have also differed at Groupon.[169]  Moreover, at least one putative

class member had a different commission structure altogether due to her tenure at Groupon.[170]

## III.    LEGAL STANDARD

A representative action is "an exception to the usual rule that litigation is conducted by

and on behalf of the individual named parties only."  *General Tel. Co. of the SW v. Falcon*, 457

U.S. 147, 155 (1982).  Consequently, a class action may only be maintained if:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there
> are questions of law or fact common to the class; (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class; and (4) the
> representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  If the Court finds that an action has satisfied the prerequisites of Rule

23(a), the Court must additionally consider whether the class is maintainable under one or more

of the three alternatives set forth in Rule 23(b).  *See Amchem Prods., Inc. v. Windsor*, 521 U.S.

591, 614 (1997); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006).  Here, Plaintiffs

request certification under Rule 23(b)(3).

The Court must conduct a "rigorous analysis," in order to satisfy itself that the

requirements of Rule 23 have been met.  *Wal-Mart Stores Inc. v. Dukes*, 131 S. Ct. 2541, 2551

(2011).  Although the defendant may bear certain burdens of proof at trial, plaintiffs bear the

burden of proving each disputed requirement of Rule 23 certification by a preponderance of the

evidence.  *See Messner v. NorthShore Univ. HealthSystem*, 669 F.3d 802, 811 (7th Cir. 2012);

*Hardin v. Harshbarger*, 814 F. Supp. 703, 706 (N.D. Ill. 1993).

Although class certification does not rely on a final determination of the merits of the

action, the Court "must make whatever factual and legal inquiries are necessary to ensure that

---

[169] App. Ex. 50, GRP00062148; App. Ex. 58, P0708-05857.

[170] App. Ex. 47, GRP00061391 (Noting that ███████████████████████████████

████████████

requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Franks v. MKM Oil, Inc.*, No. 10 CV 00013, 2012 WL 3903782, at *3 (N.D. Ill. Sept. 7, 2012) (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *see also Dukes*, 131 S.Ct. at 2551-52.

## IV.   ARGUMENT

### A.   Plaintiffs Fail to Meet the Commonality and Predominance Requirements of Rule 23.

To fulfill the commonality requirement in Rule 23(a)(2), not only must a plaintiff show that his/her claims depend upon a common contention or question, but also that the action "is capable of class-wide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.  "Although related to Rule 23(a)'s commonality requirement, 'the predominance inquiry is far more demanding.'" *Pavone v. Aegis Lending Corp.*, No. 05-c-1529, 2006 WL 2536632, at *4 (N.D. Ill. Aug. 31, 2006) (quoting *Amchem*, 521 U.S. at 623-24)).  To satisfy the predominance requirement, "the plaintiff must show that common issues not only exist but outweigh the individual questions.  The common questions must be central to all claims.'" *Pavone*, 2006 WL 2536632, at *4 (quoting *Amchem*, 521 U.S. at 623-24).

Plaintiffs must show that each element of their claim is "*capable of proof at trial* through evidence that is common to the class rather than individual to its members." *Messner*, 669 F.3d at 818 (internal quotes omitted) (emphasis in original). Here, this cannot be done. The elements of Plaintiffs' claims cannot be proven through common evidence for each individual named and putative plaintiff, because each case will be subject to an individualized analysis of that employee's experience at Groupon.

Given the fact intensive inquiry involved in assessing the applicability of the administrative exemption, and the rigorous Rule 23 requirements, it is not surprising that none of the cases Plaintiffs cite certified a class of individuals claiming that they were improperly classified as nonexempt under the administrative exemption.[171]  Indeed, courts faced with misclassification claims have repeatedly refused to decide such cases on a class-wide basis.  *See, e.g., Hundt v. Direct Sat USA, LLC*, No. 08 C 7238, 2013 WL 3338586, at *6, 12-13 (N.D. Ill. Jul. 1, 2013) (decertifying class where "variations…require individualized determinations…"); *Hill v. R+L Carriers*, No. C 09-1907 CW, 2011 WL 830546, at *5 (N.D. Cal. Mar. 3, 2011) (decertifying class and noting that "[t]he requirements of the administrative exemption alone evince the necessity of individualized inquiries in this case."); *Spainhower v. U.S. Bank Nat'l Ass'n*, No. 2:08-CV-00137, 2010 WL 1408105, at *4 (C.D. Cal. Mar. 25, 2010) ("[in] wage and hour disputes where a defendant claims exemptions, like the administrative and outside salesperson exemptions at issue, individualized inquiries about the *actual* hours worked, percentage of exempt versus non-exempt work performed, particular job experiences, and other inquiries are critical") (emphasis in original).

---

[171] *See* Plts. Mem. at 26-27; 34, citing, *inter alia, Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 533-34 (7th Cir. 1999) (affirming employer's summary judgment of FLSA overtime claims of a *single-plaintiff* who fell within the professional and administrative exemptions); *Shaw v. Prentice Hall Computer Pub., Inc.*, 151 F.3d 640, 644 (7th Cir.1998) (affirming trial court's finding that *single-plaintiff* employee fell under the administrative exemption); *Roe-Midgett v. CC Servs., Inc.*, No. 04 CV 4051 DRH, 2006 WL 839443 (S.D. Ill. Mar. 29, 2006) *aff'd*, 512 F.3d 865 (7th Cir. 2008) (collective certified under Rule 216(b) pursuant to the *parties' stipulation*); *Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 374 (7th Cir. 2005) (affirming summary judgment determination that administrative exemption applied to plaintiffs' five different positions); *Demos v. City of Indianapolis*, 302 F.3d 698, 704 (7th Cir. 2002) (affirming employer's summary judgment on two public employees' individual FLSA overtime claims).

       1.      **Individualized Fact Inquiries Are Required To Determine If Each Account Executive's Primary Duties Were Work Directly Related To Groupon's General Business Operations.**

To assess Plaintiffs' IMWL claims, the trier of fact will ultimately be called upon to decide whether the administrative exemption applies. To that end, the trier of fact will have to determine if each AE's "primary duty consist[ed] of…[t]he performance of office or nonmanual work directly related to management policies or general business operations of his employer or the employer's customers[.]" 29 CFR § 541.2(a)(1); 820 ILCS § 105/4a(1) and (2)(E).[172] Plaintiffs do not dispute that AEs perform office or non-manual work. The ultimate merits inquiry will include a determination of whether each AE's primary duties were directly related to Groupon's business operations. 29 CFR § 541.2(a)(1). That inquiry will require an individualized assessment of the actual activities performed by each AE.

       a.      **Plaintiffs Ignore Controlling Authority Establishing that "Sales Representatives" May Perform Duties Directly Related to an Employer's General Business Operations.**

Through its Regulations, the United States Department of Labor provides interpretative guidance on the meaning of work that is "directly related to management policies or general business operations[,]" stating that it "describes those types of activities relating to the administrative operations of a business…." 29 CFR § 541.205(a). The Regulations, in turn, also define the "administrative operations of a business," and supply a non-exhaustive list of functions that qualify for the administrative exemption:

> The administrative operations of the business include the work performed by so-called white-collar employees engaged in 'servicing' a business as, for, example, advising the management,

---

[172] The IMWL applies the pre-2004 DOL Regulations in defining the administrative exemption. *See* 820 ILCS § 105/4a(2)(E). All references herein are therefore to the pre-2004 Regulations unless otherwise noted. Regardless, the 2004 Regulations did not substantially alter the administrative exemption test. *Roe-Midgett v. CC Services, Inc.*, 512 F.3d 865, 870 (7th Cir. 2008).

> planning, negotiating, representing the company, purchasing,
> promoting sales, and business research, and control.

29 CFR § 541.205(b).[173]  An employee need not perform all of these functions to qualify as

exempt.  *Verkuilen v. MediaBank, LLC*, 646 F.3d 979, 982-83 (7th Cir. 2011).

The Seventh Circuit, in *Schaefer-LaRose*, recently addressed the administrative

exemption, holding that pharmaceutical "sales representatives" performed work directly related

to the business operations of their pharmaceutical company employers, and thus the

representatives were properly classified as exempt employees.  *Schaefer-LaRose*, 679 F.3d at

562.  As a threshold matter, the Court acknowledged that its evaluation of whether the

administrative exemption applied, "requir[ed] a thorough, fact intensive analysis of the

employee's employment duties and responsibilities."  *Id.* at 572.  The Court observed that the

DOL, for more than sixty years, has held the view that the administrative operations of a

business "include the work of employees servicing the business, such as, for example, advising

the management, planning, *negotiating*, *representing the company*, *purchasing*, *promoting sales*,

and *business research* and control."  *Id.* at 574 (internal quotations and citations omitted) (some

emphasis in original; other emphasis added).

Based on its examination of the evidence regarding the duties and responsibilities of the

pharmaceutical sales representatives, and the guidance from the Regulations, the Court

concluded that the sales representatives were properly classified as exempt.  Although the

illustrations in the Regulations did not provide a "perfect description" of the work performed by

---

[173] The current Regulations state that "work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations; government relations; computer network; internet and database administration; legal and regulatory compliance; and similar activities."  29 CFR § 541.201(b) (2013).  The current regulations are "informative on the issues" and may be considered by the Court.  *Roe-Midgett*, 512 F.3d at 870.

the sales representatives, the Court determined that the examples were "sufficiently similar to suggest that the representatives' work is directly related to the general business operations of the pharmaceutical companies." *Schaefer-LaRose*, 679 F.3d at 574-75.

There are significant similarities between the sales representatives in *Shaefer-LaRose* and the AEs here. The employees at issue in *Schaefer-LaRose* had the title of "sales representatives," and their interactions with physicians were characterized as "sales calls." *Schaefer-LaRose*, 679 F.3d at 562, 563 n.6. Here, the AE position has been referred to as an Account Representative and a Sales Representative. The pharmaceutical sales representatives constituted a substantial portion of their respective company's workforce. *Id.* at 563. AEs similarly make up a substantial portion of Groupon's workforce. The pharmaceutical sales representatives received a base salary plus incentive pay based on total sales by the company in their territory. *Id.* at 568. Groupon AEs likewise receive a base salary plus commissions[174] based on the number of vouchers ultimately purchased by subscribers with whom they have no contact. The *Schaefer-LaRose* sales representatives did not actually sell pharmaceuticals to the physicians they called on, but rather sought to persuade the physicians to prescribe the pharmaceutical products offered by the representative's employer. *Schaefer-LaRose*, 679 F.3d at 562-63. Similarly, AEs do not sell Groupon's vouchers to Groupon's customers and have virtually no contact with the customers who actually purchase vouchers. Instead, they call on merchants in an effort to persuade the merchant to partner with Groupon in creating a deal featuring the merchant's goods or services on Groupon's website.

---

[174] Some of the pharmaceutical sales representatives in *Schaefer-LaRose* earned over $100,000 per year (*see id.* at 563 n.5) as is the case here with certain putative class members. As the Supreme Court explained in *Christopher, et al. v. SmithKline Beecham Corp.*, 132 S.Ct. 2156, 2173 (2012), individuals earning "more than $70,000 per year...are hardly the kind of employees that the FLSA was intended to protect."

The pharmaceutical sales representatives were the "principal ongoing representatives of the company" or main "conduit" to the prescribing physicians. *Schaefer-LaRose*, 679 F.3d at 575. AEs likewise serve as the principal representative of Groupon with respect to the merchants they call on. Although Plaintiffs simply disregard the *Schaefer-LaRose* decision, the record here reveals that the primary duties of AEs constitute the kinds of job duties that the DOL and the Seventh Circuit recognize as related to an employer's general business operations.

Just as the Seventh Circuit refused to conclude that pharmaceutical representatives were "sales" employees, notwithstanding that the employer had so-labeled them, this Court should likewise refuse to simplistically characterize AEs in this manner. Indeed, given the novel nature of Groupon's internet-based business platform, and recognizing that the internet did not even exist when the FLSA Regulations were promulgated, AEs do not fit neatly into one traditional function. One could as easily analogize some AEs to the buyers for an online store – they do not ask those whom they contact to pay Groupon, but instead ask merchants to offer their goods or services on Groupon's website so that subscribers can purchase the merchant's goods or services. *See* 29 CFR § 205(b) (identifying purchasing as an exempt function).

Alternatively, one could analogize some AEs to marketing analysts that take the initiative to help merchants effectively price their services or bundle them in creative ways, advise on the editorial presentation of a merchant's deal on the Groupon website, and/or work to promote Groupon's image when launching a new market. *See* 29 CFR § 541.201(b) (2013) (identifying marketing as an exempt function); 29 CFR § 205(b) (identifying "representing the company" as an exempt function). One could also analogize AEs to customer service managers where AEs actively assist merchants during and after the period their deals run, and work to build long-term

33

relationships with them.[175]  Ultimately, it is impossible to draw a sweeping conclusion that no

AE's "…primary duties consist of 'work directly related to management policies or general

business operations of the employer or the employer's customers.'"  *Roe-Midgett*, 512 F.3d at

871 (quoting Regulations); *see also In re Wells Fargo Home Mortgage Overtime Pay Litig.*, No.

C 06-01770 MHP, 2010 U.S. Dist. LEXIS 3132, at *28 (N.D. Cal. Jan. 12, 2010) (rejecting

plaintiffs' theory that the HMC's primary duty is a common question, because "[p]laintiff

[incorrectly] assumes that in practice all HMC's have the same primary job duty").

> **b.     Substantial Variances in AEs Actual Job Functions Preclude**
> **Class Treatment, and Instead Require Individualized Inquiries**
> **to Ascertain Each AE's Primary Duties.**

In the context of what AEs actually do, the evidence establishes significant and

substantial variations with respect to the job functions performed by AEs, which the DOL

regulations classify as the "administrative operations of a business."  That work includes:

- Whether an AE launched a particular market, and the extent of their efforts to develop the market through activities such as in-person market visits, fostering a relationship with the local chamber of commerce, and building long-term relationships with the merchants (*see* pp. 16-18);

- The degree to which an AE conducted market research through lead generating (*see* pp. 7-9);

- The degree to which an AE determined what merchant types to target, and what specific merchants to contact (*see* pp. 9-10);

- The manner in which an AE negotiated deal structures, including the extent to which they created new deal structures (*see* pp. 10-13);

- The degree to which an AE independently negotiated with merchants on contract terms, such as margin split, credit card fees, and payment terms (*see* pp. 13-16);

---

[175] *See Haywood v. North Amer. Van Lines, Inc.*, 121 F. 3d 1066, 1072 (7th Cir. 1997) (customer service coordinator properly classified as exempt); *Verkuilen*, 646 F. 3d at 982-83 (account manager acting as a "bridge" between software developers and employer's customers was properly classified as exempt under administrative exemption).

- The degree to which an AE participated in the editorial process (*see* pp. 20-21);

- The degree to which an AE influenced the scheduling of a merchant's feature deal (*see* pp. 21);

- The degree to which an AE represented Groupon in resolving customer service issues (*see* pp. 21-22); and

- The degree to which an AE participated in the training or mentoring other AEs[176] (*see* pp. 23).

The performance of these job functions falls within the categories of planning, negotiating, representing the company, purchasing, promoting sales, and business research – functions that qualify for the administrative exemption. *See* 29 CFR § 541.205(b). Variations among AEs as to their performance of the functions described above demonstrate that individualized assessments of fact are necessary to determine whether an AE's primary duty is directly related to Groupon's business operations. 29 CFR § 541.2(a)(1). Indeed, "[D]etermining exactly where the line is between administrative and pure sales jobs is not clear for every position and *must be determined on a case-by-case basis*." *DeWalt v. Greencroft Goshen, Inc.*, 902 F.Supp.2d 1127, 1134 (N.D. Ind. 2012) (emphasis added).

Moreover, the determination of an employee's "primary duty must be based on all the facts in a particular case." 29 CFR § 541.206(b); 29 CFR § 541.103. While not the sole test, the time spent on exempt work can be useful in determining primary duty. *Id.* Thus, where an employee spends more than fifty percent of his or her time performing exempt work, the Regulations indicate that it satisfies the primary duty requirement.[177] *Id.* The determination of

---

[176] *See Cruz v. Lawson Software, Inc.*, 764 F. Supp. 2d 1050, 1064 (D. Minn. 2011) (mentoring as an administrative function weighed against certification, where "[s]ome consultants mentored and coached, while others never did").

[177] Yet, an employee who does not spend more than fifty percent of his or her time on exempt work can also satisfy the primary duty requirement. 29 CFR § 541.103; *see also Dewalt*, 902 F. Supp. 2d at 1134-35 (plaintiff's primary duty was "communicating with prospects" and "even if [plaintiff's] sales tasks

how much time AEs spend performing exempt activities versus non-exempt activities is not amenable to being determined on a class wide basis given the varying degrees to which AEs perform the above-described job functions. *Hundt*, 2013 WL 3338586, at *7 (where in decertifying a class the Court explained that "…determination about each plaintiff's primary duty must be undertaken individually…").

### c. "Sales Work" Does Not Automatically Fall Outside of the Administrative Exemption.

Plaintiffs' core argument for class certification is oversimplified and rests on a flawed syllogism. Plaintiffs argue that "sales work" does not fall under the administrative exemption.[178] And according to Plaintiffs, AEs all perform the "same duties." (*Id.*). Thus, Plaintiffs reason that class certification is proper because the Court can determine whether the AEs perform "sales work" in "one stroke." (*Id.*).

Apart from the authorities discussed in sub-sections (a) and (b) *supra* at pp. 30-36, Plaintiffs' argument is also directly refuted by the preamble to the current Regulations. There, the DOL has expressly observed that it revised the proposed language for the new Regulations to address the concern that the Regulations "could be interpreted as denying the administrative exemption to any employee engaged in any sales, advertising, marketing or promotional activities." *See* 69 FR 22122-01 at 22140. Indeed, the DOL confirmed that "no such categorical change was intended, or is supported by current case law[.]" *Id.* Contrary to Plaintiffs' argument, determining the applicability of the administrative exemption cannot be made mechanically and categorically merely by labeling duties as "sales work." Moreover, "sales" work that involves advising the customer as to which services it needs, and developing long-term

---

consumed more than 50% of her work time, her primary duty was still related to [the employer's] management and directly related to its business operations").

[178] Plts. Mem. at 26.

customer relationships, is exempt, administrative work. *DeWalt*, 902 F. Supp. 2d at 1135-36. This requires individualized and fact-intensive inquiry into AEs' job duties as they are actually performed, which dooms Plaintiffs' request for class certification.

Plaintiffs' argument likewise fails to the extent it is premised on the so-called "production/administrative dichotomy." *See* 29 CFR § 541.205(a). The dichotomy is not a determinative legal test, but rather provides an analogy to help answer the ultimate question of whether an employee performs work directly related to the employer's general business operations. *Marting v. Crawford & Co.*, No. 00 C 7132, 2006 WL 681060, at *6 (N.D. Ill. Mar. 14, 2006) ("the production/administration dichotomy is neither a clear nor widely relied upon legal test"). The "typical example" of the dichotomy is "a factory setting where the 'production' employees work on the line running machines, while the administrative employees work in an office communicating with the customers and doing paperwork." *Shaw*, 151 F.3d at 644. The analogy therefore "has an industrial age genesis" which has limited utility in the "modern service-industry context." *Roe-Midgett*, 512 F.3d at 872. The limitation is particularly evident here given the novel nature of Groupon's internet-based business platform.

### d. Plaintiffs' Reliance on Common Job Titles, Descriptions, and Classifications is Entirely Unavailing.

Plaintiffs suggest that class certification is appropriate merely because AEs have common titles and job descriptions, and because Groupon uniformly classified AEs for exemption purposes.[179] These arguments are insufficient as a matter of law. Indeed, "[a]n employee's title is not controlling; courts instead must engage in a case-by-case analysis of the employee's duties and responsibilities." *Roe-Midgett*, 512 F.3d at 870; *DeWalt*, 902 F.Supp.2d at 1133 (same); 29 CFR § 541.201(b)(1) ("[a] title alone is of little or no assistance in determining" an employee's

---

[179] Plts. Mem. at 16.

"exempt or nonexempt status under the regulations…").  Common job descriptions similarly

provide an insufficient basis for class certification.  *See e.g.*, *Bunyan v. Spectrum Brands, Inc.*,

07-CV-0089-MJR, 2008 WL 2959932, at * 7 (S.D. Ill. Jul. 31, 2008) (common job descriptions

alone are insufficient to warrant class-wide treatment); *Cruz*, 764 F.Supp.2d at 1057 ("[t]he

existence of these [common] job descriptions does not eliminate the need for the Court to

conduct a detailed analysis of actual job duties").[180]

It is also well-established that the common classification of employees as exempt is an

insufficient basis for class certification, and it likewise offers Plaintiffs no support here.  *See e.g.,*

*Green*, 888 F.Supp.2d at 1099 ("merely classifying a group of employees as exempt does not

automatically qualify them as similarly situated, nor eliminate the need to make a factual

determination as to whether class members are actually performing similar duties"); *Oetinger v.*

*First Residential Mortg. Network, Inc.*, No. 3:06-CV-381-H, 2009 WL 2162963, at *4 (W.D. Ky.

Jul. 16, 2009) (same).

### 2.     Individualized Assessments Are Needed Regarding AEs' Exercise of Independent Judgment or Discretion on Matters of Significance.

The administrative exemption also requires that AEs exercise independent judgment or

discretion on matters of significance in their work at Groupon.  29 CFR § 541.2(b).[181]  While a

substantive determination of whether AEs satisfy this prong of the administrative exemption is

an issue for another day, the crux of the Court's analysis at this juncture is whether the issue can

---

[180] Plaintiffs' reliance on an "Individual Contributor Job Level Chart" offers no support.  Apart from the fact that common job descriptions do not provide a basis for certification as a matter of law, the document was simply a draft based solely on a consultant's model chart without input from AEs or their supervisors.  App. Ex. 35, Sasena Decl. ¶ 5.  Equally unavailing is the emphasis on the "clone warriors" quote which appeared in a training document for City Managers, a position that existed only briefly.  Plts. Mem. at 14.

[181] Plaintiffs' misleadingly quote Andrew Mason as stating that "Overtime is for busboys," (*See* Plts. Mem. at 1), without indicating the context, as Mr. Mason was explaining that AEs should not receive overtime because they, like engineers and unlike busboys, "use judgment."  App. Ex. 45, GRP00057988.

ultimately be decided on a class-wide basis using common evidence, or whether sufficient variation exists among members of the putative class to require assessment on a case-by-case basis. The record overwhelmingly demonstrates that the level of independent judgment or discretion afforded to and exercised by AEs varied dramatically, such that individualized assessments of fact are necessary.

The record demonstrates that no two AEs' experiences at Groupon were identical. Instead, the level of independent judgment and discretion afforded to and exercised by AEs in the performance of their jobs varied materially and was affected by such factors as the time period of employment, the particular geographic market(s) to which an AE was assigned, the Groupon product platform for which an AE had responsibility (*i.e.,* daily deals, GrouponNow, GrouponLive), the level of competition in the market from other daily deal businesses, the exercise of supervision by the AE's manager(s), and perhaps most critically, an individual AE's work ethic and approach to the job. The record unambiguously reveals the existence of wide variance with respect to the discretion exercised by AEs in connection with lead generating activities (*see* Section II(B), *supra* at pp. 7-9); the selection of merchants to partner with (*see* Section II(C), *supra* at pp. 9-10); the negotiation of deal structure terms[182] (*see* Section II(D), *supra* at pp. 10-13); the negotiation of financial contract terms (*see* Section II(E), *supra* at pp. 13-16); and the involvement of AEs in the editorial process, scheduling of deals, and handling of customer service issues (*see* Sections II(H), (I) and (J), *supra* at pp. 21-23).

Simply put, at one end of the spectrum, one AE could testify at trial that he spent hour after hour calling merchants on a list handed to him, reciting the same script, and proposing deal

---

[182] Negotiation undoubtedly constitutes the exercise of discretion. *See Haywood v. North American Van Lines, Inc*., 121 F.3d 1066 (7th Cir. 1997) (employee negotiated settlements for property damage with some latitude); *Palacio v. Progressive Ins. Co*., 244 F. Supp. 2d 1040, 1048 (C.D. Cal. 2002) ("act of negotiating itself involved the exercise of discretion and judgment").

terms specifically directed by his supervisor. Another AE could testify that in her experience at Groupon, she launched a market, analyzed the market to figure out which merchants to call, decided to promote Groupon's reputation in order to facilitate Groupon's market performance, used her own style and creativity in reaching out to the merchant and negotiating a deal, helped craft the editorial, and provided significant customer service and follow-up to the merchant to build a business relationship. Neither individual can be "representative" of the other, and Plaintiffs cannot demonstrate that the conclusion regarding the exempt classification (or lack of same) of one AE can be utilized to draw a conclusion as to the other. As discussed at length in *Schaefer-LaRose*, the determination of whether an employee exercises independent judgment and discretion is a circumstance-specific inquiry that requires a thorough, fact intensive analysis of the individual employee's actual performance of his or her duties and responsibilities. *Schaefer-LaRose,* 679 F.3d at 572.

### B. Damages Cannot Be Determined on a Class-Wide Basis.

Plaintiffs previously sought and obtained leave of this Court to withdraw their prior motion for class certification and re-file a revised brief to address certain recent decisions requiring a representative means of determining damages on a class-wide basis under Rule 23, including specifically *Espenscheid*. *See* Dkt. No. 157. Yet, Plaintiffs' revised submission fails to even mention *Espenscheid*, much less distinguish its clear application here. Nor do Plaintiffs provide any explanation as to how damages could be measured in this case on a class-wide basis using a "common methodology," as required by the Supreme Court in *Comcast*. Plaintiffs' failure to do so is a tacit acknowledgment that they, like the plaintiffs in *Espenscheid* and *Comcast*, cannot meet their burden to satisfy the Rule 23(b)(3) predominance requirement.

1.    ***Comcast* and *Espenscheid* Require That Damages Can Be Determined On a Class-Wide Basis.***

The Supreme Court in *Comcast* reversed the grant of class certification, holding that the plaintiffs' failure to provide a class-wide method for determining damages meant that individual damages calculations would inevitably overwhelm questions common to the class:

> And it is clear that, under the proper standard for evaluating certification, *respondents' model falls far short of establishing that damages are capable of measurement on a classwide basis.* Without presenting another methodology, respondents cannot show Rule 23(b)(3) predominance: *Questions of individual damage calculations will inevitably overwhelm questions common to the class.*

*Comcast*, 133 S.Ct. at 1433 (emphasis added).

In a decision rendered shortly before the *Comcast* decision, the Seventh Circuit, in *Espenscheid*, affirmed the decertification of a Rule 23 class action asserting federal and state wage and hour claims, holding that Plaintiffs could not prove damages on a class-wide basis, but rather would require highly individualized proof of damages for each putative class member. In finding that individualized inquiries were necessary, the Court explained that:

> … *For it's not as if each technician worked from 8 a.m. to 5 p.m. and was forbidden to take a lunch break and so worked a 45-hour week (unless he missed one or more days because of illness or some other reason) but was paid no overtime.* Then each technician's damages could be computed effortlessly, mechanically, from the number of days he worked each week and his hourly wage. And when *'it appear[s] that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program, so that there is no need for notice…, the district court can award that relief without terminating the class action* and leaving the class members to their own devices.' Nothing like that is possible here.

*Espenscheid*, 705 F.3d at 773 (emphasis added).

In an effort to calculate damages on a class-wide basis, plaintiffs proposed presenting the trial testimony of forty-two "representative" class members. *Espenscheid*, 705 F.3d at 774. The Seventh Circuit, however, rejected the proposed approach as plaintiffs failed to explain how the

purported "representatives" were selected. And, as the Count explained, even if by "pure happenstance," the forty-two "representatives" turned out to in fact be representative (in that their average number of unpaid or underpaid hours worked equaled the average number of hours of the entire class), the proposed sample was still insufficient to enable the calculation of damages for any class members other than those forty-two. Indeed, "[t]o extrapolate from the experience of the 42 to that of the 2,341 would require that all 2,341 have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage." *Id.* Because there was no such uniformity, calculating damages based on an average number of overtime hours worked by each class member would necessarily result in a windfall for some class members while leaving other members undercompensated. *Id*.

The Seventh Circuit also observed another complication resulting from the fact that the technicians did not have records of the time that they purportedly worked but did not report. *Id.* at 774-75. Because plaintiffs would have to reconstruct the unreported time "from memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways" unique to the individual technician, damages could not be calculated on a class-wide basis. *Id.* at 775.

In a recent decision, *Farmer v. DirectSat USA, LLC*, No. 08 CV 3962, 2013 WL 2457956, at *5 (N.D. Ill. June 6, 2013), this Court relied on *Espenscheid* to decertify a Rule 23 class alleging violations of the Illinois Minimum Wage Law and the FLSA. As in *Espenscheid*, the *Farmer* plaintiffs failed to present a common methodology for calculating class-wide damages, which thus precluded class treatment. *Id.* at *7.

### 2. Plaintiffs Have Failed to Demonstrate that Damages Can Be Determined on a Class-Wide Basis.

Plaintiffs here, like the plaintiffs in *Comcast*, *Espenscheid* and *Farmer*, have failed to provide a "common methodology" that can be used to calculate damages on a class-wide basis.

Rather, the determination of damages will require individualized proofs with respect to each class member. Like the situation in *Espenscheid*, "it's not as if each [Plaintiff] worked from 8:00 a.m. to 5:00 p.m. and was forbidden to take a lunch break and so worked a 45-hour week…." 705 F.3d at 774. There was no set company policy dictating that AEs start work at a particular time or stay at the office until a prescribed time. Nor was there a company policy or practice requiring the AEs to work a set number of hours in excess of the 40 hour work week. Rather, similar to Plaintiffs in *Espenscheid*, AEs had discretion as to how long or late they would work on a given day or week and the record reflects that even as to an individual AE, the number of hours worked varied based upon a number of factors. Given the variability in the approaches taken by AEs with respect to the hours worked, the determination of any alleged damages here will require individualized determinations resulting in over 1,000 mini-evidentiary hearings – one for each putative class member. *See also Franks*, 2013 WL 3903782, at *6 (denying class certification of claim for overtime under the IMWL where Plaintiffs failed to satisfy Rule 23's predominance requirement "because the Court would have to conduct an analysis of each individual employee, how long they worked for [the employer], and make individual calculations to determine whether they failed to receive the minimum wage or overtime pay").

Furthermore, any effort by Plaintiffs to prepare "representative" proof would not resolve this problem. Plaintiffs have proposed no method for doing so, and any such proposal would fail for the same reasons that it failed in *Espenscheid* and *Farmer* – a lack of uniformity in hours worked and a lack of individualized records to establish hours worked. *Espenscheid*, 705 F.3d at 774-75; *Farmer*, 2013 WL 2457956, at *6-7.[183] Plaintiffs have acknowledged that for most of

---

[183] Plaintiffs define "Class #2", but plainly state that it has the same factual and legal issues as Class #1. (Plts. Mem. at 24, 34.) Because Plaintiffs concede that the factual and legal issues are the same, the AEs who worked during the Class #2 period cannot be treated as a class for the same reasons as all the other AEs. Plaintiffs do not state the purpose of Class #2. If it is included because the hours were purportedly

their work experience they provided no documentation or record of the overtime allegedly worked.[184] Even during the periods where Plaintiffs supposedly tracked their overtime in a system called Ultipro, Plaintiffs have testified that it did not contain an accurate account of the time they worked.[185] Not only would a separate hearing be needed regarding each AE's hours worked, but each such hearing would also need to account for variances in that individual AE's hours over time. For example, opt-in Plaintiff Carney testified that when he recorded his hours, there were some weeks where he worked 40 or fewer hours, and other weeks where he worked 50 or more hours. There was no traceable pattern and it was not based on any direction to work that few or that many hours. He also testified that he worked differing hours during certain periods based on his assigned markets.[186] Add to this, the complexity of trying to reconstruct the hours worked when certain AEs worked from home in the evening, or when someone such as opt-in Plaintiff Suh worked from Arizona, makes the evaluation of AEs' hours worked a daunting task.[187]

"[A]s in *Espenscheid*, to calculate damages here, the hours Plaintiffs worked would need to be reconstructed from 'memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways' which were unique to the individual technician." *Farmer*, 2013 WL 2457956, at *7 (quoting *Espenscheid*, 705 F.3d at 774-75). Such a process does not satisfy the

---

recorded during that period, Plaintiffs nonetheless fail to discuss how they would model the damages during that period.

[184] App. Ex. 1, Carney Dep. at 45:4-14; App. Ex. 9, Poggi Dep. at 237:5-238:13; App. Ex. 7, Lonze Dep. at 184:5-13; App. Ex. 5, Hassey Dep. at 86:12-87:1.

[185] App. Ex. 11, Suh Dep. at 146:19-150:6; App. Ex. 9, Poggi Dep. at 237:5-238:16; App. Ex. 69, Noone Interrogatory Response ¶ 2.

[186] App. Ex. 1, Carney Dep. at 50:1-53:9.

[187] App. Ex. 11, Suh Dep. at 30:10-31:4, 36:12-24, 147:5-151:22.

predominance requirements of Rule 23(b)(3) as individualized inquires would overwhelm any common issues. *See Comcast*, 133 S.Ct. at 1432-33.

Unable to reconcile the law with the facts of this case, Plaintiffs ignore the Seventh Circuit's holding in *Espenscheid*, instead citing a recent Seventh Circuit decision, *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796 (7th Cir. 2013). However, *Butler* does not address *Espenscheid*, much less purport to overrule it. Rather, in the context of a consumer products liability class action, *Butler* explains that the fact damages are not identical across all class members should not preclude class certification where the "…damages of individual class members can be *readily* determined in individual hearings…." *Butler*, 727 F.3d at 801 (emphasis added). In that case, the Court concluded that individual damages could be easily determined, because "[t]he parties probably would agree on a schedule of damages based on the cost of fixing or replacing class members' mold-contaminated washing machines." *Id*. at 798. Here (as in *Espenscheid*), no such agreement exists and there is no schedule of damages to be made based on some fixed cost. The alleged damages here, like in *Espenscheid*, require detailed inquiries concerning the amount and frequency of overtime (if any) worked from one AE versus the next. *Espenscheid*, not *Butler*, controls here and dooms Plaintiffs' request for class certification.

In sum, any damages determinations here would be fact-intensive and individualized. Plaintiffs offer no common methodology, or for that matter, any other solution, to this problem, notwithstanding the pronouncements of the Supreme Court and Seventh Circuit.

## V.    CONCLUSION

For all the foregoing reasons, Plaintiffs' Renewed Motion for Class Certification should be denied.

Date: November 20, 2013                    Respectfully Submitted,


David K. Haase                    By: /s Richard J. Prendergast
Catherine S. Lindemann                 One of the Attorneys
LITTLER MENDELSON, P.C.                    for Defendant
321 North Clark Street, Suite 1000
Chicago, IL  60654
(312) 372-5520


Richard J. Prendergast, Esq.
Michael T. Layden, Esq.
RICHARD J. PRENDERGAST, LTD.
111 W. Washington St., Suite 1100
Chicago, Illinois  60602
(312) 641-0881