**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Ranita Dailey, John Daley II, Eric Hall, and Dominic Poggi, on behalf of themselves and all other persons similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 11 C 05685 |
| v. | ) ) | Judge Edmond E. Chang |
| Groupon, Inc., | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Ranita Dailey, John Daley II, Eric Hall, and Dominic Poggi filed this proposed class-action lawsuit against Defendant Groupon, Inc. for failing to pay them overtime compensation in alleged violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.*, and the Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.*[1] R. 96, Second Am. Compl. Plaintiffs have now moved for class certification. R. 179, Mot. Class Cert. For the reasons explained below, their class-certification motion is denied, but without prejudice to moving for certification of a class that is narrower than the currently proposed classes.

**I. Background**

Defendant Groupon is a ███████ website, ████████████ ████████████████████████████████████████████████. R. 182-3, Pls.' Exh. 1, May 2010 Sales Training Manual at GRP00548. ████████████



---

[1]The Court has subject matter jurisdiction over the FLSA claim based on 28 U.S.C. § 1331, and supplemental jurisdiction over the Illinois claim based on 28 U.S.C. § 1367.

████████████████████████████████████████████████
██████████████████████████. *Id.* The plaintiffs in this lawsuit were Account Representatives and Account Executives[2] at Groupon. R. 99, Answer ¶ 19. Account Reps are ██████████████████████████████████████ ██████ *See* May 2010 Sales Training Manual at GRP00549. ███████████ ████████████ *See id.* ██████████████████████████████████ ██████

Significantly, Groupon's method of paying Account Reps has fluctuated over time. Before March 20, 2011, and then again after August 23, 2011, Groupon classified its Account Reps as "exempt" from state and federal overtime requirements and uniformly paid all Account Reps on a salary-plus-commission basis for all the time that they worked. During these two time periods, Groupon did not pay Account Reps overtime. Answer ¶¶ 3, 8. Plaintiffs allege that they are not exempt and are entitled to overtime pay. During a five-month period—from March 20 to August 23, 2011—Groupon did classify its Account Reps as "non-exempt" and paid Account Reps overtime pay. *Id.* ¶¶ 4-5. Plaintiffs, however, believe that the method Groupon used to calculate their overtime pay during this short time period was incorrect. Groupon admits that it calculated Account Reps' overtime pay using the following equation:

$$\text{Salary} \div 2080 \text{ hours} = \text{Regular Rate of Pay}$$

$$\text{Regular Rate of Pay} \times 1.5 = \text{Overtime Rate}$$

---

[2]The parties use these labels interchangeably in their briefs. For simplicity's sake, the Court will refer to them collectively as "Account Reps."

*Id.* ¶ 5. In other words, Groupon did not include Account Reps' earned commissions when calculating Account Reps' regular rate of pay for overtime purposes. *See id.* ¶¶ 5-6. During this five-month period, Groupon required Account Reps to record their daily hours in a timekeeping system, s*ee, e.g.*, R. 180-3, Pls.' Exh. 2, Poggi Decl. ¶¶ 19, 21, but the company abandoned this timekeeping requirement in August 2011 when it decided once again to stop paying Account Reps overtime, *see, e.g.*, R. 180-2, Pls.' Exh. 2, Hall Decl. ¶¶ 23-24. Groupon notified Account Reps of this payroll change in an email on August 19, 2011. *See* R. 182-6, Pls.' Exh. 1, 8/18/11 Georgiadis Email at GRP00010872-GRP00010873; R. 180-6, Pls.' Exh. 11, Dailey Dep. at 137-38 (explaining that Account Reps received the Georgiadis email on August 19).

On the same day that Groupon notified its Account Reps that it was going to stop paying them overtime, Plaintiffs filed this lawsuit. *See* R. 1. Plaintiffs argue that all of Groupon's Account Reps are entitled to overtime pay under the FLSA and the IMWL for weeks where they claim to have worked more than forty hours. *See* Second Am. Compl. Groupon, however, believes that the Account Reps are not entitled to overtime because they fall within the "administrative exemption" under both statutes. *See* Answer at 16-17; R. 191, Def.'s Resp. Br. at 1.

Plaintiffs now move for class certification. Mot. Class Cert. They propose the following two class definitions, the first for the time period when Account Reps were not paid overtime, and the second for the five months in 2011 when they were paid overtime:

> <u>Class #1</u> – All inside Account Representatives and Account Executives employed by Defendant from August 19, 2008, through March 19, 2011, and after August 22, 2011, to the present.

> <u>Class #2</u> – All inside Account Representatives and Account Executives employed by Defendant from March 20, 2011 through August 22, 2011.

R. 181, Pls.' Br. at 24. In response, Groupon opposes class certification, arguing that individualized inquiries will predominate when determining whether Account Reps fall under the administrative exemption. Def.'s Resp. Br. at 1-4. The Court will address these arguments and the facts supporting them in more detail below.

## II. Legal Standard

Courts usually should decide the question of class certification before turning to the merits of a case. *See Wiesmueller v. Kosobucki*, 513 F.3d 784, 786-87 (7th Cir. 2008). To be entitled to class certification, a plaintiff must satisfy each requirement of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—as well as at least one of the subsections of Rule 23(b). *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 716 (7th Cir. 2012). Here, Plaintiffs are seeking money damages for both of their claims, so they must satisfy Rule 23(b)(3). *See* Fed. R. Civ. P. 23(b)(3) (requiring plaintiffs to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"). "Failure to meet any of the Rule's requirements precludes class certification." *Harper v. Sheriff of Cook Cnty.*, 581 F.3d 511, 513 (7th Cir. 2009) (quoting *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008)) (internal quotation marks omitted).

In this case, the parties' arguments only focus on two of Rule 23's requirements: commonality and predominance.[3] Rule 23(a)(2) requires that "there are questions of law or fact common to the class." To establish commonality, the class representative must demonstrate that members of the class "have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks and citation omitted). Commonality requires that all of the class members' claims "depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 2551. In *Dukes*, the Supreme Court concluded that what is most relevant to class certification "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (internal quotation marks and citation omitted).

---

[3]Groupon does not challenge that Plaintiffs can satisfy Rule 23(a)(1)'s numerosity requirement. *See* Def.'s Resp. Br. at 28-45 (discussing only commonality and predominance). Plaintiffs assert that the proposed class would include at least 1,070 Account Reps. Pls.' Br. at 25; *see* R. 180-1, Pls.' Exh. A, Werman Decl. ¶ 13 (stating that 1,070 Account Reps have received notice of the FLSA collective-action claims). And Groupon admits that it employed over 100 Account Reps during the applicable limitations period. *See* Answer ¶ 49. Thus, numerosity is likely satisfied. *See McCabe v. Crawford & Co.*, 210 F.R.D. 631, 643 (N.D. Ill. 2002) ("Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)(1).").

Because Plaintiffs have failed to meet the commonality and predominance requirements, as discussed below, the Court need not address the typicality and adequate-representation requirements under Rule 23(a)(3) and (a)(4).

Although similar to commonality, "the predominance criterion is far more demanding." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 814 (7th Cir. 2012) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)). Under Rule 23(b)(3), the plaintiff must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." The Court thus must compare the role of common issues of law and fact with the role of individual issues, including whether it would be necessary to examine individual transactions in adjudicating whether there is liability on individual claims. *See Messner*, 669 F.3d at 815; *see also Lady Di's, Inc. v. Enhanced Servs. Billing, Inc.*, 654 F.3d 728, 738 (7th Cir. 2011).

"A class may be certified only if 'the trial court is satisfied, *after a rigorous analysis*, that the prerequisites of Rule 23(a) have been satisfied.'" *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 916 (7th Cir. 2011) (emphasis in original) (quoting *Dukes*, 131 S. Ct. at 2551). The named plaintiff bears the burden of showing by a preponderance of the evidence that all of Rule 23's requirements are satisfied. *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *Messner*, 669 F.3d at 811 (7th Cir. 2012). The Court "must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified, even if those considerations overlap the merits of the case." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)); *see also Dukes*, 131 S. Ct. at 2551 (recognizing that class-

certification analysis "[f]requently . . . will entail some overlap with the merits of the plaintiff's underlying claim"). In the end, the Court has "broad discretion to determine whether certification of a class-action lawsuit is appropriate." *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 976 (7th Cir. 2011) (internal quotation marks and citation omitted).

Similar to Rule 23's class-certification requirements, section 16(b) of the FLSA permits employees (or former employees), who are similarly situated, to bring a collective action against an employer for unpaid minimum wages or overtime compensation. 29 U.S.C. § 216(b). A collective action under § 216(b) differs from a class action under Federal Rule of Civil Procedure 23 in that Rule 23 binds class members unless they opt *out* of the class, whereas collective action members are bound under § 216(b) only if they opt *in* to the action by providing their written consent. *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771 (7th Cir. 2013).

Although the Seventh Circuit has not decided this issue, "the majority of courts . . . have adopted a two-step process for determining whether an FLSA lawsuit should proceed as a collective action." *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 847 (N.D. Ill. 2008). At the first step, "[a] named plaintiff can show that the potential claimants are similarly situated by making a modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Flores v. Lifeway Foods, Inc.*, 289 F. Supp. 2d 1042, 1045 (N.D. Ill. 2003) (alteration in original) (internal quotation marks and citation omitted). At the second step, after the parties have

engaged in a substantial amount of discovery, "the court's inquiry is more stringent." *Mielke v. Laidlaw Transit, Inc.*, 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004). At the second step—where this litigation is now—the Court must consider three factors: "(1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to be individually applied to each plaintiff; and (3) fairness and procedural concerns." *Id.*

Despite the opt-out versus opt-in difference between collective actions under the FLSA and class actions under Rule 23, the Seventh Circuit has suggested that they should nevertheless be treated the same for purposes of certification. *See Espenscheid*, 705 F.3d at 772 ("[T]here isn't a good reason to have different standards for the certification of the two different types of action, and the case law has largely merged the standards, though with some terminological differences."); *see also Alvarez v. City of Chicago*, 605 F.3d 445, 449 (7th Cir. 2010) (analyzing whether "common questions predominate[d]" in a proposed FLSA collective action). It is true that the Supreme Court has not endorsed that the collective- and class-certification questions be treated the same, and the Supreme Court has even signaled a concern with that approach. *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1527 n.1 (2013) ("[W]e do note that there are significant differences between certification under [Rule] 23 and the joinder process under § 216(b).") But Seventh Circuit precedent remains binding here, so the Court will consider both the proposed collective action and class action in this case "as if it were a single class

action" and apply the Rule 23 standards to Plaintiffs' motion for both claims.[4] *Espenscheid*, 705 F.3d at 772 (treating the FLSA "collective" and the Rule 23 class as a single class and applying Rule 23's standards in evaluating a motion to decertify both claims).

## III. Analysis

In evaluating the propriety of class certification, the key issue is whether the "administrative exemption" under the FLSA and the IMWL is a sufficiently common and predominant question for the proposed classes so that certification is appropriate. *See* Pls.' Br. at 1, 28;[5] Def.'s Resp. Br. at 1. Administrative employees are exempt from the FLSA and the IMWL's overtime requirements. 29 U.S.C. § 213(a)(1); 820 ILCS 105/4a(2)(E). To qualify for the administrative exemption, an employee's "primary duty" (1) must be "[t]he performance of office or non-manual work directly related to management policies or general business operations of [the] employer or [the] employer's customers," and (2) must "customarily and regularly" involve the exercise of "discretion and independent judgment." 29 C.F.R.

---

[4]In an earlier order, the Court instructed the parties to address *both* the IMWL class claim and the FLSA collective claim. *See* R. 103, 8/2/12 Minute Entry. But neither party's current briefs address Plaintiffs' proposed *collective* action under the FLSA; instead, both parties focus only on Plaintiffs' proposed *class* action under the IMWL. The Court will assume, however, that Plaintiffs' IMWL motion is also a motion for collective action under the FLSA. In terms of efficiency, including the FLSA claim in the analysis makes sense at this point because class-certification discovery is now closed, *see* R. 171, 8/5/13 Minute Entry, and it is therefore appropriate to consider the collective action under the more stringent second-step standard, which, as the Seventh Circuit has noted, is more or less the same as Rule 23. *See Espenscheid*, 705 F.3d at 772; *Mielke*, 313 F. Supp. 2d at 762.

[5]Plaintiffs also list, as an additional common question, whether Groupon qualifies as a "retail or service establishment" for the purpose of Groupon's commission-sales-person affirmative defense. *See* Pls.' Br. at 28. Outside of this single bullet-point item, however, Plaintiffs do not develop this argument in their briefs. Because they do not provide additional argument about this asserted common question, Plaintiffs have waived this argument as an additional ground for class certification.

§ 541.2(a)(1), (b) (2003).[6] Administrative duties that are directly related to general business operations include, for example, "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control." *Schaefer-LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 574 (7th Cir. 2012) (emphasis omitted). If an employee does not fall under the administrative exemption, both statutes require employers to pay that employee one and one-half times their regular rate of pay for all hours worked beyond forty hours in one week. 29 U.S.C. § 207(a)(1); 820 ILCS 105/4a(1). Although it would be Groupon's burden to establish, on the merits, that an employee falls within this exemption, *see Roe-Midgett*, 512 F.3d at 869, it is Plaintiffs' burden at the class-certification stage to demonstrate, under Rule 23, that resolving this exemption issue on a class-wide basis is appropriate, *see Messner*, 669 F.3d at 811. Here, variations in Account Reps' actual job duties and their individualized damages claims prevent Plaintiffs from establishing commonality and predominance. The Court addresses each of these problems in turn.

## A. Job Duties

Plaintiffs' primary argument in support of class certification is that all Account Reps perform the same job duties. In support of this argument, Plaintiffs focus first on how Groupon treats and classifies its Account Reps. For example,

---

[6]The IMWL applies the pre-2004 federal Department of Labor Regulations in defining the administrative exemption. *See* 820 ILCS 105/4a(2)(E). Therefore, all references to the federal Department of Labor's Regulations are to the 2003 version of the Regulations, unless otherwise noted. *Cf. Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865, 870 (7th Cir. 2008) (noting that the 2004 Regulations did not substantively alter the administrative-exemption test).

Plaintiffs point to the uniform training that Account Reps receive, Groupon's job description for the position, and the set of performance criteria that Groupon allegedly uses to evaluate Account Reps. *See* Pls.' Br. at 10-13. But Plaintiffs rely most heavily on Groupon's uniform classification of all Account Reps as either exempt or not exempt from state and federal overtime requirements. *See id.* at 7-9; R. 204, Pls.' Reply Br. at 4. Plaintiffs argue that Groupon's policy decisions in March and August 2011—first classifying all Account Reps as non-exempt (in March) and then reclassifying them as exempt (in August)—reinforce that all Account Reps perform the same duties. As Plaintiffs points out, all Account Reps received an email from Groupon management explaining that the overtime policy change was based on Account Reps' ███████████████████ Pls.' Reply Br. at 4; *see also* 8/18/11 Georgiadis Email at GRP00010872. According to Plaintiffs, Groupon could not make this blanket policy shift, applicable to *all* Account Reps, unless all Account Reps performed the same duties. *See* Pls.' Br. at 27; *see also* Pls.' Reply Br. at 18-20.

Groupon's uniform exemption policy, however, is not dispositive. As the Seventh Circuit has held, "An employee's title is not controlling." *Roe-Midgett*, 512 F.3d at 870. Courts must still "engage in a case-by-case analysis of the employee's duties and responsibilities." *Id.* It is true that, in a wage-and-hour case, the Ninth Circuit explained that "[a]n internal policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees. This undercuts later arguments that the

employees are too diverse for uniform treatment." *See In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009). The court ultimately held, however, that even though "uniform exemption policies are relevant to the Rule 23(b)(3) analysis," it is an abuse of the district court's discretion "to rely on such policies to the near exclusion of other relevant factors touching on predominance." *See id.* at 955; *see also Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010) (agreeing that an employer's blanket exemption policy is relevant, but not determinative, in the predominance inquiry). As the Ninth Circuit concluded, "[T]he fact that an employer classifies all or most of a particular class of employees as exempt does not eliminate the need to make a factual determination as to whether class members are *actually* performing similar duties." *In re Wells Fargo*, 571 F.3d at 959 (emphasis added) (internal quotation marks and citation omitted).

Here, although Groupon's uniform exemption policy is certainly relevant, it is only one of many facts that the Court must consider in the predominance analysis. In addition to the exemption policy, the Court must still consider Account Reps' *actual* day-to-day job duties. *See Schaefer-LaRose*, 679 F.3d at 580 (explaining that the proper analysis under the FLSA is of the employee's "day-to-day duties"); *Roe-Midgett*, 512 F.3d at 870 ("An employee's title is not controlling; courts instead must engage in a case-by-case analysis of the employee's duties and responsibilities."); *see also* U.S. Dep't of Labor, *Field Operations Handbook* § 22c01(c) (2010) ("Whether a particular employee primarily performs exempt work depends on the actual duties performed.").

Turning to Account Reps' actual job duties, Plaintiffs argue that all Account Reps perform the same primary duties, all of which can be described as "sales work." Therefore, according to Plaintiffs, whether those duties place Account Reps within the administrative exemption can be determined all at once. *See* Pls.' Br. at 26, 28. In support of this argument, Plaintiffs rely heavily on the results of a June 2011 "Sales Process Survey" that Groupon asked its Account Reps to complete. *See id.* at 22-23; Pls.' Reply Br. at 14-17. Plaintiffs argue that the survey reveals that Account Reps performed ████████████████████████████ and that Account Reps spent the majority of their time ████████████████████████ Pls.' Br. at 22, 24 (internal quotation marks omitted). But the problem with this survey data is that it provides only a snapshot of the Account Reps' job duties as they were in the summer of 2011. *See id.* at 23 (explaining that ██████ Groupon's Account Reps "then employed" in June 2011 responded to the survey). Plaintiffs' proposed classes, however, would include virtually *all* Account Reps who have worked at Groupon, from all the way back in 2008 up until the present, not just Account Reps working at Groupon in the summer of 2011. *See id.* at 24. Nor did the survey ask Account Reps whether their duties had changed over the past few years, and if so, what the duties were. *See* R. 182-9, Pls.' Exh. 13, Rule 30(b)(6) Dep., Keeler Dep. Exh. 2 at GRP00060700-GRP00060714. The survey only asked about current job duties, which was the summer of 2011. *See id.*

In addition to the survey results, Plaintiffs have also submitted two dozen declarations from members of the putative class. In an attempt to demonstrate that

Account Reps' experiences at Groupon were uniform across the board, these declarations are nearly identical, with certain portions appearing verbatim in all of them.[7] *See* R. 180-2 to -4, Pls.' Exh. 2. The *entire* record presented to the Court, however, does not support the picture of Account Rep "████" that Plaintiffs try to paint. *See* Pls.' Br. at 2. Instead, as discussed below, Account Reps' job duties have varied widely over the proposed class time period depending on the particular geographic market where Account Reps were assigned and the manager that supervised the Account Reps. The types of duties that each Account Rep performed, the amount of time each Account Rep spent on a certain duty, and also the amount of independence and discretion Account Reps could exercise has varied from employee to employee. Because of these varied experiences, individualized factual and legal inquiries would be necessary to determine if each Account Rep's "primary dut[ies]" involved work directly related to Groupon's general business operations and also whether Account Reps customarily and regularly exercised "discretion and independent judgment." *See* 29 C.F.R. § 541.2(a)(1), (b).

First, the record contains varying reports about how much time Account Reps spend "cold-calling" businesses every day. Some Account Reps spend upwards of

---

[7]Groupon argues that these declarations are repeatedly contradicted by other evidence in the record. *See* Def.'s Resp. Br. at 3, 11-12, 26. As one example, Groupon points out that the declarants' own resumes often contradict their declarations. *Compare, e.g.*, R. 180-3, Pls.' Exh. 2, Noone Decl. ¶ 17 ("I also had no responsibility for planning long or short term sales goals for markets or customers to which I was assigned to sell."), *with* R. 192-22, Def.'s Exh. 22, Noone Resume ████████████████████████████████████████ ████████████████████████████████████████████████████). Although it is true that these inconsistencies might present impeachment problems for Plaintiffs if the class were certified, descriptions of job responsibilities in resumes are bullet-point summaries and not dispositive on whether class certification is appropriate.

70% to 90% of their time each day on cold-calling. *See, e.g.*, R. 180-2, Pls.' Exh. 2, Carney Decl. ¶ 8 (70%); R. 180-3, Pls.' Exh. 2. Moscardelli Decl. ¶ 8 (85%-90%). Other Account Reps, however, spend significantly less time cold-calling, sometimes as little as ████████ each workday. *See* R. 192-37, Def.'s Exh. 37, Wijekoon Decl. ¶ 7 (████████████████████████████████████████████ ███████████████████████████). Even though the Court could analyze whether, as a matter of law, cold-calling is a duty "directly related to . . . [Groupon's] general business operations," this variation in the amount of time Account Reps spend on cold-calling affects whether class certification is appropriate because it is the employee's *primary* duty that counts for purposes of the administrative exemption. *See* 29 C.F.R. § 541.2(a). In other words, Plaintiffs must show that Account Reps not only had common duties, but also common *primary* duties. For example, even if two Account Reps perform the same limited set of duties, one Account Rep's primary duty may place her in the exempt category, while the other Account Rep's primary duty may place her in the non-exempt category. Evaluating these individualized variations in how Account Reps primarily spend their time would therefore predominate over the common question of whether cold-calling as a duty was a sales duty or an administrative duty.[8]

On top of the wide range of time that Account Reps spend cold-calling business, performance metrics varied amongst Account Reps, and in turn, that is evidence of variation in job duties (on the idea that performance metrics are a

---

[8]Other duties on which Account Reps have spent varying amounts of time include editorial responsibilities, scheduling deals, and post-deal customer service. *See* Def.'s Resp. Br. at 21-23.

reflection of job duties). Some managers required Account Reps to make at least 50 cold-calls per day, *see, e.g.*, Carney Decl. ¶ 8, while another required 100 calls each day, *see* R. 180-2, Pls.' Exh. 2, Kukuy Decl. ¶ 9. Some managers required a certain number of "solid" calls (calls that lasted at least two minutes), *see* R. 180-2, Pls.' Exh. 2, Kotars Decl. ¶ 9; R. 180-2, Pls.' Exh. 2, Letellier Decl. ¶ 9, and another required Account Reps to have 120 minutes of "talk time" each day, regardless of how many individual calls they made, *see* R. 180-4, Pls.' Exh. 2, Suh Decl. ¶ 9. Finally, one Account Rep explained that ███████████████████████████ ███████████████ *See* R. 192-29, Def.'s Exh. 29, Intal Decl. ¶ 30; *see also* R. 192-32, Def.'s Exh. 32, Massery Decl. ¶ 40 (████████████████████████████ ████████████████████).

In addition to variations in how much time Account Reps spend on a particular duty, the record also reveals that there are variations in how much "discretion and independent judgment" Account Reps can exercise. *See* 29 C.F.R. § 541.2(b). Again, this is relevant for class-certification purposes, because even if two Account Reps had the same primary job duty, one Account Rep might be exempt if she could exercise discretion and independent judgment when performing that duty, whereas the other might be non-exempt because she did not have that kind of leeway. If there was no common policy governing how closely Account Reps were supervised, then this individualized issue would predominate the analysis.

One area of variability concerns how much discretion Account Reps have during contract negotiations with businesses. Plaintiffs argue that Account Reps,

across the board, have never had the authority to determine the terms of any contracts without immediate direction or supervision. Pls.' Br. at 20-22. But here again, the record demonstrates that Account Reps' ability to independently negotiate contract terms with businesses has varied widely, depending on the time period, the market, and the manager. For example, some putative class members claim that they could not deviate from a ███████████████████████ ████████ *See, e.g.*, R. 192-5, Def.'s Exh. 5, Hassey Dep. at 28 (█████████████ █████████████████████████████); R. 192-8, Def.'s Exh. 8, Noone Dep. at 21; R. 192-10, Def.'s Exh. 10, Sprague Dep. at 79. ██████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████ *See, e.g.*, R. 192-31, Def.'s Exh. 31, Locklund Decl. ¶¶ 8-13; R. 192-36, Def.'s Exh. 36, Schuberth Decl. ¶¶ 10-11. ████████████████████████████████████ *See, e.g.*, R. 192-7, Def.'s Exh. 7, Lonze Dep. at 75-76. Analyzing these varying amounts of discretion would predominate over questions common to all Account Reps.

Despite these variations, some of the Account Reps' job duties have become more uniform as Groupon has implemented company-wide management policies over time. The amount of discretion Account Reps can exercise during contract negotiations is one example. One Account Rep explained ██████████████ ████████████████████████████████████████████████████████████ ████████████████ *See* Intal Decl. ¶ 8. But in mid-2011, that changed. As the same

---

[9]"Margin split" refers to the split of the revenues between Groupon and the business from the sale of a Groupon voucher to a customer. *See* R. 192-30, Def.'s Exh. 30, LaPlante Decl. ¶ 16.

Account Rep reported, ██████████████████████████████████████████

███████████████████████ *Id.* ¶¶ 25, 33; *see also* LaPlante Decl. ¶¶ 19, 21

(██████████████████████████████████████████████████

██████████████████████████████████); Schuberth Decl. ¶ 18

(same).

A similar change that impacted how much discretion Account Reps can exercise involves how Account Reps select businesses to cold-call. Early on, ████

████████████████████████████████████████████████

██████████████████████████████████. *See, e.g.,*

LaPlante Decl. ¶ 8; Schuberth Decl. ¶ 8 ("████████████████████

██████████████████████████). ████████████████████

██████████████████████. *See* LaPlante Decl. ¶ 22; Locklund Decl.

¶ 19; Schuberth Decl. ¶ 20. Under that system, ███████████████████

████████████████████████████████████████████████

██████████████████ *See* LaPlante Decl. ¶ 22; Locklund Decl. ¶ 19; Schuberth

Decl. ¶ 20. As Groupon management training materials during this time period

explained, ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ R. 182, Pls.' Exh. 1, City Management

Handbook at GRP00195, GRP00215 (dated Aug. 19, 2011). Ultimately, this new

system limited Account Reps' discretion in selecting businesses.

Another job duty that has evolved over time has been performing market research, known at Groupon as ██████████████ *See* Locklund Decl. ¶ 6 (████████████████████████████). In Groupon's early years, and particularly in new markets, ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████ *See, e.g.*, Hassey Dep. at 11-16; R. 192-33, Def.'s Exh. 33, Mohideen Decl. ¶ 4. One Account Rep, for example, ██████████████████████████

████████████████████████████████ ¶ 6.

Plaintiff Daley similarly explained that ██████████████████████

██████████████ R. 192-3, Def.'s Exh. 3, Daley Dep. at 331-32. Over time, however, Account Reps reported that ██████████████████████

██████████████ *See, e.g.*, Lonze Dep. at 32; Noone Dep. at 159-60.

Plaintiff Poggi, for example, ██████████████████████████

████████████████ R. 192-9, Def.'s Exh. 9, Poggi Dep. at 93-94.

████████████████████████████████████████

██████████████ *Id.* ████████████████████

████████████████████████████████████████

██████████████ *Id.* at 98. Ultimately, ██████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████ . *See* R. 192-28, Def.'s Exh.

28, Banfield Decl. ¶ 4; LaPlante Decl. ¶ 31; Locklund Decl. ¶ 21; R. 192-38, Def.'s Exh. 38, Wroblewski Decl. ¶ 13.

In short, Plaintiffs are in fact correct to point out that Groupon *eventually* systematized its processes for supervising Account Reps, ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. It is true that these types of company-wide management policies could create enough commonality to support class certification. *See Ross v. RBS Citizens, N.A.*, 667 F.3d 900, 909-10 (7th Cir. 2012) (explaining that "slight variations" in employees' duties would not preclude class certification when there is a "company-wide policy" requiring employees to perform non-exempt work); *In re Wells Fargo*, 571 F.3d at 959 (recognizing that a "centralized . . . corporate policy would be highly relevant to the predominance analysis"); *Haschak v. Fox & Hound Rest. Grp.*, No. 10 C 8023, 2012 WL 5509617, at *3-4 (N.D. Ill. Nov. 14, 2012) (holding that the plaintiffs satisfied the commonality and predominance requirements by identifying a company-wide policy that applied to all employees). In fact, the implementation of these company-wide management policies could serve as markers for defining a smaller class or sub-classes.[10] But Plaintiffs' current proposed classes do not target the time periods

---

[10]It is true, as Groupon points out, that Account Reps' job duties were still not identical after Groupon implemented these management policies. ████████████████████ ████████████, *see, e.g.*, Schuberth Decl. ¶ 20, and ████████████ ████████████, *see, e.g.*, Banfield Decl. ¶ 4; R. 192-34, Def.'s Exh. 34, Ronalds Decl. ¶¶ 23-24. But there does seem to be substantial commonality in management policies governing Account Reps starting in August 2011. These exemptions

when these systems were in place. Instead, for three years in Class 1 (2008 to 2011) and for all of Class 2, there is no evidence in the record that Groupon had any company-wide management policies that it systematically applied to Account Reps spanning the applicable time periods. Instead, during this early time period, Account Reps had a wide range of experiences in their day-to-day job duties.

In sum, Account Reps' individualized experiences and job duties demonstrate that Plaintiffs have failed to satisfy both the commonality and predominance requirements. Commonality is not satisfied because Plaintiffs will not be able to establish "in one stroke" whether the administrative exemption covers its Account Reps. *Dukes*, 131 S. Ct. at 2551. For the same reason, predominance is not satisfied. Because a company-wide policy managing Account Reps did not exist until late 2011, individualized inquiries will predominate when determining whether members of Plaintiffs' proposed classes fell within the administrative exemption. The Court therefore denies Plaintiffs' motion for class certification. This denial, however, is without prejudice, leaving open the possibility that Plaintiffs may renew their motion with more refined class definitions.[11] For example, ████████████ ████████████████████████, and that potentially is a start-time for

are not so sensitive to changes in supervisors or the daily whims of a trusted employee that an employee can float in and out of exempt status, even when a company has taken steps to systematically oversee a group of employees. Although the Court will not definitively decide here, without the benefit of the parties' briefing and argument, whether these company-wide policies provide enough consistency to support class certification, the Court recognizes that a company-wide policy could be enforced with enough regularity that there would exist common questions of law and fact and that those common questions would predominate.

[11]If Plaintiffs renew their class-certification motion, they should make clear that the motion is also for an FLSA collective action. The renewed motion should also re-address all of Rule 23's requirements, even though Defendants challenged only two of those requirements in response to Plaintiffs' current motion.

a class period, going forward to the present (assuming the system, or some other company-wide policy, is still in place).

## B. Damages

Even if Plaintiffs could establish that common questions predominated on the issue of liability, individualized damages issues provide an alternative basis for denying Plaintiffs' motion to certify the specific proposed classes. On the issue of calculating damages, the parties' positions are at opposite ends of the spectrum. Plaintiffs, on the one end, argue that individualized hearings on damages are *never* a problem. *See* Pls.' Reply Br. at 24-26. At the other end, Groupon argues that individualized damages issues are *always* a problem. *See* Def.'s Resp. Br. at 41-42. Neither parties' extreme position is correct.

Plaintiffs rely primarily on *Butler v. Sears, Roebuck & Co.*, 727 F.3d 796 (7th Cir. 2013), to support their position that individualized damages issues do not preclude class certification. *See* Pls.' Br. at 32. But the damages inquiries that the Seventh Circuit evaluated in *Butler* are categorically different from the damages issues in this lawsuit. In *Butler*, consumers brought class-action breach-of-warranty claims against a washing-machine manufacturer, alleging that the machines either had a defect that caused mold or a defect in the control unit that caused the machines to stop inopportunely. 727 F.3d at 797. Considering the issue of damages, the Seventh Circuit held that certification of both classes (the mold class and the control-unit class) was appropriate. *Id.* at 797-98, 801-02. *Butler* explained that Rule 23(b)(3) does not require that "every member of the class have identical

damages." *Id.* at 801. Instead, even when damages are not identical across all class members, class certification can still be appropriate "[i]f the issues of liability are genuinely common issues" *and* if "the damages of individual class members *can be readily determined* in individual hearings, in settlement negotiations, or by creation of subclasses." *Id.* (emphasis added). In *Butler*, the class members' damages could be "readily determined" because the parties could either agree on a schedule of damages based on the cost of fixing or replacing class members' washing machines or create subclasses that accounted for differences in machine design or differences in states' laws. *See id.* at 798-99. In contrast, Plaintiffs here propose no method for calculating their individualized damages other than having hundreds, or even thousands, of individualized hearings.

Because Plaintiffs offer no alternatives for how to calculate class members' damages, the Seventh Circuit's opinion in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013), is more on point. In a case much more factually analogous to this one, *Espenscheid* affirmed the decertification of a class asserting federal and state wage-and-hour claims. *Id.* at 777. Decertification was appropriate because the plaintiffs' trial plan did not present a feasible way of determining the plaintiffs' damages; instead, calculating damages would have "require[d] 2341 separate evidentiary hearings." *Id.* at 773. These individualized inquiries were required because the employees varied in how much they worked and how they recorded their time. *Id.* As the Seventh Circuit noted, "[I]t's not as if each [employee] worked from 8 a.m. to 5 p.m. and was forbidden to take a lunch break and so worked a 45-

hour week (unless he missed one or more days because of illness or some other reason) but was paid no overtime." *Id.* If that had been the case, the Court reasoned, "each [employee's] damages could be computed effortlessly, mechanically, from the number of days he worked each week and his hourly wage." *Id.* But a formulaic calculation of damages was not possible in *Espencheid*, over 2,000 "separate hearings loomed," and class treatment was therefore not appropriate. *Id.* at 775.

But individualized damages questions did *not* automatically thwart class certification in *Espenscheid*, as Groupon suggests. Instead, the Seventh Circuit went on to identify other expeditious ways of calculating damages, even in scenarios where damages may be individualized. *See id.* (noting that settlements "with the aid of a special master," bifurcated liability and damages trials, and narrower subclasses could alleviate individualized damages issues). The problem for the *Espenscheid* plaintiffs, though, was that they rejected the proposals that the district court offered and they failed to offer any feasible alternatives for calculating damages. *See id.* at 773-76 (rejecting plaintiffs' proposal of presenting testimony from forty-two "representative" members of the class because class counsel could not explain how these "representatives" were chosen). That left the plaintiffs back in the position of having to reconstruct their unreported work time "from memory, inferred from the particulars of the jobs the [employees] did, or estimated in other ways" unique to each employee. *Id.* at 775.

Like in *Espenscheid*, individualized damages issues also defeat Plaintiffs' class-certification motion, at least as to the currently proposed classes. ████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████ *See, e.g.*, Intal Decl. ¶¶ 34-35; Locklund Decl. ¶¶ 23-24. ████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ *See* R. 192-11, Def.'s Exh. 11, Suh Dep. at 140, 150-51. Instead, ████████████ ████████████████████████████████████████████████████████████, *see, e.g.*, Sprague Dep. at 178-79; Massery Decl. ¶¶ 8-10, and ████████████████ ██████████████████████████████████████████, *see, e.g.*, Hassey Dep. at 86-87; Lonze Dep. at 184. And even from March to August 2011, ████████████ ██████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████████████. *See* Poggi Dep. at 237 (████████████████████████████████████████████████████████ ████); Suh Dep. at 146 (████████████████████████████████████████████████ ██████████████████████████). In short, because there is no company-wide policy on work hours and because the Account Reps do not have accurate records of the time that they worked, Account Reps would have to recreate from memory the hours that they worked or estimate their overtime in ways unique to each Account Rep. And because Plaintiffs propose no alternative method of addressing these individualized damages issues, class certification, as in *Espenscheid*, is not appropriate.[12] This

---

[12]Plaintiffs state in their reply brief that "Rule 23(c)(4) permits liability-only class certification, and will often be the sensible way to proceed." Pls.' Reply Br. at 26 (internal

problem too might be fixable, if Plaintiffs renew their motion for a narrower time period or propose some alternative method (as explained in *Espenscheid*) that would avoid thousands of damages hearings.

Finally, had Plaintiffs just been seeking injunctive or declaratory relief, they would have obviated all of these individualized damages problems. Then, the only issue would have been whether Groupon acted lawfully under federal and state wage-and-hour laws. *See Espenscheid*, 705 F.3d at 773. But although Plaintiffs requested injunctive relief for their IMWL claim in their complaint, *see* Second Am. Compl. ¶ 62(D), they never mention injunctive relief in their briefs and they do not request certification under Rule 23(b)(2). Instead, Plaintiffs, through their proposed class action, seek only damages under Rule 23(b)(3). In sum, the Account Reps' individualized damages issues provide an alternative basis for denying Plaintiffs' class-certification motion.[13]

## IV. Conclusion

For the reasons discussed above, Plaintiffs' motion for class certification [R. 179] is denied, but without prejudice as explained in the opinion. If Plaintiffs wish to file a renewed motion, they must do so by September 23, 2014. The August 27, 2014 status hearing is reset to September 24, 2014 at 9 a.m. If Plaintiffs do not

quotation marks and citations omitted). But Plaintiffs do not elaborate beyond this brief point and do not specify whether they are proposing liability-only certification.

[13]If Plaintiffs file a renewed motion, they should address their specific proposal for calculating damages, bearing in mind that the parties' current extreme positions are rejected. Plaintiffs should also provide an estimate of Account Reps' average damages. This estimate will help the Court evaluate whether class treatment is the most efficient way of resolving Plaintiffs' wage-and-hour claims. *See Butler*, 727 F.3d at 801 (recognizing that the class members' individual damages claims impact whether a class action is more likely to "yield substantial economies in litigation").

renew their class-certification motion by the deadline above, the parties should be prepared to discuss at that status hearing how to move forward with Plaintiffs' individual claims.

ENTERED:

<u>      s/Edmond E. Chang    </u>
Honorable Edmond E. Chang
United States District Judge

DATE: August 27, 2014